UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, FOR OUR FUTURE, and ALEX TITCOMB,<br><br>*Plaintiffs.*<br><br>v.<br><br>WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; and AARON M. FREY, in his official capacity as Attorney General of Maine,<br><br>*Defendants.* | Case No. 24-cv-_____<br><br>**COMPLAINT**<br><br>DECLARATORY AND INJUNCTIVE RELIEF SOUGHT |

INTRODUCTION

Political campaigns matter to everyone. All Americans, not just those running for office, have a fundamental First Amendment right to talk about political campaigns. Their "independent expenditures," payments that fund political expression by those who are *not* running for office but nonetheless have something to say about a campaign, are a vital feature of our democracy.

Maine's just-enacted "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" suppresses this classic method of speech and association in a manner that has been unanimously rejected by every circuit court to decide the issue. It limits contributions to a political action committee ("PAC") for the purpose of making independent expenditures, 21-A M.R.S. §§ 1015(2-C), 1015(2-D); requires the disclosure of all donors to PACs which make independent expenditures, *id.* § 1019-B(4); and mandates that independent expenditures by PACs only be made from funds raised subject to the contribution limits, *id.* § 1019-B(6). But plaintiff Dinner Table Action and its donors have the right to speak about other people's campaigns without limit, and to associate with each other for those purposes, privately.

There is no argument supporting the Act's validity under existing law. *See Citizens United v. FEC*, 558 U.S. 310 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (*en banc*). Rather, the Act's proponents designed it to prompt a test case, intended to reach the U.S. Supreme Court in the hopes of reversing *Citizens United*. Because the Act is patently (indeed, designedly) unconstitutional, this Court must enjoin it to secure Plaintiffs' fundamental rights.

JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 over this action arising out of the First and Fourteenth Amendments to the United States Constitution; and under 42 U.S.C. § 1983, because it involves a deprivation of rights secured by the Constitution.

2. Venue lies in this Court 28 U.S.C. § 1391 because all defendants reside in this judicial district, and the events giving rise to these claims occurred and are occurring here.

THE PARTIES

3. Plaintiff Dinner Table Action is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits. Dinner Table Action seeks to provide a voice for Mainers who believed in advancing limited government, free enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates. Dinner Table Action makes independent expenditures under 21-A M.R.S. § 1019-B.

4. Plaintiff For Our Future is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits. For Our Future seeks to advance conservative causes and candidates. For Our Future makes independent expenditures under 21-A M.R.S. § 1019-B, and contributes to other PACs for the purpose of those PACs making independent expenditures.

5. Plaintiff Alexander Titcomb is the co-founder, principal officer, a primary fundraiser, and Executive Director of Dinner Table Action.

6. Plaintiff Titcomb is also the founder, principal officer, and the primary fundraiser for For Our Future.

7. Defendant William J. Schneider is sued in his official capacity as the Chairman of the Maine Commission on Governmental Ethics and Election Practices, an independent state agency that (1) administers Maine's campaign finance laws, the Maine Clean Election Act, and the state's lobbying disclosure law, and (2) issues advisory opinions and conducts investigations regarding legislative ethics.

8. Defendant David R. Hastings III is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

9. Defendant Sarah E. LeClaire is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

10. Defendant Dennis Marble is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

11. Defendant Beth N. Ahearn is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

12. Defendant Aaron M. Frey is sued in his official capacity as Attorney General of Maine.

STATEMENT OF FACTS

*The preexisting regulatory scheme*

13. Maine law defines a "political action committee"("PAC") as "[a]ny separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate too political office," or "[a]ny person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office." *See* 21-A M.R.S. § 1052(5)(A)(1) and (5).

14. In any election, PACs as well as individuals may not contribute over $1950 to a gubernatorial candidate, over $475 to a legislative candidate, over $575 to a municipal candidate,

or over $975 to any other candidate, adjusted for inflation every two years commencing December 1, 2024. 21-A M.R.S. §§ 1015(1) and (2-B).

15. A person or political action committee who knowingly makes or accepts an unlawful contribution commits a Class E crime. 21-A M.R.S. § 1004(1). Such violations are punishable by up to six months' imprisonment, 17-A M.R.S. § 1604(1)(E), and by fines of up to $1,000 for individuals, *id.* § 1704(5), and $10,000 for organizations, *id.* § 1705(5).

16. Additionally, "[a] person that accepts or makes a contribution that exceeds the limitations . . . may be assessed a penalty of no more than the amount by which the contribution exceeded the limitation." 21-A M.R.S. § 1004-A(2).

17. The Commission has the power to "collect the full amount of any penalty . . ." 21-A M.R.S. §1004-B. "[F]ailure to pay the full amount of any penalty assessed by the commission . . . is a civil violation by the candidate, treasurer, party committee, political action committee, or other person." *Id.*

18. The penalized party generally has 30 days to pay the full amount of the penalty. *Id.*

19. If the penalized party fails to pay the penalty within 30 days, the Commission "shall report to the Attorney General the name of any person who has failed to pay the full amount of any penalty . . ." *Id.*

20. The Attorney General "shall enforce the violation in a civil action to collect the full outstanding amount of the penalty. . ." *Id.*

#17687042v2

*The Citizens Initiative*

21. A citizens' initiative entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act") appeared as Question 1 on Maine's November 5, 2024 election ballot, and was approved.

22. Per Article IV, Part Third, Section 19 of the Maine Constitution, the Governor must proclaim election results within ten days of the vote's certification. Legislation enacted by ballot initiative is effective 30 days following such proclamation. The vote on Question 1 was certified on or about November 25, 2024, and the Governor's proclamation followed the same day. Accordingly, the Act will take effect on or about December 25, 2024.

23. The Fiscal Impact Statement prepared by the Office of Fiscal and Program Review assembled by the Maine Secretary of State that appeared in the Maine Citizen's Guide to the Referendum Election of Tuesday, November 5, 2004 correctly noted: "As federal appeals courts have held that limits on contributions to political action committees that engage only in making independent expenditures violate free speech protections, it is possible that if this initiative becomes law the Commission could be a defendant in constitutional challenges by the parties impacted."

24. Section 1 of the Act, codified as 21-A M.R.S. § 1015(2)(C), imposes a limit of $5,000 per year for contributions made by an individual to a PAC for the purpose of making an independent expenditure.

25. Section 2 of the Act, codified as 21-A M.R.S. § 1015(2)(D), imposes a limit of $5,000 per year for contributions made by each PAC or business entity to a PAC for the purpose of making an independent expenditure.

#17687042v2

26. Sections 3 of the Act amends 21-A M.R.S. § 1019-B(4)(B) to require any person, party committee, or PAC that makes any independent expenditure exceeding $250 to file reports itemizing the total contributions from each of their contributors.

27. Section 4 of the Act, codified as 21-A M.R.S. 1019-B(6), provides that PACs may only make independent expenditures from funds received subject to the contribution limits for independent expenditures, and to keep an account of all such contributions.

*The Act's Impact
on Plaintiffs' speech and association rights*

28. Dinner Table Action raised over $489,880 during the 2022 election cycle—a historic amount for a political action committee in Maine.

29. During the 2024 cycle, Dinner Table Action has raised over $454,000.

30. Over one-third of the value of donations Dinner Table Actions has received thus far in 2024 have been from individuals or entities that have donated in excess of $5,000 in a calendar year.

31. In 2022, the top five individual donors to Dinner Table Action each contributed more than $10,000.00, while the Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to Dinner Table Action.

32. In 2023, Dinner Table Action was subject to a short-lived law that restricted the amount of funds it could raise. The law was quickly repealed after Dinner Table Action sued. Nevertheless, Dinner Table Action still received three individual contributions in excess of $5,000 that year.

33. In 2024, the top six donors to Dinner Table Action each contributed more than $5,000.

34. So far in 2024, Dinner Table Action has raised $291,215.42 in donations for independent expenditures, $168,655 of which came from the top six donors.

35. More than half of Dinner Table Action's receipts for independent expenditures in 2024 came from these six donors.

36. In 2024, Dinner Table Action made over $375,000 in independent expenditures in Maine elections in support of or opposition to candidates for office across the state, including to send mailers, postcards, and hand- written letters; purchase radio and digital advertisements; pay for phone calls and text messages; and to organize door knocking and events.

37. Dinner Table Action regularly receives contributions of less than $50 from individual contributors.

38. Under prior Maine law, the identity of such contributors was not required to be reported.

39. For reasons personal to them, multiple contributors have indicated to Plaintiff Titcomb that they would not contribute to Dinner Table Action if their identities would be publicly disclosed.

40. Because the Act does not contain a threshold below which the identity of a contributor will not be disclosed, at least some of these contributors will stop contributing to Dinner Table Action.

41. Going forward, several donors will contribute over $5,000 per year to Dinner Table Action for the purposes of having Dinner Table Action make independent expenditures, and Dinner Table Action will spend that money make similar expenditures as it has in the past, and to also potentially purchase newspaper and print advertisements.

42. One such donor is Plaintiff For Our Future.

43. For Our Future donated over $230,000 to other PACs in 2024, including $100,000 to Dinner Table Action, for the recipients to use for independent expenditures.

44. For Our Future will contribute in excess of $5,000 to Dinner Table Action per year for the purpose of independent expenditures in each of the next several years.

45. The Act would severely impair Dinner Table Action's ability to successfully and fully communicate its election-related views, and severely impair Dinner Table Action's ability to associate with its donors, including Plaintiff For Our Future and its donors, as it limits the amount of money that Dinner Table Action has available to speak by limiting and dissuading contributions. It limits Dinner Table Action donors' abilities to associate with each other in making independent expenditures.

46. For Our Future also contributes in excess of $5,000 per year to other Maine PACs for the purpose of the recipient making independent expenditures.

47. For instance, in 2024, For Our Future contributed more than $5,000 to Women's Leadership Fund, Fight for Freedom, and Free Maine Campaign.

48. For Our Future intends to make contributions in excess of $5,000 annually to these or other Maine PACs for the purpose of independent expenditures perpetually into the future.

49. The Act will severely impair For Our Future' ability to associate with the PACs to which it contributes, including Plaintiff Dinner Table Action, and with other donors, as it limits the amount of money that For Our Future can contribute to other PACs for use in making independent expenditures.

50. For Our Future receives donations in excess of $5,000 for the purpose of making independent expenditures.

#17687042v2

51. For example, a single contributor contributed well in excess of $5,000 to For Our Future for the purpose of making independent expenditures in each year that For Our Future has existed and is expected to do so again in future years.

52. In 2024, For Our Future made independent expenditures supporting or opposing several candidates for office in Maine. It intends to do so perpetually into the future.

53. Because For Our Future has been exclusively funded by donations in excess of $5,000, the Act will cripple For Our Future's ability to receive anywhere near the level of contributions it currently receives, which in turn would all but eliminate its ability to make independent expenditures or contributions for independent expenditures, thereby stifling its ability to successfully and fully communicate its election related views, and to associate with others for the purpose of making their election related views known.

54. Section 4 of the Act requires a PAC to segregate funds received for independent expenditures and permits a PAC to spend only those funds received in compliance with the Act on independent expenditures. This requirement is based on the date the expenditure is made, not the date that it was received. Accordingly, funds held by a PAC now that were contributions of more than $5,000 will not be permitted to be spent for independent expenditures once the Act takes effect.

55. Dinner Table Action still has on hand over $30,000 available for independent expenditures; $27,224.80 of which is part of a $50,000 contribution from For Our Future made on October 7, 2024.

56. Dinner Table Action raised funds and made independent expenditure in support of local candidates in "off year" elections in the past, and intends to do so again in 2025. Dinner Table Action intends to keep soliciting and accepting contributions exceeding $5,000 for the

purpose of making independent expenditures, and it intends to spend its cash-on-hand already raised in amounts exceeding $5,000, after the Act's effective date. Dinner Table Action will make these independent expenditures to express itself about local races in 2025, and in further campaigns indefinitely going forward as it has done for years.

57. For Our Future has approximately $40,000 on hand, all of which was received from a single contributor. For Our Future intends to use most of these funds to either make independent expenditures or to contribute to other PACs for the purpose of those PACs making independent expenditures in Maine.

58. Thus, Plaintiffs are adversely impacted by the Act.

COUNT I
CONTRIBUTION AND EXPENDITURE LIMITS
RIGHTS OF FREE SPEECH AND ASSOCIATION
U.S. CONST. AMENDS. I, XIV — 42 U.S.C. § 1983

59. Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 above.

60. The First Amendment protects both political association and political expression. The Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon v. FEC*, 572 U.S. 185, 191–92 (2014) (plurality opinion). Furthermore, "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) (internal quotes omitted).

61. Laws that limit the amount of money a person may give to a political action committee for the purpose of making independent expenditures intrude upon both of those First Amendment interests and infringe on the rights of contributors, as well as on the rights of advocacy groups and the people who operate them.

62. Government-imposed limits on political contributions must be closely drawn to match a sufficiently important interest. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam).

63. The only governmental interest that can justify limiting political contributions is an interest in preventing quid pro quo corruption or the appearance thereof.

64. Because, by definition, independent expenditures are not coordinated with a candidate, there is no risk of quid pro quo corruption to justify any restriction on contributions for the purpose of making independent expenditures.

65. The Act's limitations on contributions that PACs may receive from individuals, other committees, and business entities for the purpose of making independent expenditures, 21-A M.R.S. §§ 1015(2-C) and (2-D), and its corresponding expenditure restriction, 21-A M.R.S. § 1019-B(6), are not closely drawn to any sufficiently important governmental interest, and thus violate Dinner Table Action's and For Our Future's First Amendment rights to free speech and association, on their face and as applied to the contributions for independent expenditures that Plaintiffs Dinner Table Action and For Our Future would accept from individuals, other committees, and "business entities," including contributions for independent expenditures Dinner Table Action would accept from For Our Future.

66. The Act's contribution limits violate For Our Future's First Amendment rights to free speech and association, on their face and as-applied to the contributions that Plaintiff For Our Future would make to Dinner Table Action and/or to other committees for the purpose of making independent expenditures.

67. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the rights of free speech and association in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs are damaged

#17687042v2

in violation of 42 U.S.C. § 1983 and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against the enforcement of Defendants' unconstitutional policies and practices under and owing to the Act.

68. Plaintiffs are also entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT II
DISCLOSURE REQUIREMENTS
RIGHTS OF FREE SPEECH AND ASSOCIATION
U.S. CONST. AMENDS. I, XIV — 42 U.S.C. § 1983

69. Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 above.

70. The Act's amendment of 21-A M.R.S. § 1019-B(4)(B) adds a requirement that PACs disclose to the Commission the total contributions from each contributor for independent expenditures.

71. Section 1019-B(4)(B) applies to all contributions for independent expenditures, no matter how small.

72. Section 1019-B(4)(B) is not necessary to prevent quid pro quo corruption.

73. Section 1019-B(4)(B) is overly burdensome because it contains no threshold below which disclosure of contributions are not required.

74. Section 1019-B(4)(B) chills speech and associational rights of individuals who wish to remain anonymous.

75. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the rights of free speech and association in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983 and, therefore, they are entitled to declaratory and preliminary

and permanent injunctive relief against the enforcement of Defendants' unconstitutional policies and practices under and owing to the Act.

76. Plaintiffs are also entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT III
EQUAL PROTECTION
U.S. CONST. AMEND. XIV — 42 U.S.C. § 1983

77. Plaintiffs reallege and incorporate by reference paragraphs 1-58.

78. The Fourteenth Amendment secures Plaintiffs' right to the equal protection of the law. The right to equal protection is most salient with respect to the exercise of fundamental rights, including the speech and associational rights protected by the First Amendment.

79. Maine allows for "party committees" under 21-A M.R.S. § 1013-A(3), which can make independent expenditures, *id.* § 1019-B(1). However, party committees are excluded from the definition of "political action committees." *See* 21-A M.R.S. § 1052(5)(B)(3). Accordingly, party committees are not subject to the Act's contribution limits.

80. PACs are similarly situated to party committees. Both make independent expenditures. Yet the Act treats them unequally with respect to contribution limits, based solely on a party committee being associated with a state, district, country or municipal party.

81. This unequal treatment places PACs at a significant competitive disadvantage relative to party committees in the ability to express themselves and associate with others. It tilts the political system in favor of entrenched party leadership, who can continue to raise and spend unlimited funds from unlimited sources in party committees, and against those who may pursue competing political visions.

82. The PAC restrictions also violate nearly every Mainer's right to equal protection because, unlike those who are in party leadership, they cannot fund, direct, or maintain a PAC free of contribution limits. The fund-raising restrictions penalize outsiders by hobbling their abilities to participate in the political process through PACs.

83. Limiting PACs' ability to make independent expenditures entrenches power within political parties.

84. For instance, a candidate who falls out of favor with party leadership might face a primary challenger backed by a party committee, with its unlimited fundraising potential. The disfavored candidate would be at a significant disadvantage because a PAC that would want to support the candidate would have strict limits on fundraising for independent expenditures.

85. No legitimate state interest, let alone a compelling or even important one, justifies such discrimination against PACs and those who would contribute to and otherwise associate with them.

86. Nor is such discrimination a least restrictive, narrowly tailored, direct, proportionate, or rational means of advancing any legitimate state interest.

87. The discrimination is simultaneously over- and underinclusive.

88. It is overinclusive because the restrictions are not necessary.

89. It is underinclusive because any legitimate public interest theoretically served by limiting the ability of PACs to raise funds for the purpose of making independent expenditures cannot be valid so long as party committees, run by political party leaders, are excluded from those limits.

90. The Act's contribution limits and corresponding accounting burdens violate Dinner Table Action's and For Our Future's Fourteenth Amendment right to equal protection, on

their face and as-applied to the contributions that Plaintiffs Dinner Table Action and For Our Future would accept from individuals, other committees, and business entities for the purpose of making independent expenditures, including Dinner Table Action's ability to accept such contributions from For Our Future.

91. The Act's contribution limits violate For Our Future's Fourteenth Amendment right to equal protection, on their face and as-applied to the contributions that Plaintiff For Our Future would make to Dinner Table Action and to other committees for the purpose of making independent expenditures.

92. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the right to equal protection in violation of the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983, and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Dinner Table Action, For Our Future, and Alex Titcomb request that judgment be entered in their favor and against Defendants as follows:

    A.    Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Act, on its face and as against Plaintiffs;

    B.    Declaratory relief consistent with the injunction;

    C.    Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

- 17 -

    D.    Any other relief this Court may grant in its discretion.

Dated: December 13, 2024

Respectfully submitted,

*/s/ Joshua Dunlap*
Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
207-791-1350
jdunlap@pierceatwood.com
*Counsel of Record for Plaintiffs*

and

Charles Miller*
(**pro hac vice* to be submitted)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, DC 20036
202-301-9800
cmiller@ifs.org
*Counsel for Plaintiffs*

#17687042v2