# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, et al.,<br><br>*Plaintiffs.*<br><br>v.<br><br>WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices, et al.<br><br>*Defendants.* | Case No. 24-cv-00430-KFW<br>Magistrate Judge Karen Frink Wolf |

## MOTION FOR PERMANENT INJUNCTION
## WITH INCORPORATED MEMORANDUM OF LAW

#17770765v2

NOW COMES Plaintiffs Dinner Table Action, For Our Future, and Alex Titcomb and hereby moves this Court, pursuant to Fed. R. Civ. P. 65, for entry of a permanent injunction preventing Defendants William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn, in their official capacities as members of the Maine Commission on Governmental Ethics and Election Practices, and Aaron M. Frey, in his official capacity as Attorney General for the State of Maine, from implementing the "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" (the "Act"). The Act strikes at the heart of the First Amendment by severely limiting political speech. Given the burden imposed by the Act on this fundamental right, the Court should enjoin its enforcement.[1]

## INTRODUCTION

The First Amendment bars limits on contributions to entities making independent political expenditures. Every federal court of appeals to consider the question has so held, without a single dissent. The Supreme Court has approvingly acknowledged this uniform conclusion.

The reasoning is simple: Because independent expenditures cannot be limited, then neither can contributions for independent expenditures. This is because (1) a donor can make unlimited expenditures in its own name; and (2) donating to an entity that makes an independent expenditure is an additional step removed from a candidate than a direct independent expenditure. Thus, there is even less chance of the donation being the source of quid pro quo corruption than a direct expenditure, where the risk has already been adjudged by the Supreme Court to be zero.

Maine's just-enacted "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" suppresses this classic method of speech and association. It

---

[1] The Parties previously agreed that the Court advance the trial on the merits and consolidate it with the hearing on this motion, while the Defendants agreed not to enforce the Act through May, 2025, obviating any need for a preliminary injunction. Accordingly, Plaintiffs seek a final judgment on the merits.

1

limits contributions to a political action committee ("PAC") for the purpose of making independent expenditures, 21-A M.R.S. §§ 1015(2-C), 1015(2-D); requires the disclosure of all donors to PACs which make independent expenditures, *id.* § 1019-B(4); and mandates that independent expenditures by PACs only be made from funds raised subject to the contribution limits, *id.* § 1019-B(6). But plaintiff Dinner Table Action and its donors have the right to speak about other people's campaigns without limit, and to associate with each other for those purposes, privately.

This conclusion is dictated by the First Amendment as explained in *Citizens United v. FEC*. 558 U.S. 310 (2010). The proponents of the initiative underlying the Act recognize this. They admittedly drafted the Act to prompt a test case, with the hopes the Supreme Court might overrule *Citizens United*. Their effort is misguided. Not only has every appellate court found this issue to be controlled by *Citizens United*, but the Supreme Court has approvingly cited the lead case holding such limits on contributions unconstitutional, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (*en banc*), in *McCutcheon v. FEC*, 572 U.S. 185, 193 n.2 (2014) (plurality opinion).

The Act is designedly unconstitutional under *Citizens United* and its progeny. The Act must be enjoined to secure Plaintiffs' fundamental rights to Free Speech.

**FACTS**

Political campaigns matter to everyone. All Americans, not just those running for office, have a fundamental First Amendment right to talk about political campaigns. Their "independent expenditures," payments that fund political expression by those who are *not* running for office but nonetheless have something to say about a campaign, are a vital feature of our democracy.

Plaintiff Dinner Table Action is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits. Titcomb Dec. ¶ 8. Dinner Table Action seeks to provide a voice for Mainers who believe in advancing limited government, free

enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates. *Id*. ¶ 9. Dinner Table Action makes independent expenditures under 21-A M.R.S. § 1019-B. *Id*. ¶ 10. For Our Future is a political action committee formed under Maine law and is subject to the challenged fundraising limits. *Id*. ¶ 11. For Our Future seeks to advance conservative causes and candidates. *Id*. ¶ 12. For Our Future makes independent expenditures under 21-A M.R.S. § 1019-B, and contributes to other PACs for the purpose of those PACs making independent expenditures. *Id*. ¶ 13. Plaintiff Alexander Titcomb is the co-founder, principal officer, a primary fundraiser, and Executive Director of Dinner Table Action. *Id*. ¶ 14. Plaintiff Titcomb is also the founder, principal officer, and the primary fundraiser for For Our Future. *Id*. ¶ 15.

Maine law defines a "political action committee"("PAC") as "[a]ny separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate too political office," or "[a]ny person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office." *See* 21-A M.R.S. § 1052(5)(A)(1) and (5).

In any election, PACs and individuals may not contribute over $1,950 to a gubernatorial candidate, over $475 to a legislative candidate, over $575 to a municipal candidate, or over $975 to any other candidate, adjusted for inflation every two years commencing December 1, 2024. *See* 21-A M.R.S. §§ 1015(1) and (2-B).

3

*The Citizens Initiative*

A citizens' initiative entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act") appeared as Question 1 on Maine's November 5, 2024 election ballot, and was approved. Under Maine law, the Act would have taken effect on or about December 25, 2024. However, the State agreed to forego enforcing the Act through May 30, 2025 to provide the Court with an opportunity to resolve this case.

Section 1 of the Act, codified as 21-A M.R.S. § 1015(2)(C), imposes a limit of $5,000 per year for contributions made by an individual to a PAC for the purpose of making an independent expenditure. Section 2 of the Act, codified as 21-A M.R.S. § 1015(2)(D), imposes a limit of $5,000 per year for contributions made by each PAC or business entity to a PAC for the purpose of making an independent expenditure. Sections 3 of the Act amends 21-A M.R.S. § 1019-B(4)(B) to require any person, party committee, or PAC that makes any independent expenditure exceeding $250 to file reports itemizing the total contributions from each of their contributors. Section 4 of the Act, codified as 21-A M.R.S. 1019-B(6), mandates that PACs may only make independent expenditures from funds received within these limits, and to keep an account of all such contributions.

*Potential Criminal and Civil Liability*

A person or PAC who knowingly makes or accepts an unlawful contribution, including under the Act, commits a Class E crime. 21-A M.R.S. § 1004(1). Such violations are punishable by up to six months' imprisonment, 17-A M.R.S. § 1604(1)(E), and by fines of up to $1,000 for individuals, *id.* § 1704(5), and $10,000 for organizations, *id.* § 1705(5).

Additionally, "[a] person that accepts or makes a contribution that exceeds the limitations . . . may be assessed a penalty of no more than the amount by which the contribution exceeded the limitation." 21-A M.R.S. § 1004-A(2). The Commission has the power to "collect the full amount of any penalty . . ." *Id.* §1004-B. "[F]ailure to pay the full amount of any penalty assessed by the

4

commission . . . is a civil violation by the candidate, treasurer, party committee, political action committee, or other person." *Id.* The penalized party generally has 30 days to pay the full amount of the penalty. *Id.* If the penalized party fails to pay the penalty within 30 days, the Commission "shall report to the Attorney General the name of any person who has failed to pay the full amount of any penalty . . ." *Id.* The Attorney General "shall enforce the violation in a civil action to collect the full outstanding amount of the penalty . . ." *Id.*

*The Act's Impact
on Plaintiffs' Speech and Association Rights*

Dinner Table Action raised over $489,880 during the 2022 election cycle—a historic amount for a political action committee in Maine. Titcomb Dec. ¶ 16. During the 2024 cycle, Dinner Table Action raised over $454,000. *Id*. ¶ 17. Over one-third of the value of donations Dinner Table Actions received in 2024 were from individuals or entities that donated in excess of $5,000 that year. *Id*. ¶ 18.

In 2022, the top five individual donors to Dinner Table Action each contributed more than $10,000.00. *Id*. ¶ 19. Additionally, the Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to Dinner Table Action. *Id*. ¶ 20. In 2023, Dinner Table Action was subject to a short-lived law that restricted the amount of funds it could raise. The law was quickly repealed after Dinner Table Action sued. *Id*. ¶ 21. Nevertheless, Dinner Table Action still received three individual contributions in excess of $5,000 that year. *Id*. ¶ 22.

In 2024, the top six donors to Dinner Table Action each contributed more than $5,000. *Id*. ¶ 23. Dinner Table Action raised $291,215.42 in donations for independent expenditures, $168,655 of which came from the top six donors. *Id*. ¶ 24. More than half of Dinner Table Action's receipts for independent expenditures in 2024 came from these six donors. *Id*. ¶ 25.

#17770765v2

In 2024, Dinner Table Action made over $375,000 in independent expenditures in Maine elections to send mailers, postcards, and hand-written letters; purchase digital advertisements; pay for phone calls and text messages, and to organize door knocking and events, in support of or opposition to candidates for office across the state. *Id*. ¶ 26.

Dinner Table Action regularly receives contributions of less than $50 from individual contributors. *Id*. ¶ 27. Maine law previously did not require the identity of such contributors to be reported. For reasons personal to them, multiple contributors have indicated to Plaintiff Titcomb that they would not contribute to Dinner Table Action if their identities would be publicly disclosed. *Id*. ¶ 28. Because the Act does not contain a threshold below which the identity of a contributor will not be disclosed, at least some of these contributors will stop contributing to Dinner Table Action. *Id*. ¶ 29.

Going forward, several donors will contribute over $5,000 per year to Dinner Table Action for the purposes of having Dinner Table Action make independent expenditures, and Dinner Table Action will spend that money to make similar expenditures as it has in the past, and to also potentially purchase newspaper and print advertisements. *Id*. ¶¶ 30-31 One such donor is Plaintiff For Our Future. *Id*. ¶ 32.

For Our Future donated over $230,000 to other PACs in 2024, including $100,000 to Dinner Table Action, for the recipients to use for independent expenditures. *Id*. ¶ 33. For Our Future will contribute in excess of $5,000 to Dinner Table Action per year for the purpose of independent expenditures in each of the next several years. *Id*. ¶ 34. The Act would severely impair Dinner Table Action's ability to successfully and fully communicate its election related views, and severely impair Dinner Table Action's ability to associate with its donors, including Plaintiff For Our Future and its donors, as it limits the amount of money that Dinner Table Action has available

to speak by limiting and dissuading contributions. *Id*. ¶ 35. It limits Dinner Table Action donors' abilities to associate with each other by limiting the amount of speech they can share via independent expenditures. *Id*. ¶ 36.

For Our Future also contributes in excess of $5,000 per year to other Maine PACs for the purpose of the recipient making independent expenditures. *Id*. ¶ 37. For instance, in 2024, For Our Future contributed more than $5,000 to Women's Leadership Fund, Fight for Freedom, and Free Maine Campaign. *Id*. ¶ 38. For Our Future intends to make contributions in excess of $5,000 annually to these or other Maine PACs for the purpose of independent expenditures perpetually into the future. *Id*. ¶ 39.  The Act will severely impair For Our Future' ability to associate with the PACs to which it contributes, including Plaintiff Dinner Table Action, and with other donors, as it limits the amount of money that For Our Future can contribute to other PACs for use in making independent expenditures. *Id*. ¶ 40.

For Our Future receives donations in excess of $5,000 for the purpose of making independent expenditures. *Id*. ¶ 41. For example, a single contributor contributed well in excess of $5,000 to For Our Future for the purpose of making independent expenditures in each year that For Our Future has existed and is expected to do so again in future years. *Id*. ¶ 42. In 2024, For Our Future made independent expenditures supporting or opposing several candidates for office in Maine. *Id*. ¶ 43. It intends to do so perpetually into the future. *Id*. ¶ 44.

Because For Our Future has been exclusively funded by donations in excess of $5,000, the Act will cripple For Our Future's ability to receive anywhere near the level of contributions it currently receives, which in turn would all but eliminate its ability to make independent expenditures or contributions for independent expenditures, thereby stifling its ability to

7

successfully and fully communicate its election related views, and to associate with others for the purpose of making their election related views known. *Id*. ¶ 45.

Section 4 of the Act requires a PAC to segregate funds received for independent expenditures and permits a PAC to spend only those funds received in compliance with the Act on independent expenditures. This requirement is based on the date the expenditure is made, not the date that it was received. Accordingly, funds held by a PAC now that were contributions of more than $5,000 will not be permitted to be spent for independent expenditures once the Act takes effect. Dinner Table Action still has on hand over $30,000 available for independent expenditures; $27,224.80 of which is part of a $50,000 contribution from For Our Future made on October 7, 2024. *Id*. ¶ 46.

Dinner Table Action raised funds and made independent expenditures in support of local candidates in "off year" elections in the past, and intends to do so again in 2025. *Id*. ¶ 47. Dinner Table Action intends to keep soliciting and accepting contributions exceeding $5,000 for the purpose of making independent expenditures, and it intends to spend its cash-on-hand already raised in amounts exceeding $5,000, after the Act's effective date. *Id*. ¶ 48. Dinner Table Action would make these independent expenditures to express itself about local races in 2025, and in further campaigns indefinitely going forward as it has done for years. *Id*. ¶ 49. However, Dinner Table Action will refrain from doing all these things while the law is in effect so as to be in compliance with all laws, and avoid potential civil and criminal liability for itself and those with whom it associates. *Id*. ¶ 50.

For Our Future has approximately $20,000 on hand, all of which was received from a single contributor. *Id*. ¶ 51. For Our Future intends to use most of these funds to either make independent expenditures or to contribute to other PACs for the purpose of those PACs making independent

expenditures in Maine. *Id.* ¶ 52. However, so long as the Act remains in effect, For Our Future will refrain from doing all these things so that it, and those with whom it would associate remain in compliance with all laws and avoid potential civil and criminal liability. *Id.* ¶ 53.

## ARGUMENT

**I.**     **Limits on Contribution for Independent Expenditures Violate the Rights of Free Speech and Association.**

The First Amendment protects both political association and political expression. The Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon*, 572 U.S. at 191–92 (plurality opinion). Furthermore, "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) (internal quotes omitted).

Laws that limit the amount of money a person may give to a political action committee for the purpose of making independent expenditures intrude upon both of those First Amendment interests and infringe on the rights of contributors, the rights of advocacy groups, and the people who operate them. Government-imposed limits on political contributions must be closely drawn to match a sufficiently important interest. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam).

The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). Because, by definition, independent expenditures are not coordinated with a candidate, there is no risk of quid pro quo corruption to justify any restriction on contributions for the purpose of making independent expenditures. *Citizens United*, 558 U.S. at 357 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.")

9

Three months after *Citizens United* was decided, the *en banc* Court of Appeals for the District of Columbia squarely addressed the same issue raised here and found *Citizens United* to be controlling. "In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." *SpeechNow.org*, 599 F.3d at 694. "The Court has effectively held that there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'" *Id*. at 694-695. As Justice Blackmun had previously explained, "[C]ontributions to a committee that makes only independent expenditures pose no such threat [of actual or potential corruption]." *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (Blackmun, J concurring).

Because there is no legitimate government interest in limiting political contributions absent the risk of quid pro corruption, the D.C. Circuit did not decide which standard of review applies, holding that "[n]o matter which standard of review governs . . . the limits on contributions to [an independent expenditure group] cannot stand." *SpeechNow.org*, 599 F.3d at 696.

The Second, Fourth, Fifth, Seventh, Eighth, Ninth and Tenth Circuits have all followed suit. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (holding a law unconstitutional to the extent it limited the "use of the contributions . . . for independent expenditures"); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008) (independent expenditure groups are "furthest removed" from candidates); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 537-40 (5th Cir. 2013) (holding limiting contributions to independent expenditure groups to be "incompatible with the First Amendment"); *Wisc. Right to Life State PAC v. Barland*, 664 F.3d 139, 155 (7th Cir. 2011) (holding a contribution limit unconstitutional as applied to independent expenditure committees); *Free & Fair Election Fund*

*v. Mo. Ethics Comm'n,* 903 F.3d 759, 766 (8th Cir. 2018) ("A State does not have a sufficiently important interest in preventing contributions to a PAC that makes only independent expenditures"); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010) ("[C]ontributions … for use as independent expenditures [do not] raise the specter of corruption or the appearance thereof."); *Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013) (holding that independent committees "may receive unlimited contributions for independent expenditures"). All eight circuits to consider the issue have agreed. The courts have noted how remarkable the uniform agreement is: "Few contested legal questions are answered so consistently by so many courts and judges." *Walsh*, 733 F.3d at 489. Every federal appellate judge who considered the issue concluded limitations on independent-expenditure contributions are unconstitutional. This Court should do likewise.

The most recent court to address the issue stated the reason well. "There is no logical rationale for limiting contributions to independent expenditure groups. If anything, contributions to such groups are more attenuated from the possibility of quid pro quo corruption than the expenditures themselves. There is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Alaska Pub. Offices Comm'n v. Patrick*, 494 P.3d 53, 58 (Alaska 2021).

The Supreme Court has approvingly cited *Speechnow.org.* "The base and aggregate limits govern contributions to traditional PACs, but not to independent expenditure PACs." *McCutcheon*, 572 U.S. at 193 n.2 (citing *SpeechNow.org*, 599 F.3d at 696). While this statement was dictum, "federal [ ] courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings." *McCoy v. Mass. Ins. of Tech*., 950 F.2d 13, 19 (1st Cir. 1991). This dictum is consistent with the Supreme Court's holding that where independent expenditures are

11

concerned, "[t]he candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011). In short, *Citizens United* controls this case, which the Supreme Court recognized with its tacit approval of *SpeechNow.org*.

The Act's limitations on independent expenditures contributions to PACs, 21-A M.R.S. §§ 1015(2-C) and (2-D), and its corresponding expenditure restriction, *id.* § 1019-B(6), are not closely drawn to any sufficiently important governmental interest. Thus, they violate Plaintiffs' First Amendment rights to free speech and association on their face, and as applied to the contributions for independent expenditures that Plaintiffs Dinner Table Action and For Our Future would accept from individuals, other committees, and "business entities," including contributions from For Our Future to Dinner Table Action.

These same limits violate For Our Future's First Amendment rights as a contributor of such donations, on their face and as-applied to the contributions that Plaintiff For Our Future would make to Dinner Table Action and other committees for the purpose of making independent expenditures.

II.     **The Act is Underinclusive and Violates Equal Protection.**

Alternatively, even if this Court were to find that *Citizens United, SpeechNow.org* and their progeny do not control and are not persuasive, the Act must still fail because it violates both the First Amendment and the Fourteenth Amendment right to equal protection by being underinclusive. Under the First Amendment, "a law cannot be regarded as protecting an interest of the highest order, and thus justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172

12

(2015). Further, the Fourteenth Amendment right to equal protection is most salient with respect to the exercise of fundamental rights, including the speech and associational rights protected by the First Amendment. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.")

The Act violates the Fourteenth Amendment's equal protection guarantee. Maine allows for "party committees" under 21-A M.R.S. § 1013-A(3), which can make independent expenditures, *id.* § 1019-B(1). However, party committees are excluded from the definition of "political action committees." *See id*. § 1052(5)(B)(3). Accordingly, party committees are not subject to the Act's contribution limits. PACs are similarly situated to party committees. Both receive contributions and make independent expenditures. Yet, the Act treats them unequally with respect to contribution limits, based solely on a party committee being associated with a state, district, country or municipal party.

This unequal treatment places PACs at a significant competitive disadvantage relative to party committees in the ability to express themselves and associate with others. It tilts the political system in favor of entrenched party leadership, who can continue to raise and spend unlimited funds from unlimited sources in party committees, and against those who may pursue competing political visions.

The PAC restrictions violate nearly every Mainer's right to equal protection because—unlike those who are in party leadership—they cannot fund, direct, or maintain a PAC free of contribution limits. The fund-raising restrictions penalize outsiders by hobbling their abilities to

13

associate with likeminded individuals in the political process through PACs to bring about changes insiders do not want.

Limiting PACs' ability to make independent expenditures entrenches power within political parties. For instance, a candidate who falls out of favor with party leadership might face a primary challenger backed by a party committee, with its unlimited fundraising potential. The disfavored candidate would be at a significant disadvantage because a supportive PAC would have strict limits on fundraising for independent expenditures. The party-supported candidate could have unlimited support from a party committee, which has no fundraising limits.

This differential treatment is also fatal under the First Amendment. "[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP*, 357 U.S. at 460-461. No legitimate state interest, let alone a compelling or even important one, justifies such discrimination against PACs and those who would contribute to and otherwise associate with them.

The discriminatory nature of the Act renders the Act underinclusive because any legitimate public interest theoretically served by limiting the ability of PACs to raise funds for independent expenditures cannot be valid so long as party committees, run by political party insiders, are excluded from those limits. Insiders have no restrictions, but outsiders do. Thus, the Act leaves a glaring exception for certain (favored) individuals to make contributions that are otherwise banned because of their allegedly corrupting effects. "The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which [ ] is alone enough to defeat it [because] [u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

The Act's contribution limits and corresponding accounting burdens are underinclusive under the First Amendment and simultaneously violate Dinner Table Action's and For Our Future's Fourteenth Amendment right to equal protection on their face, and as-applied to the contributions that Plaintiffs Dinner Table Action and For Our Future would accept or make.

**III. The Zero-Dollar Disclosure Threshold for Independent Expenditure Contributions also Violates the First and Fourteenth Amendments.**

The Act's amendment of 21-A M.R.S. § 1019-B(4)(B) adds a requirement that PACs disclose to the Commission the total contributions from each contributor for independent expenditures, no matter how small. This provision exists only because of the contribution limits imposed by the Act. When those provisions are stricken, the reporting is unnecessary, and the entire Act should fall. *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 19 (1st Cir. 1996). Additionally, the zero-dollar threshold for reporting contributions for independent expenditures fails for separate reasons.

Maine permits aggregate reporting of donations to candidates, party committees, and PACs that use the funds for donations or coordinated activity. Candidates and PACs are not required to report the identity of donors of less than $50. 21-A M.R.S. §§ 1017(5), 1060(6). Party committees are not required to report the identity of donors of less than $200. *Id.* § 1017-A(1).

Section 1019-B(4)(B) is not necessary to prevent quid pro quo corruption. It violates the First Amendment by requiring disclosure and reporting of contributor identities and information at levels lower than candidates and PACs have to report for money that could be given to a candidate, and far below the $200 threshold for reporting contributions to party committees, which can make donations to candidates, expenditures in coordination with candidates, and independent expenditures.

15

#17770765v2

"Governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" *Buckley*, 424 U.S. at 25 (*quoting NAACP*, 357 U.S. at 460-461). The Court applied its *NAACP v. Alabama* holding recently in a donor disclosure case. "We have also noted that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action. … [A]nd we noted 'the vital relationship between freedom to associate and privacy in one's associations,'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-07 (2021) (*quoting NAACP*, 357 U.S. at 462).

*Bonta* required exacting scrutiny and narrow tailoring of a disclosure regimes. *Id*. at 607. "Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Id*. at 609-610. "[A] reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 611.

Section 1019-B(4)(B) is not narrowly tailored because it lacks a threshold below which disclosure of contributions are not required. Section 1019-B(4)(B) chills speech and associational rights of individuals who wish to remain anonymous in their associations. *See McIntyre v. Ohio Elecs. Comm'n*, 514 U.S. 334, 341-42 (1995) (recognizing the importance of anonymity in political speech). Any arguable need for the government to be told the identity of a contributor is at its nadir for small dollar donations, which are not corrupting when given directly to a candidate, and certainly are not when contributed to an independent expenditure committee. There simply is no government interest in knowing the smallest of donations to an independent expenditure group which, by definition, cannot lead to quid pro quo corruption.

#17770765v2

When weighing the fundamental rights of donors and committees to associate anonymously, against Maine's lack of any legitimate interest in the disclosure of the small-dollar independent-expenditure donations, the analysis is simplified. "Something outweighs nothing every time." *SpeechNow.org*, 599 F.3d at 695 (cleaned up). "The First Amendment cannot be encroached upon for naught." *Id*.

Additionally, the underinclusive nature of Section 1019-B(4)(B)—in that it does not apply equally to candidate donations, donations to traditional PACs, or donations to party committees—demonstrates both that the law is not appropriately tailored and that the disclosure requirement does not advance a legitimate state interest. This is most obvious when compared to party committees, which have a $200 reporting threshold and can make independent expenditures. This dichotomy between donations for independent expenditures to PACs and party committees cannot be justified.

Section 1019-B(4)(B) thus cannot survive any level of heightened scrutiny. It is not narrowly tailored. It is both over- and under-inclusive. It is over-inclusive because small-dollar donations for independent expenditures that have no likelihood to corrupt are subject to full reporting. It is underinclusive because candidate donations and donations to party committees are not similarly reported. Section 1019-B(4)(B) does not advance any valid governmental interest. It does not prevent corruption or the appearance of corruption. Reporting requirements already exist for contributions to PACs of more than $50. Requiring heightened reporting for independent expenditures serves no logical end. Rather, it serves solely to limit the political participation and association rights of individuals who desire to make small donations for the express purpose of not having their identities revealed.

## CONCLUSION

For the foregoing reasons, Plaintiffs request (1) that the Court enter final judgment declaring the Act unconstitutional, facially and as applied to them, and permanently enjoining Defendants from enforcing the Act, and (2) that the Court award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

Dated: January 17, 2025

Respectfully submitted,

*/s/ Joshua Dunlap*
Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
207-791-1350
jdunlap@pierceatwood.com

and

Charles Miller*
(**pro hac vice*)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, DC 20036
202-301-9800
cmiller@ifs.org

*Counsel for Plaintiffs*

#17770765v2

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below I caused a copy of the foregoing pleading to be filed with the Court's ECF filing system, which will cause an electronic notice to be sent to counsel of record.

Dated: January 17, 2025

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: 207.791.1100
jdunlap@pierceatwood.com

19

#17770765v2