**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM J. SCHNEIDER, *et al.*, <br><br> Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF SENATOR RICHARD A. BENNETT**

1. I am a Senator of District 18 of the Maine State Senate. I was born and raised in Maine and my family has roots in Oxford County, Maine going back several generations. My wife Karen and I have two children who were born and raised in Maine, as well.

2. I have served in the Maine State Legislature for more than sixteen years. From 1990 to 1994, I served two terms in the Maine House of Representatives. I then went on to represent western Maine for four terms in the Maine Senate from 1996 to 2004. During that time, I was unanimously elected to serve as the President of the Maine Senate, a position which I held from 2001 to 2002. During my time in public office, I have served most recently on the Housing and Economic Development Committee, Appropriations and Financial Affairs Committee, Environment and Natural Resources Committee, and the Government Oversight Committee. For several years, I held positions on the boards of the Maine Heritage Policy Center and the Maine Conservation Voters. I won reelection to my seat in the Maine Senate in 2020 and 2022. Most recently, I won reelection for my third consecutive term as my District's representative during the November 2024 election cycle.

3. In Maine, politicians have the option to campaign under the Maine Clean Election Act, a voluntary program that places limitations on private contributions. The program is applicable to campaigns for the Maine House, Senate, and Governor. Candidates who run under the Act must demonstrate their grassroots support by collecting $5 qualifying contributions from voters in their district and agree not to raise or spend private money, beyond a limited amount of "seed money." There are limits on anonymous donations under the Maine Clean Election Act, as well. Once the candidate successfully qualifies under the Act, he or she receives a limited amount of public funds from the Maine Clean Election Fund, which the candidate can use to run his or her campaign. I believe this Act prevents quid pro quo corruption and the appearance of such corruption by providing public funding for elections.

4. I have campaigned during nine state election cycles in Maine. Since the voters passed the Maine Clean Election Act through a citizens' initiative in 1996, I have voluntarily chosen to campaign under the Act's limitations on private contributions. It has always been important to me to run a transparent and honest campaign because fair campaigns are the building blocks of fair elections. At most, a State Senate candidate that campaigns under the Maine Clean Election Act spends roughly $75,000 on a local campaign. But not all candidates who run for elected office in Maine choose to voluntarily abide by the Act's regulations. Candidates who choose not to run under the Maine Clean Election Act are not subject to the Act's spending limitations. In my races, I have run against candidates who campaign under the Maine Clean Election Act and those who do not.

5. During my time in elected office, I have been an ardent supporter of fair elections and election transparency. In the 131st Maine Legislature, I was the prime sponsor of a bill that would have required political action committees to disclose the original sources for donors who contribute

more than $5,000 in Maine elections. I have reintroduced that bill for consideration by the current Legislature. I was also the prime sponsor of a bill to prohibit foreign governments and the entities they control from spending money in Maine elections. I am currently the prime sponsor of a bill to expand Maine's Clean Election Act to races for sheriff and district attorney. Finally, I am the prime sponsor of joint resolutions calling for an Article V convention under the U.S. Constitution to allow for reasonable regulations on campaign spending.

6. Over the course of my long career, I have observed that local elections in Maine have changed dramatically. When I started out in politics, candidates for local office depended in large part on donations from their local supporters in Maine. But in the 2010s, the electoral landscape began to change. Large political action committees, or SuperPACs, began to invest heavily in Maine elections. In my experience as a candidate and as a state legislator, anonymous, unregulated contributions to SuperPACs create an appearance of corruption, because they create a risk that politicians who benefit from these SuperPACs' are beholden to the SuperPACs' contributors and will engage in quid-pro-quo corruption.

7. Over the last decade, I have witnessed broader changes to Maine's electoral process that are particularly damaging to the integrity of our democratic processes. SuperPACs spend enormous sums of money to ensure that the issues that their out-of-state supporters find most important take centerstage during election season, to the detriment of local issues that matter to local voters. This spending is possible because of anonymous, unregulated donations to SuperPACs. Through this spending, SuperPACs change the tenor of local races with large-scale advertising campaigns and social media blitzes. The size of this spending in Maine creates the appearance of quid-pro-quo corruption. As a result, Maine citizens are discouraged from donating to candidates, participating in political campaigns, and even from voting, because they do not wish

to participate in a system that they believe is corrupt, or at a minimum, appears to be corrupt. This lack of participation by Maine citizens in turn means that Maine politicians are less likely to engage with the local issues that really matter to Maine citizens, and instead focus on the issues raised by SuperPACs. I believe this fundamentally injures legislators like me who want to engage with local Maine voters and work with other legislators to pass legislation to address local issues.

8. The influence of SuperPACs reaches beyond the election season and into state governance more generally. From my experience serving in the State Legislature, I have personal knowledge that elected officials may flinch in the performance of their duties because any stray remark or vote could attract the ire of an unfriendly SuperPAC, potentially dooming the politician's chances of success in the subsequent election. Legislators are often worried that one misstep could be exploited as a centerpiece of their opponent's next SuperPAC-backed campaign. This enhances the appearance of corruption in Maine's political system, because it means that legislators are not performing their duties to the fullest as a result of SuperPAC-funded advertising campaigns, often paid for by anonymous individuals. This harms legislators like me, who benefit from a robust debate before the passage of new legislation, and individual Maine voters like me, who likewise benefit when the fullest range of viewpoints is aired prior to the passage of legislation.

9. I personally know several Maine citizens who would run for office but choose not to because of the influence of unregulated SuperPAC spending on the system and the appearance of corruption it creates. Potential candidates do not want to run against candidates that appear to benefit from quid-pro-quo corruption as a result of unregulated SuperPAC contributions, and as a result, these citizens choose not to run at all. This hurts me in my role as legislator, because strong candidates who may have won elections never even run for office, so I do not have an opportunity

to collaborate with them to pass legislation to benefit Maine citizens. It also hurts me in my role as a citizen, as I have fewer options when voting for candidates for state office.

10. Based on my experience running campaigns in Maine, I have witnessed first-hand how the system in Maine in particular is susceptible to corruption and the appearance of corruption. In our small state, it does not take much money to move the needle in an election. An out-of-state infusion of $1,000,000 can be a gamechanger in a race against a candidate running under the Maine Clean Election Act that has less than one-tenth the funds with which to compete. An anonymous donation of $500,000 in support of a referendum can be transformational at the local level. I believe unregulated donations to SuperPACs create an appearance of corruption in Maine because they create a risk that a legislator will be beholden to the SuperPAC and its donors once elected to office.

11. Given the negative influence of SuperPACs in Maine, I strongly support the Act to Limit Contributions to Political Action Committees That Make Independent Expenditures. The Act places limits on contributions to SuperPACs and requires disclosure of contributors to such groups. During the November 2024 election cycle, I attended meetings to encourage support for the Act and testified before a Legislative committee during a hearing to determine whether the Legislature should adopt the bill. I feel strongly that the Act will play an important role in restoring faith in Maine elections by decreasing the appearance of corruption from anonymous, unlimited SuperPAC contributions.

12. At bottom, the Act allows candidates to be in control of their campaigns, focus on the issues that are most important to voters, and remain accountable to their constituents. This is essential to reducing the appearance of corruption in Maine elections and the legislative process. If this Act is struck down or otherwise curtailed, I will continue to fight for fair elections in Maine, including

by introducing legislation through my role as a Maine State Senator to promote fair elections and address the appearance of corruption in Maine elections.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of January, 2025.

_____<u>*s/ Richard A. Bennett*</u>_____<br>
Richard A. Bennett