UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM J. SCHNEIDER, *et al.*,<br><br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF CARA MCCORMICK**

1. I am a resident and voter in the state of Maine. My husband, Peter McCormick, and I moved to Maine over 19 years ago and have lived here ever since. We have two sons who were born and raised in Maine.

2. My husband is a retired master electrician and former volunteer firefighter, and I am a research consultant. Since we became Maine residents, we have been heavily involved in local politics from a grassroots perspective, lending our efforts to campaign and canvass for local politicians and initiatives that we believe in. We have regularly voted in Maine elections since we moved to the state.

3. I have worked professionally on local and national political elections in every election cycle since 1991. In Maine in particular, I served as a senior advisor to Angus King during his first successful independent campaign for the United States Senate. I am the co-founder and co-lead of The Committee for Ranked Choice Voting, the historic campaign that made Maine the first state in the nation to adopt ranked choice voting for its state and federal elections. Until December 31, 2024. I was the CEO of The Chamberlain Project and the volunteer executive director of The Chamberlain Project Foundation, entities that supported ranked choice voting in Maine and around

1

the nation. My husband and I worked tirelessly to support and promote the ranked choice voting ballot initiative in Maine throughout 2014, 2015, and 2016. In the November 2016 election, Maine voters approved Question 5, the ranked choice voting ballot initiative, with 52% of the vote. In response to the Maine Legislature's attempt to amend the ranked choice voting ballot initiative on October 17, 2017, my husband and I mobilized extensive grassroots efforts to invoke the People's Veto to the proposed amendments. Maine voters approved the People's Veto by 53.88% on June 12, 2018, and ranked choice voting remains in effect for all federal primary and general elections in Maine. In 2019-2020, I also worked to protect ranked choice voting for President in Maine, after the Republican Party mounted an unsuccessful effort to repeal the law. Ranked choice voting has now been used in eight consecutive statewide elections in Maine without interruption.

4. Beginning in 2023, I spearheaded the campaign to secure a position on the ballot for the Act to Limit Contributions to Political Action Committees That Make Independent Expenditures during the November 2024 election cycle. The Act aims to curb the influence of SuperPACs in our local elections and imposes needed transparency requirements on campaign donations. My husband and I became involved in the campaign in support of the Act because we both feel discouraged and disheartened by the influence of SuperPACs on local Maine elections. In particular, we have witnessed how out-of-state money and influence in local elections and initiatives have created the appearance of corruption. In recent elections in particular, this out-of-state money has prevented local campaigns from focusing on local issues, to the detriment of Maine voters like me who care about such local issues and would like to see their legislators focus on them. My voice, and my interests, and the voices and interests of other ordinary Maine citizens who supported the Act, are significantly diluted by unlimited SuperPAC donations.

5. These unrelated, anonymous donations give rise to corruption, or the appearance of corruption, between the donor and the politician whom the SuperPAC supports. Without knowledge of who these donors are, we cannot protect the integrity of our political process, because no one can investigate whether the donations in fact led to corruption. We thus lack crucial information about candidates running for public office, and our elected officials, to ensure they represent the interests of Maine voters and do not make decisions based on corruption. The legislature has failed to adequately protect citizens' interests from the influence of SuperPACs on our elections, so I chose to take the problem into my own hands through the citizens' initiative process, rallying the people of Maine behind the Act.

6. From August 2023 up through the November 2024 election, my husband and I engaged in significant personal efforts to support the adoption of the Act. In total, we spent hundreds of hours on the campaign for the Act, including speaking with neighbors and friends, writing letters to newspaper editors, and enlisting volunteers to spread the word about the petition.

7. In August 2023, my husband and I submitted a petition to the Maine Secretary of State with the text of the proposed legislation and a summary of its purpose. Once the Secretary of State approved our petition, my husband and I collected approximately 800 signatures in a single day. Once the campaign had acquired sufficient signatures, we returned our petitions to the Secretary of State who affirmed the petition's validity.

8. Pursuant to the Constitution of Maine, the initiative was then presented to the Maine Legislature so that members of the Senate and House of Representatives in Maine had the opportunity to enact the bill before it went to a people's vote on the November 2024 ballot. The Joint Committee for Veterans and Legal Affairs held a hearing on the proposed bill. Our eldest son, John Christopher McCormick, his classmate Saga Hart, and several other voters including

Peter Murray, and I all testified at the hearing, describing the importance of the bill to the Maine political process. In particular, I highlighted the risk of corruption absent limits on SuperPAC contributions, the belief of Maine citizens that our political system is broken in light of the potential for SuperPAC-related corruption, and the need for a clear ruling upholding the law. Despite overwhelming public support for the bill, as demonstrated by the almost 70,000 signatures that were collected from registered voters, the Legislature chose to take no action on the bill and thus the Act was sent to a voters' referendum.

9. Per Maine election regulations, the Secretary of State drafted the ballot question and asked for public comment. The initial language the Secretary proposed did not refer to "political action committees" at all, which I found surprising given that the citizens' initiative was intended to regulate SuperPAC donations. Given my and my husband's firm conviction that the influence of SuperPACs must be limited, we submitted a public comment insisting that the Secretary change the language of the initiative to fix her vague wording and directly reference political action committees. The Secretary of State ultimately relented, noting the Act's application to SuperPACs in the "Intent and Content" description of the Act in the official "Maine Citizen's Guide to the Referendum Election."

10. Once the language of the referendum was settled, we began a year-long grassroots campaign to educate and inform Maine voters about the Act. We organized a group of students from our son's high school to get the word out about the initiative. We spoke to our neighbors and encouraged them to speak to others about the Act. We distributed lawn signs, bumper stickers, and mailings to reach Maine voters. We developed a website for interested voters to learn more about the Act's purpose and took to social media to publish regular posts about the Act. We wrote op-eds and letters to the editor for the two major newspapers in Maine: the Portland Press Herald and

the Bangor Daily News. We attended editorial board meetings and successfully convinced the two major newspapers in Maine to endorse and approve of the Act. We also commissioned polling to keep abreast of public opinion on the Act.

11. From my experience speaking and surveying Maine voters over the past 19 years, I have gained personal knowledge of the overwhelming view of Maine voters that both in-state and out-of-state monied interests are creating an appearance of corruption, if not actual corruption, by spending undisclosed and unregulated amounts of money to influence Maine politicians. In my experience, the citizens of Maine are deeply supportive of limiting and requiring disclosure of SuperPAC donations, as demonstrated by the fact that the Act passed with 74.9% approval in the November 2024 election. The initiative received more votes, 600,191, than any citizens' initiative or politician has ever received in any election in the history of the State of Maine.

12. From my experience campaigning for Question 1, I have gained personal knowledge that the citizens of Maine are well aware of the substantial negative impacts of SuperPAC funding on local elections. Ordinary Maine citizens understand why elected officials would choose to curry favor with anonymous megadonors to access their deep coffers and have experience how this dynamic contributes to poorer public policy. As a result, the citizens of Maine are dispirited by our institutions, convinced that the system is broken, and resolved that the root of those issues is the absence of campaign spending limits and donor transparency. For the citizens of Maine, this issue permeates all corners of the electoral process and gives off the appearance of corruption at the heart of our democracy.

13. I will be personally injured if the Act is invalidated. I have dedicated time and effort over many years to fighting for fair elections in Maine, as demonstrated by my work convincing Maine citizens to adopt ranked choice voting and place reasonable limits on contributions to SuperPACs

that make independent expenditures. This effort is substantial: I was the Chair of the campaign and the lead signatory for the effort. I spent hundreds of hours of my personal and professional time advocating for limits on contributions to SuperPACs that make independent expenditures, including by speaking with friends and neighbors, collecting signatures, helping to gather more than 120 endorsements of elected officials and other civic leaders, testifying before the Legislature in Augusta, attending two VLA hearings on LD2232, mailing and emailing letters, putting up "Yes on 1" signs, writing letters to the editor, attending fundraisers, meeting with editorial boards, giving interviews to state and national press outlets, filing regular campaign finance reports detailing our activities, and canvassing for votes. I thus have an interest in upholding the Act that goes far beyond that of an ordinary citizen. If the Act is invalidated, I will begin a new campaign to combat corruption and the appearance of corruption in Maine elections, which will again involve significant personal efforts, including evaluating options for a new citizens' initiative, drafting the initiative, and raising support for the initiative by personally canvassing friends and neighbors. This is time that I would not otherwise spend if the Act is upheld, given my personal belief that the Act is a successful measure to prevent corruption and the appearance of corruption in Maine elections.

      I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of January, 2025.

                                                                            _s/ Cara McCormick_
                                                                             Cara McCormick