## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, et al., | |
| *Plaintiffs*, | |
| v. | No. 24-cv-00430-KFW |
| WILLIAM J. SCHNEIDER, et al., | |
| *Defendants*. | |

## BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

## <u>TABLE OF CONTENTS</u>

Interest of Amicus Curiae ...........................................................................................1

Introduction................................................................................................................2

Arguement..................................................................................................................3

I.     The First Amendment Guarantees The Right Of Mainers to Have Their Voices Heard Through Political Action Committees ......................................................3

II.    The Act Is A Direct Challenge To *Citizens United* .............................................6

III.   There Is No Narrower Path For Avoiding *Citizens United*................................10

Conclusion ...............................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Tradition P'ship, Inc. v. Bullock*,
    567 U.S. 516 (2012)..................................................................................1, 13

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)............................................................................................1

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011)..........................................................................................12

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................3, 7, 12

*Chamber of Com. of the U.S. v. FEC*,
    69 F.3d 600 (D.C. Cir. 1995)............................................................................1

*Citizens United v. FEC*,
    558 U.S. 310 (2010)................................................................... *passim*

*Davis v. FEC*,
    554 U.S. 724 (2008)..........................................................................................12

*Elections Bd. of State of Wis. v. Wis. Mfrs. & Com.*,
    597 N.W.2d 721 (Wis. 1999)............................................................................1

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989)..........................................................................................4

*FEC v. Mass. Citizens for Life, Inc.*,
    479 U.S. 238 (1986)..........................................................................................1

*FEC v. Nat'l. Right to Work Comm.*,
    459 U.S. 197 (1982)..........................................................................................4

*FEC v. Ted Cruz for Senate*,
    596 U.S. 289 (2022)........................................................................................13

*First Nat'l. Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)..........................................................................................4

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)..........................................................................................4

*McConnell v. FEC,*
    540 U.S. 93 (2003)................................................................................1

*McCutcheon v. FEC,*
    572 U.S. 185 (2014)..............................................................................3

*Murthy v. Missouri,*
    603 U.S. 43 (2024)................................................................................4

*NAACP v. State of Ala. ex rel. Patterson,*
    357 U.S. 449 (1958)..............................................................................3

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002)..............................................................................1

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)..............................................................................4

*SpeechNow.org v. FEC,*
    599 F.3d 686 (D.C. Cir. 2010) .......................................................2, 5, 7

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957)..............................................................................4

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986)..............................................................................5

*United States v. Menendez,*
    291 F. Supp. 3d 606 (D.N.J. 2018)....................................................11

*United States v. Menendez,*
    No. 2:15-cr-00155 (D.N.J. 2015).......................................................11

*W. Tradition P'ship, Inc. v. Att'y. Gen. of State,*
    271 P.3d 1 (Mont. 2012).....................................................................13

*Wis. Right to Life, Inc. v. FEC,*
    546 U.S. 410 (2006)..............................................................................1

**Statutes**

18 U.S.C. § 201(b)(1)(A)............................................................................11

52 U.S.C. § 30125(e)(1)(A)........................................................................11

21-A M.R.S. § 1015.....................................................................................7

21-A M.R.S. § 1019-B(6).............................................................................7

## Other Authorities

Benjamin Siegel and Soo Rin Kim, *Mike Bloomberg Spent More Than $1 Billion On Four-Month Presidential Campaign According To Filing*, ABC News (Apr. 20, 2020), https://tinyurl.com/54n3kjvh............................................................................9

Emma Davis, *A 'Simple' Bill With Broad Implications: Legislature Hears Campaign Finance Reform Initiative*, Maine Morning Star (Mar. 7, 2024), https://tinyurl.com/5n9yrvkp.........................................................................10

Equal Citizens, *Equal Dependence: Representatives Should Depend On Citizens Equally*, https://tinyurl.com/mwahdptw (last visited Jan. 23, 2025) .......................................8

Free Speech for People, *The Democracy Amendments*, https://tinyurl.com/yhtvsxk2 (last visited Jan. 23, 2025)........................................................8

Free Speech for People, *Victory! Maine Becomes The First State To Eliminate Super PACs* (Nov. 7, 2024), https://tinyurl.com/n985pce4 .......................................7

Larry Neumeister and Philip Marcelo, *Sen. Bob Menendez guilty of taking bribes in cash and gold and acting as Egypt's foreign agent*, AP (Jul. 16, 2024), https://tinyurl.com/5x29975s ........................................................................11

Letter from Anne Sterman, Deputy Chief, Government Bureau, Massachusetts Office of the Attorney General to Thomas O. Bean, Partner, Verrill Dana LLP, at 2 (Sept. 7, 2022), available at https://tinyurl.com/ezcuxhfv .......................................8

Matea Gold, *Menendez Indictment Marks First Big Corruption Case Involving A Super PAC*, The Washington Post (Apr. 2, 2015) ...................................................11

Ro Khanna and Lawrence Lessig, *Citizens United Isn't Going Away Any Time Soon. But We Can Still Make Campaign Financing Less Corrupt*, Boston Globe (updated Dec. 1, 2024), https://tinyurl.com/5n74tbzn ....................................9

*See* FEC, *Mike Bloomberg 2020, Inc., FEC Form 3P* (filed Apr. 4, 2020), https://tinyurl.com/5haravrm .......................................................................9

*Testimony Before the Joint Standing Committee on Veterans and Legal Affairs in Support of LD 2232*, 131st Leg., 2nd Reg. Sess. (Me. 2024) (Statement of Adam Cote, Attorney, Drummond Woodsum), https://tinyurl.com/ycxzzu5u.......................12

## INTEREST OF AMICUS CURIAE

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3,000,000 companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to advocate on behalf of its members in matters before Congress, the Executive Branch, and the courts.

The Chamber plays a key role in advancing the First Amendment rights of its members.  In that capacity, the Chamber was a party to the *McConnell v. FEC*, 540 U.S. 93 (2003) litigation that challenged the facial constitutionality of an electioneering communication ban on corporate political speech.  The Chamber also regularly files *amicus curiae* briefs where the business community's right to political speech is at stake.  *See, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021); *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516 (2012); *Citizens United v. FEC*, 558 U.S. 310 (2010); *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006); *Republican Party of Minn. v. White*, 536 U.S. 765 (2002); *Elections Bd. of State of Wis. v. Wis. Mfrs. & Com.*, 597 N.W.2d 721 (Wis. 1999); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986); Amicus Brief of the Chamber of Commerce of the United States, *Minn. Chamber of Com. v. Choi*, No. 0:23-CV-02015, (D. Minn. Aug. 2, 2024) (Dkt. No. 139-1).  And the Chamber has litigated to preserve its own First Amendment rights of speech and association.  *See, e.g.*, *Chamber of Com. of the U.S.*, 288 F.3d 187 (5th Cir. 2002); *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995).

The restrictions Maine is attempting to place on the ability of citizens to participate in the democratic process through contributions to independent-expenditure political action committees, often referred to as "Super PACs," are contrary to the First Amendment, which protects the ability

of Americans to speak both as individuals and collectively.  The Chamber has a strong interest in ensuring that individuals can associate and speak in concert without undue interference from government.  If the activities of political action committees are restricted, as Maine is attempting to do here, the First Amendment rights of other organizations are necessarily at risk.

## INTRODUCTION

The State of Maine has restricted the ability of political action committees to engage in political speech.  If such a law sounds implausible, that is because it is.  As the U.S. Supreme Court's decision in *Citizens United*, 558 U.S. at 342, made clear, the First Amendment protects independent political speech by businesses and associations.  Indeed, the receipt and expenditure of funds by these organizations, including political action committees, supports political speech in its purest form.  Political action committees add to the public discourse, amplify voices, and provide new perspectives to Mainers.  In short, political action committees play a crucial role in informing the electorate—a core First Amendment interest that the Framers recognized as a necessary function for the maintenance of a healthy and functioning republic.

An attack on the ability of independent-expenditure political action committees to receive contributions is therefore a direct attack on First Amendment precedent, which recognizes the important role organizations like Plaintiffs Dinner Table Action and For Our Future play.  And that is precisely what the law's backers intended.  Having failed to pass a similar initiative in Massachusetts, proponents of the law travelled north, motivated by a disdain for *Citizens United* and *SpeechNow.org v. FEC.  See SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (the D.C. Circuit's case applying *Citizens United* to political action committees).  Neither of these decisions has been overruled or called into question in the years since they were decided.  Indeed, they have been reaffirmed time and again.

This Court should therefore reject Maine's ill-conceived effort to silence political speech. Because there is no way to distinguish *Citizens United*, and because that decision remains the law of the land, the Court should rule for Plaintiffs so that Mainers may continue to benefit from the healthy and vibrant political discourse that the First Amendment guarantees.

## ARGUMENT

### I.  THE FIRST AMENDMENT GUARANTEES THE RIGHT OF MAINERS TO HAVE THEIR VOICES HEARD THROUGH POLITICAL ACTION COMMITTEES

When the Framers drafted the First Amendment's Speech Clause, their primary purpose was to ensure that Americans could engage openly in political discourse without fear of government suppression.  While the Constitution protects many forms of speech, it sought to protect political speech above all else because "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976).  Indeed, true democratic governance would be impossible if the state were permitted to control what information is available to the electorate.  Thus, as the U.S. Supreme Court has emphasized, the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office."  *See McCutcheon v. FEC*, 572 U.S. 185, 191–92 (2014) (plurality opinion) (citation omitted).

The right to express political opinions, however, is not limited to individuals—"political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Citizens United*, 558 U.S. at 342 (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978)).  As the Supreme Court has long recognized, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," given "the close nexus between the freedoms of speech and assembly." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) (citing *De Jonge v. Oregon*, 299 U.S. 353,

364 (1937); *Thomas v. Collins*, 323 U.S. 516, 530 (1945)).  As a result, an "individual's freedom to speak . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward th[at] end[] were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Thus, just as the Constitution provides robust protection to individuals to opine on political topics, it likewise protects association for the purpose of furthering that expression.  Indeed, the "political freedom of the individual" has "traditionally been [exercised] through the media of political associations." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

This logic applies with greatest force to associations committed to advancing political messages, and it "is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989); *see FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) ("[T]he right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.") (internal citation and quotation marks omitted).  Political action committees are, by their very nature, associations formed to further electoral expression.  Any attempt by government to inhibit their ability to speak is an attack on political discourse itself, harming both the organization, which has its speech restricted, and potential consumers of that speech, who are prevented from accessing information.  *See Murthy v. Missouri*, 603 U.S. 43, 75 (2024) ("we have recognized a First Amendment right to receive information and ideas" (internal quotation marks omitted)); *see First Nat'l Bank of Boston*, 435 U.S. at 783 ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."); *see Kleindienst v. Mandel*, 408 U.S.

4

753, 762 (1972) (It is thus "well established that the Constitution protects the right to receive information and ideas."). It is an assault on the very core of what the First Amendment was designed to protect.

Thus, while the First Amendment looks skeptically on all government speech restrictions, these concerns are at their zenith where the government attempts to prevent political organizations from conveying opinions to fellow citizens—a "crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986). Ultimately, democratic systems—as with most human endeavors—depend on individuals acting in concert. A restriction on the ability of a political organization, like a political action committee, to operate is thus a restriction on the operation of democracy itself and must be met with skepticism.

The Supreme Court recognized as much fifteen years ago in *Citizens United*, where a nonprofit corporation challenged the ability of the government to impose civil and criminal penalties for the mere act of distributing a movie critical of a presidential candidate. *See* 558 U.S. at 319–20. As the Court explained, "[p]olitical speech is 'indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual.'" *Id.* at 349 (quoting *First Nat'l Bank of Boston*, 435 U.S. at 777). While the Court acknowledged that the government may have a legitimate interest in combatting *quid pro quo* corruption or the appearance thereof—the justification the Court in *Buckley* had relied on to uphold limits on direct contributions to candidates, *id.* at 345 (citing *Buckley*, 424 U.S. at 47–48); *see id.* at 357 ("independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.").

The Court of Appeals for the D.C. Circuit subsequently applied *Citizens United*'s straightforward reasoning to contributions in *SpeechNow.org*. *See* 599 F.3d at 696. In that case, the court reviewed the permissibility of a federal prohibition on contributions by corporations to political action committees engaged exclusively in making independent expenditures. As the court explained, "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." *Id.*; *see also Citizens United*, 558 U.S. at 359 (limits on direct contributions to candidates, "which, unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption." (citing *McConnell*, 540 U.S. at 136–38 & n.40)).

Since *SpeechNow.org*, political action committees have contributed greatly to American democracy—amplifying voices in the marketplace of ideas and exposing Americans to new perspectives and insights. They help inform voters and enrich the political discourse. Contributions made to political action committees for the purpose of independent expenditures therefore warrant maximum protection under the First Amendment.

## II.     THE ACT IS A DIRECT CHALLENGE TO *CITIZENS UNITED*

The State of Maine's decision to place limits on contributions to political action committees that make independent expenditures is a direct challenge to *Citizens United* and strikes at the very core of the First Amendment. Because contributions of this nature are fully covered by the Constitution's protection of political speech and association, and because Maine cannot identify a valid justification for burdening the First Amendment rights of its citizens, the law cannot stand.

Maine's "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" (the "Act"), in relevant part, imposes a limit of $5,000 per year on contributions made by an individual, business entity, or political action committee, to a political

action committee for the purpose of making an independent expenditure. *See* 21-A M.R.S. § 1015(2). A political action committee, in turn, may make independent expenditures only from funds received subject to these contribution limits. *See id.* § 1019-B(6).

Maine's new law, *by design*, restricts the ability of political action committees to contribute to the public discourse via independent expenditures. As its proponents have argued, the Act "addresses *quid pro quo* corruption and the appearance of corruption created by [larger] contributions." Free Speech for People, *Victory! Maine Becomes the First State to Eliminate Super PACs* (Nov. 7, 2024), https://tinyurl.com/n985pce4. And they acknowledge—triumphantly—that the "$5,000 contribution limit effectively eliminates super PACs." *Id.*

But that logic collides head-on with the U.S. Supreme Court's reasoning in *Citizens United*. As discussed, *supra* Sec. I, the Court in that case concluded *unequivocally* that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United*, 558 U.S. at 357; *see SpeechNow.org*, 599 F.3d at 693. Indeed, long before *Citizens United*, the Court had already determined that "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Buckley*, 424 U.S. at 47. The government thus has no legitimate interest in regulating independent expenditures, and that same logic necessarily applies with equal force to contributions used to fund independent expenditures. *See SpeechNow.org*, 599 F.3d at 695–96. Indeed, referring to payments made to groups that make only independent expenditures as "contributions" is misleading because, by definition, those payments are not coordinated with any candidate. Instead, such payments are effectively independent expenditures in their own right, made through an agent. Neither *Buckley* nor its progeny suggest otherwise.

A previous effort to suppress political speech in Massachusetts confirms this law's unconstitutionality. In 2022, the very same interest group that succeeded in placing Maine's law on the ballot, proposed a ballot initiative that would have imposed speech restrictions on political action committees similar to those challenged here. The state's Office of the Attorney General, required by Massachusetts law to confirm that any submitted initiative petition does not violate central rights guaranteed by the state Constitution, opined that the same restrictions Maine has placed on political action committees via the Act could not survive judicial review. Citing *SpeechNow.org*, the opinion noted that "[c]ourts across the country have uniformly held that limits on contributions to independent expenditure PACs—like those at issue in this proposed law — violate free speech protections." Letter from Anne Sterman, Deputy Chief, Government Bureau, Massachusetts Office of the Attorney General to Thomas O. Bean, Partner, Verrill Dana LLP, at 2 (Sept. 7, 2022), https://tinyurl.com/ezcuxhfv. Having failed in Massachusetts, proponents moved on to Maine, which does not subject ballot initiatives to a similar preliminary legal review.

It is no surprise that the Act is an affront to *Citizens United*, as its supporters have made clear that their ultimate goal is to have that decision overruled. For example, a group that advocated for passage of Maine's law notes that it "has been at the forefront of the movement to amend the Constitution to reverse the Supreme Court's Citizens United decision since 2010." Free Speech for People, *The Democracy Amendments*, https://tinyurl.com/yhtvsxk2 (last visited Jan. 23, 2025). Likewise, "Equal Citizens," which helped place the measure on the ballot and is openly committed to ending independent-expenditure political action committees, argues that *Citizens United* was wrongly decided because it "rest[s] upon a conception of 'corruption' that is decidedly modern and inconsistent with our Framers' vision." Equal Citizens, *Equal Dependence: Representatives Should Depend on Citizens Equally*, https://tinyurl.com/mwahdptw (last visited

Jan. 23, 2025).  And while Harvard Professor Lawrence Lessig, founder of Equal Citizens and one of the law's leading proponents, has acknowledged that "*Citizens United* isn't going away any time soon," he has not shied away from his view that "the *Citizens United* decision should be overturned."  Ro Khanna and Lawrence Lessig, *Citizens United Isn't Going Away Any Time Soon. But We Can Still Make Campaign Financing Less Corrupt*, Boston Globe (updated Dec. 1, 2024), https://tinyurl.com/5n74tbzn.  Maine's statute is thus nothing more than a vehicle through which its proponents will attempt to overturn Supreme Court precedent.  They cannot do so in this Court.

At bottom, the Act appears to be motivated by a fear of increased political speech.  But increased speech is never itself a problem for the government to address.  That is because, ultimately, it is a candidate's message that wins or loses the day.  While freedom of political speech is *necessary* to get one's message out, it is not *sufficient*.  To succeed in a democratic system, an individual's or group's message must be a persuasive one.  One need only look at recent history to confirm as much.  In the Democratic Party's 2020 presidential primary, for example, former New York Mayor Michael Bloomberg is reported to have spent over *one billion dollars* on his short, 100-day primary run.  *See* FEC, *Mike Bloomberg 2020, Inc., FEC Form 3P* (filed Apr. 4, 2020), https://tinyurl.com/5haravrm.  He won only 55 delegates, having spent roughly $18 million to secure each.  *See* Benjamin Siegel and Soo Rin Kim, *Mike Bloomberg Spent More Than $1 Billion On Four-Month Presidential Campaign According To Filing*, ABC News (Apr. 20, 2020), https://tinyurl.com/54n3kjvh.  And Professor Lessig himself acknowledges that former Vice President Kamala Harris lost the presidential election despite having raised *two and a half times* the amount of money as President Trump—an odd fact to emphasize for someone who believes that expenditures furthering political speech corrupt elections.  *See* Khanna and Lawrence, *supra*.

As the Court in *Citizens United* made clear, "it is our law and our tradition that more speech, not less, is the governing rule." 558 U.S. at 361. Independent expenditures help facilitate this speech. Maine's law, which is premised on disdain for political speech from groups like Plaintiffs in this case, simply cannot pass constitutional muster under *Citizens United*.

## III.    THERE IS NO NARROWER PATH FOR AVOIDING *CITIZENS UNITED*

Despite the wishes of proponents of Maine's law, *Citizens United* remains the law of the land. Because the Act cannot be squared with that decision, this Court must hold it unconstitutional and enjoin its enforcement. Alternative arguments that the Act is somehow compatible with *Citizens United* are unpersuasive.

Professor Lessig, for his part, suggests that instead of attacking *Citizens United* directly, the Act is a challenge to *SpeechNow.org*. Indeed, that is precisely how he pitched the law to the Veterans and Legal Affairs Committee; Lessig testified that Maine could provide the Supreme Court with an opportunity to overrule the D.C. Circuit without having to revisit *Citizens United*. *See* Emma Davis, *A 'Simple' Bill With Broad Implications: Legislature Hears Campaign Finance Reform Initiative*, Maine Morning Star (Mar. 7, 2024), https://tinyurl.com/5n9yrvkp. But any argument that Maine can flout *SpeechNow.org* while remaining faithful to *Citizens United* is wholly unpersuasive. That is because Maine's law is a precedential hand grenade, not a sniper rifle. It rejects the philosophy on which both *Citizens United* and *SpeechNow.org* were premised. It is no wonder, then, that *SpeechNow.org*, which simply applied First Amendment protections to contributions for independent expenditures—as the reasoning, if not the holding, of *Citizens United* required—has been followed by every Circuit faced with the same question. *See* Pl.'s Mot. for Permanent Inj. at 10–11 (Dkt. No. 16). An attack on *SpeechNow.org* is necessarily an attack on *Citizens United*'s central pillar: the recognition that independent political expenditures, by their very nature, cannot lead to *quid pro quo* corruption or the appearance thereof. Accordingly, Maine

cannot justify its speech-suppressing law on that basis that it is attempting to prevent *quid pro quo* corruption because when it comes to independent expenditures, none can exist.

Nor do examples of alleged corruption justify the law's constitutionality under the reasoning of *Citizens United*. Professor Lessig points to the long-running bribery scandals involving Senator Robert Menendez of New Jersey. In one case brought against the embattled legislator, the government alleged, among many other improprieties, that a wealthy Floridian made a $600,000 contribution to a Democratic political action committee that was earmarked to support the senator's 2012 reelection in exchange for the senator using his office to help the donor's girlfriend obtain a visa to enter the United States. *See* Matea Gold, *Menendez Indictment Marks First Big Corruption Case Involving a Super PAC*, The Washington Post (Apr. 2, 2015), https://tinyurl.com/2s3em73c. The political action committee at issue was not alleged to have been complicit in the arrangement. *See id.*[1] But campaign finance law governing so-called "soft money contributions" already prohibits such conduct, *see* 52 U.S.C. § 30125(e)(1)(A) ("A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office . . . shall not . . . solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act."), as do anti-bribery statutes—as evidenced by the Department of Justice's prosecution, *see United States v. Menendez*, No. 2:15-cr-00155 (D.N.J. 2015); *see, e.g.*, 18 U.S.C. § 201(b)(1)(A). Yet rather than relying on existing

---

[1] While that prosecution ultimately resulted in a mistrial, *see United States v. Menendez*, 291 F. Supp. 3d 606, 611 (D.N.J. 2018), Senator Menendez was convicted for other unrelated improprieties in a subsequent proceeding, *see* Larry Neumeister and Philip Marcelo, *Sen. Bob Menendez guilty of taking bribes in cash and gold and acting as Egypt's foreign agent*, AP (Jul. 16, 2024), https://tinyurl.com/5x29975s.

law or advocating for others that impose fewer burdens on political speech, Professor Lessig would prefer restricting the constitutional rights of political action committees operating wholly independently of candidates.

Another proponent of the law, Adam Cote, who helped secure its placement on the ballot, testified that Maine's law is indeed designed to spur a test case—but only "to challenge the lower courts' interpretation to the Supreme Court's decisions in *Buckley v*[.] *Valeo* and *Citizens United*." *Testimony Before the Joint Standing Committee on Veterans and Legal Affairs in Support of LD 2232*, 131st Leg., 2nd Reg. Sess. (Me. 2024) (statement of Adam Cote, Attorney, Drummond Woodsum), https://tinyurl.com/ycxzzu5u. But his explicit justification for the law confirms its invalidity under not only *Citizens United*, but also other unambiguous U.S. Supreme Court precedent. As Cote explained, Maine's suppression of political action committees was justified because "wealthy donors contributing to SuperPACs is one of [those] truly undemocratic forces that enjoys a grossly disproportionate share of influence over our election process." *Id.* That is to say, the law is designed to "level the playing field" by reducing the relative influence of wealthy individuals. But the U.S. Supreme Court unambiguously rejected this justification in *Davis v. FEC*, when it invalidated the so-called "Millionaires' Amendment" of federal campaign finance law. *See* 554 U.S. 724 (2008). As the Court explained, "[t]he argument that a candidate's speech may be restricted in order to 'level electoral opportunities' has ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Id.* at 742; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) ("'Leveling the playing field' can sound like a good thing. But in a democracy, campaigning for office is not a game."); *Buckley*, 424 U.S. at 48–49 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the

relative voice of others is wholly foreign to the First Amendment . . . .").  Indeed, as discussed, the Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."  *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022).

At bottom, any attempt at sidestepping *Citizens United*'s effective prohibition on regulating independent political speech would be futile.  The Supreme Court made as much clear shortly after deciding *Citizens United* when the State of Montana attempted to ignore the Court's central holding.  The law at issue in that case imposed a flat ban on any corporation making "an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party."  *Am. Tradition P'ship, Inc.*, 567 U.S. at 516 (per curiam) (quoting Mont. Code § 13–35–227(1) (2011)).  Montana argued that its law could be squared with *Citizens United* because: (1) those challenging the law had other means of engaging in political speech, (2) the campaign finance regulatory regime in Montana was simpler and less burdensome than equivalent federal law, and (3) Montana had a unique political history necessitating the suppression of corporate speech, including a long history of corporate influence in campaigns.  *See W. Tradition P'ship, Inc. v. Att'y Gen. of State*, 271 P.3d 1, 6–8 (Mont. 2012).  The Court found none of these justifications to be persuasive, concluding in a one-paragraph *per curiam* opinion that "[t]here can be no serious doubt" that Montana's arguments in defense of the law "either were already rejected in *Citizens United*, or fail to meaningfully distinguish that case."  *Am. Tradition P'ship*, 567 U.S. 516–17.

As the Court made clear in ruling against Montana, *Citizens United* was not a narrow decision limited to the federal regulatory scheme before it; it was a broad pronouncement concerning the fundamental constitutional right of businesses and other associations to engage in

13

political speech without government interference.  States like Maine are not at liberty to concoct innovative excuses for curtailing this right; thus, Maine's effort to skirt *Citizens United* should meet a similar fate here.

Simply put, *Citizens United*, which remains binding precedent, cannot be avoided.  Maine's law attempts to suppress the ability of political action committees to engage in political speech independent of any candidate, but the Supreme Court has clearly precluded Maine from doing so, as such a prohibition would undermine the core constitutional right to engage in political speech. Accordingly, the law violates the First Amendment and is unenforceable.

## CONCLUSION

Because independent-expenditure political action committees engage in conduct protected by the First Amendment, this Court should declare Maine's law unconstitutional and enjoin its enforcement.

Dated: January 24, 2025

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
By counsel

/s/ Ashley E. Eiler
Caleb P. Burns (*pro hac vice* forthcoming)
Andrew G. Woodson (*pro hac vice* forthcoming)
Ashley E. Eiler (Maine Bar No. 005300)
William K. Lane III (*pro hac vice* forthcoming)
WILEY REIN LLP
2050 M St NW
Washington, DC 20036
(202) 719-7000
cburns@wiley.law
awoodson@wiley.law
aeiler@wiley.law
wlane@wiley.law

*Counsel for* Amicus Curiae *Chamber of Commerce of the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2025, I electronically filed the above paper with the Clerk of Court using the ECF system, which sends notification of such filing to all counsel of record.


Dated: January 24, 2025                    /s/ Ashley E. Eiler
                                            Ashley E. Eiler