UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DINNER TABLE ACTION et al.,

Plaintiffs,

v.

WILLIAM J. SCHNEIDER et al.,

Defendants.

Docket No. 1:24-cv-00430-KFW

**STATE DEFENDANTS' OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION**

AARON M. FREY
Attorney General

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

The Commissioners of the Commission on Governmental Ethics and Election Practices (the "Commission") and Aaron M. Frey, all in their official capacities (collectively "State Defendants") oppose Plaintiffs' motion for entry of a permanent injunction (ECF No. 16).

## Preliminary Statement

In recent years, the funding of political campaigns has dramatically changed. As the result of a court decision invalidating federal limits on contributions to political action committees (PACs) that make independent expenditures, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), a new type of entity, the Super PAC, has come to dominate the financing of political campaigns. *SpeechNow* took the syllogism adopted in *Citizens United v. FEC*, 558 U.S. 310 (2010)—that independent *expenditures* could not, as a matter of law, give rise to quid pro quo corruption—and illogically expanded it to *contributions* to entities making such expenditures. In so doing, *SpeechNow* failed to anticipate the major loophole it was creating in federal campaign finance laws, authorizing the creation of entities designed to act as de facto campaign organizations but unfettered by the contribution limits meant to ensure that candidates and donors do not trade official acts for campaign support.

*SpeechNow*'s failure of imagination has become apparent. Since 2010, there has been an explosion of large contributions to Super PACs, some in the millions of dollars. In 2025, it is now clear that a contributor seeking to exchange financial support for official action—the classic quid pro quo arrangement that is properly subject to prophylactic regulation under the First Amendment—can execute that arrangement through a contribution to a candidate-aligned Super PAC just as effectively as they could by making a contribution to the candidate's own campaign. The same important governmental interests that support limiting contributions to candidates equally support limiting contributions to the Super PACs supporting those candidates.

1

The citizen initiative challenged here (the "Act") directly furthers Maine's strong interest in stopping this channel for quid pro quo corruption and its appearance. The Act imposes a $5,000 annual limit on contributing to state PACs to fund independent expenditures (IEs), while still leaving individuals and PACs free to make unlimited IEs as required by *Citizens United*. The Act is a response to the new electoral landscape that has arisen since *SpeechNow* in Maine. It guards not only against the real risk of quid pro quo corruption, as shown by at least two high-profile scandals in other states, but also against its appearance, as evidenced by, among other things, the record-breaking 600,191 Mainers who voted to approve the Act in November 2024.

Because the Act squarely furthers Maine's interest in combatting quid pro quo corruption and its appearance and is neither underinclusive nor overbroad, the Court should deny the motion for permanent injunction.

## Facts

### *Post-2010 Growth of Super PACs*

In 2010, the D.C. Circuit in *SpeechNow* concluded that federal contribution limits in the Federal Election Campaign Act were unconstitutional as applied to entities that make independent expenditures. This decision allowed for the creation at the federal level of Super PACs and related entities called Carey committees. Super PACs are limited to making IEs and can raise unlimited sums to do so. Declaration of Hilary Braseth, dated Feb. 14, 2025, ("Braseth Decl.") ¶ 6. Carey committees are hybrid entities that make both IEs and contributions to candidates and can raise unlimited funds for their IE spending. *Id.* ¶ 7.

Since 2010, contributions to federal Super PACs and Carey committees have gone from $86.5 million to $6.9 billion. *Id.*, Ex. A at 4. Similarly, IEs by Super PACs and Carey committees have gone from $62 million in 2010 to $4.1 billion in 2024. *Id.* at 2. In 2024, nearly

half (47.2%) of these IEs were made by Super PACs and Carey committees dedicated to single candidates. *Id.* Donors on both sides the political spectrum have made billions in contributions. *Id.* at 8. And these PACs are increasingly funded by large contributions: in 2024 Super PACs and Carey committees raised over $2 billion in individual contributions of $1 million or more, made by a mere 337 donors. *Id.* at 5.

Although *SpeechNow* did not directly impact Maine state elections, both because it was issued in a different jurisdiction and because Maine at the time did not place general limits on contributions to state PACs, Maine state and county elections have followed the federal trend. In the gubernatorial elections from 2010 to 2022, IEs by PACs have roughly quadrupled from $3.5 million to $13.6 million while candidate spending fell. Declaration of Jonathan Wayne, dated Feb. 14, 2025 ("Wayne Decl."), ¶ 10. Other state and county races saw similar changes, with IE PAC spending quadrupling from $833,000 in 2010 to $3.5 million in 2024, and candidate spending rising more slowly, from $3.9 million in 2010 to $5.6 million in 2024. *Id.* ¶ 11.

In 2022, Maine's last election with a gubernatorial race, 16 PACs made more than $100,000 in IEs. *Id.* ¶ 14. These PACs collectively received $19.4 million in contributions and spent $16.8 million in IEs. *Id.* ¶ 15. Some of these PACs received large contributions, with 101 contributions of $5,000 or more, 46 contributions of $25,000 or more, 23 contributions of $100,000 or more, and two contributions of over $1 million. *Id.* Four of these 15 PACs focused on a single race. *Id.* ¶ 14.

*Recent Corruption Scandals Involving Super PACs*

Although Super PACs have only existed since 2010, there have already been at least two corruption scandals in which contributions to them played a prominent role. In 2015, the U.S. Department of Justice charged New Jersey Senator Robert Menendez with a variety of

corruption-based crimes, including bribery, for allegedly soliciting contributions to a Super PAC, among other things, in exchange for official acts. Bolton Decl., Ex. A (Menendez Superseding Indictment). Specifically, Sen. Menendez was alleged (among other things) to have solicited $600,000 in contributions to a Super PAC, earmarked to support his campaign, in exchange for intervening on the contributor's behalf in a federal administrative proceeding alleging that the contributor had overbilled the Medicare program by millions of dollars. *Id.* ¶¶ 57–61; 196–218.

Sen. Menendez took the position in the ensuing criminal case that a contribution to a Super PAC cannot support a bribery charge. The District Court twice rejected this argument, holding that *Citizens United* did not preclude prosecution for bribery based on an exchange of an official act for a Super PAC contribution. *United States v. Menendez*, 291 F. Supp. 3d 606, 621 (D.N.J. 2018). The resulting trial ended with a hung jury.

A similar scandal recently unfolded in Ohio, where the former speaker of the Ohio House of Representatives, Larry Householder, was convicted on federal racketeering charges (appeal pending) for exchanging support for a state bailout of a nuclear plant for financial campaign support for himself and allied candidates, routed through a Super PAC. Bolton Decl., Ex. B (Indictment and Verdict). The indictment describes the conspirators' funneling of payments to an unnamed PAC, which used the money to benefit Householder and allied candidates. *Id.* ¶¶ 15–16, 91, 97. A related civil complaint by the Ohio Attorney General identifies the PAC as the Growth & Opportunity PAC, a federal Super PAC. *Ohio v. Firstenergy Corp.*, Complaint ¶ 51, *available at* https://tinyurl.com/47x2ru7x (last visited Feb. 14, 2025). FEC records confirm that this Super PAC received virtually all of its funding—over $1 million—from contributions from the conspirators' entity and spent most of those contributions on advertising supporting specific Ohio House candidates. *See* FEC, Campaign Data, https://tinyurl.com/ywp6kvkj.

*The Act*

The Act was enacted by citizen's initiative.[1]  During the Legislature's consideration of the Act, several witnesses testified to their concern about the potential for unlimited contributions to Super PACs to cause corruption.  Bolton Decl., Ex. C at 9, 40, 42–43, 56–57.  Voters ultimately approved the initiative by a vote of 600,191 in favor and 201,034 opposed, or 74.9% to 25.1%.  *See id.*, Ex. D (Governor's Proclamation).  The Act received more votes than any citizen's initiative in Maine history.[2]

The Act prohibits individuals and entities from contributing more than $5,000 to a given PAC in a calendar year "for the purpose of making [IEs]."  I.B. 2023, ch. 4, §§ 1–2 (codified at 21-A M.R.S.A. § 1015(2-C) & (2-D)) (filed as Bolton Decl., Ex. E).  A PAC is defined, with certain exceptions, to include any person other than an individual (as well as any separate or segregated fund established by a corporation or other entity) that "receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate to political office."[3]  21-A M.R.S.A. § 1052(5).  An IE is generally defined to mean an expenditure made to "design, produce or disseminate any communication that expressly advocates the election or defeat of a clearly

---

[1]  Under the Maine Constitution, Me. Const., art. IV, pt. 3, §§ 17–18, citizens that gather the required number of voter signatures (currently 67,682) in support of proposed legislation may submit that legislation to the Maine Legislature for enactment.  Unless the Legislature enacts the legislation as written, it is placed on the ballot that November and becomes law if approved by a majority of voters.

[2]  *See* Maine State Legislature, Legislative History Collection, Citizen Initiated Legislation, 1911–Present, available at https://legislature.maine.gov/legis/lawlib/lldl/citizeninitiated/ (last visited Jan. 28, 2025).

[3]  State law, including the Act, regulates PACs only to the extent they seek to influence state, county, and municipal elections.  *See* 21-A M.R.S.A. § 1011.  Campaign spending to influence federal elections is regulated exclusively by federal law.  *See* 52 U.S.C.A. § 30143.

identified candidate." *Id.* § 1019-B(1)(A).  In the period shortly before an election, the definition

is slightly broader, covering communications that name or depict a clearly identified candidate

unless the spender demonstrates that the expenditure does not have the purpose or effect of

influencing an election.  *Id.* § 1019-B(1)(B).

To the extent a PAC might receive contributions from a single source exceeding the

$5,000 limit, the Act prohibits the PAC from using the excess for IEs.  I.B. 2023, ch. 4, § 4

(codified at 21-A M.R.S.A. § 1019-B(6)).

Finally, PACs making IEs must include in their IE reports "the total contributions from

each contributor."  I.B. 2023, ch. 4, § 3 (codified at 21-A M.R.S.A. § 1019-B(4)(B)).

Commission staff interprets this provision as requiring PACs to disclose all contributions used to

fund the IEs disclosed in the report.  Wayne Decl. ¶ 30.

**Argument**

**I.    The Act does not violate the First Amendment**

**A.    The Act is a contribution limit subject to more relaxed scrutiny**

The Supreme Court has drawn a sharp analytical distinction between laws limiting

campaign expenditures—such as the ban on corporate IE spending struck down in *Citizens*

*United*—and laws limiting contributions—such as the Act challenged here.  It has explained that,

unlike expenditure limits, contribution limits do not meaningfully restrain speech because "[t]he

quantity of communication by the contributor does not increase perceptibly with the size of his

contribution, since the expression rests solely on the undifferentiated, symbolic act of

contributing." *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).

This analytical distinction remains good law.  In *FEC v. Beaumont*, 539 U.S. 146 (2003),

the Court explained that while expenditure limits are subject to strict scrutiny, "restrictions on

political contributions have been treated as merely 'marginal' speech restrictions subject to

6

relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Id.* at 161. Under this more deferential standard, a contribution limit must be "closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tuned." *Daggett v. Comm'n on Govtl. Ethics & Election Pracs*., 205 F.3d 445, 454 (1st Cir. 2000) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 385 (2000) ("*Shrink Mo.*")) (cleaned up).

The Act is a contribution limit. The core of the Act is the $5,000 limit on giving to PACs for the purpose of making IEs. The Act's only limit on expenditures is to prohibit PACs from spending illegally contributed funds, a necessary subsidiary provision.

### B. The Act is closely drawn to match the State's interest in combating quid pro quo corruption and its appearance

Current precedent generally requires the state to demonstrate that a challenged spending restriction, whatever the applicable level of scrutiny, furthers its interest in combatting quid pro quo corruption or its appearance. *See FEC v. Cruz*, 596 U.S. 289, 305 (2022).[4] As defined by the Court, such corruption involves "a direct exchange of an official act for money" or "dollars for political favors." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)). Under federal criminal law, an illegal quid can be "anything of value" given to the candidate in exchange for an official act, including otherwise legal campaign contributions. 18 U.S.C.A. § 201(b); *see United States v. Evans*, 504 U.S. 255 (1992). Contributions to Super PACs can thus be crimes if they are made in

---

[4]    *But see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (upholding campaign finance law based on compelling interest in "public confidence in the integrity of the judiciary"); *Bluman v. FEC,* 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (upholding campaign finance law based on governmental interest in "preventing foreign influence over U.S. elections."), *aff'd,* 565 U.S. 1104 (2012).

exchange for official acts.  *Menendez*, 291 F. Supp. 3d at 622.

In demonstrating that a challenged law combats quid pro quo corruption or its appearance, "[i]t is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption."  *Ognibene v. Parkes*, 671 F.3d 174, 183 (2d Cir. 2011) (citing *McConnell v. FEC*, 540 U.S. 93, 150 (2003) *overruled in part by Citizens United,* 558 U.S. 310).  Legislatures may take into account that "candidates, donors, and parties test the limits of the current law."  *McConnell*, 540 U.S. at 144 (quoting *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001)); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights").  Thus, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  *Shrink Mo.*, 528 U.S. at 391.

The Act furthers Maine's interest in stopping quid pro quo corruption by preventing candidates from trading official acts for contributions to Super PACs aligned with their campaigns.  PACs that make IEs are now major players in campaigns, both in Maine and nationally.  Wayne Decl. ¶¶ 8–27; Braseth Decl. Ex. A.  While Super PACs cannot legally collaborate with candidates they support,[5] candidates are not blind; they can be expected to know based on the PAC's stated purpose, personnel, and previous expenditures whether a contribution to the Super PAC will provide a reliable and effective benefit to the candidate's election

––––––––––––––––––––

[5]  Or, more precisely, if they collaborate, any resulting expenditures by the PAC are treated as contributions to the candidate subject to contribution limits.  *See* 21-A M.R.S.A. § 1015(5).

prospects.  A candidate with an effective Super PAC supporting them wishing to trade "dollars for political favors" thus need not demand direct campaign contributions; securing contributions to the aligned Super PAC accomplishes the same end.  Maine has just as strong an interest in barring such indirect quid pro quos as it does in barring arrangements when the money goes directly to the candidate.  Both are corrupt under any reasonable definition of the term.

Indeed, though Super PACs have only existed since 2010, there have been at least two scandals involving candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements: the 2015 bribery indictment of Robert Menendez for allegedly trading favors for Super PAC contributions and the 2023 conviction of Larry Householder for a conspiracy that involved trading official acts for campaign support funneled through a Super PAC.  *See* page 3, above.  These scandals confirm that the corruption risks addressed by the Act are neither novel nor implausible.  *See Shrink Mo.*, 528 U.S. at 391.

While Maine has not yet had a similar scandal, it is "entitled to rely on evidence from other jurisdictions to justify campaign-finance reform measures, . . . if the evidence relied upon is 'reasonably believed to be relevant to the problem.'"  *Homans v. City of Albuquerque*, 366 F.3d 900, 909 (10th Cir. 2004) (quoting *Shrink Mo.*, 528 U.S. at 394 & n.6).  The record here shows that arrangements like the one alleged in the Menendez case and proven in the Householder case could easily occur.  A number of PACs in Maine accept large contributions and spend them on IEs to influence a small number of races.  *See* Wayne Decl. ¶¶ 19–24.  Among others, Plaintiff Dinner Table Action PAC accepted a number of large contributions in 2024 from individuals and entities to support 10 legislative candidates with nearly a million dollars in IEs.  *Id.* ¶ 24 & Ex. B.

The point is not that any of these contributions was necessarily part of a quid pro quo.

Contribution limits are, by their nature, prophylactic, preventing non-corrupt transactions to better protect against the corrupt ones. *See Citizens United*, 558 U.S. at 357 (explaining that contribution limits are preventative since "few if any contributions to candidates will involve quid pro quo arrangements"). But the existence of high-spending PACs focused on IEs and funded by large contributions collectively shows that there is fertile ground in Maine for contributors and candidates to execute the sort of corrupt arrangements alleged in the Menendez case and proven in the Householder case.

Plaintiffs contend that the Act is unconstitutional by pointing to the D.C. Circuit's decision in *SpeechNow*. Mot. at 10. *SpeechNow* concluded that the Federal Election Campaign Act was unconstitutional to the extent its $5,000 limit on contributions to federal PACs applied to PACs that make IEs. 599 F.3d at 698. *SpeechNow* relied heavily on *Citizens United*, which struck down the federal ban on IEs by corporations and labor unions. *Id.* at 694–95. Quoting *Citizens United*'s holding that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption," *SpeechNow* asserted that it was tautological that "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." *Id.* at 694. According to the court, under *Citizens United*'s categorical holding, "there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'" *Id.*

The flaw in this reasoning is that the quid in a corrupt arrangement between a candidate and a donor to the Super PAC is not any particular IE. Rather, the quid is the provision of a large amount of financial support to an entity that the candidate knows to be working toward their election. The prospect of such funding to an aligned entity that the candidate knows exists to boost their electoral prospects provides the candidate with the "thing of value" for which they

might be tempted to trade official acts. The Super PAC receiving the corrupt contribution need not coordinate with the candidate or, indeed, know anything at all about the corrupt deal. In such an arrangement, the *expenditure* would be independent—just as *Citizens United* held—but the *contribution* funding the expenditure would nonetheless be the product of a corrupt quid pro quo properly regulated by the state.[6]

The facts in *SpeechNow* may have obscured this corruption risk. The plaintiff was a nonprofit association that wished to make IEs supporting or opposing candidates based on their perceived support for the First Amendment. 599 F.3d at 689. Such an organization is a far cry from modern PACs like Make America Great Again Inc. or FF PAC, each of which collected individual contributions sometimes in the millions of dollars in order to support the 2024 Republican and Democratic presidential candidates respectively.[7] While it may have seemed implausible to the *SpeechNow* court that a candidate would trade official acts in exchange for a $5,500 contribution to a policy-focused nonprofit, the same cannot be said about, say, a $50 million contribution to an entity that exists for the sole purpose of electing the candidate. It is thus understandable that *SpeechNow* may not have anticipated the rise of such entities and the corresponding opportunities for quid pro quo corruption. But this Court, in deciding whether it agrees with *SpeechNow*'s reasoning that quid pro quo corruption between candidates and contributors to Super PACs is impossible, can and should consider the fundamental changes to

---

[6] *See also* Alschuler, Albert W. et al., "Why Limits on Contributions to Super PACs Should Survive *Citizens United*," 86 Fordham Law R. 2299 (Apr. 2018) (extensively critiquing *SpeechNow*'s reasoning).

[7] *See* FEC, Campaign Finance Data, "FF PAC," at https://www.fec.gov/data/committee/C00669259/; "Make America Great Again Inc." at https://www.fec.gov/data/committee/C00825851/ (last visited Feb. 11, 2025).

American campaign finance unleashed by that decision.

Plaintiffs also point out that other courts (though none in this jurisdiction)[8] have agreed with *SpeechNow*. Mot. at 10–11. While true, perhaps most notable about Plaintiffs' string cite of cases is their collective age. With only a couple of exceptions, these cases were decided within a few years of *SpeechNow*, before those courts had the benefit of observing the full transformation of America's elections wrought by that decision.

The error in these cases is exemplified by the statement in *Alaska Public Officials Commission v. Patrick*, 494 P.3d 53, 58 (Alaska 2021), highlighted by Plaintiffs, that "[t]here is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Id.*; *see* Mot. at 11. This statement has it exactly backwards. The campaign professionals likely to operate a modern Super PAC would not seem to be particularly plausible candidates to engage in bribery schemes with a candidate whom it is already their mission to support. Rather, potential bribers are likely to be entities and individuals with business before the government and who, while lacking the expertise to establish an effective Super PAC, have the wealth to make a large contribution to one. Contributing to the candidate's Super PAC represents a way for such persons to pay the quid in a seemingly legitimate manner. Thus, the potential for contributions to Super PACs to corrupt is higher, not lower, than the potential for IEs to corrupt.

Plaintiffs also fail to account for the substantial appearance of corruption created by unlimited contributions to PACs to make IEs. The appearance of quid pro quo corruption is of

_____

[8]  Plaintiffs assert that the Supreme Court "approvingly cited" *SpeechNow* in a footnote in *McCutcheon* at 572 U.S. at 193 n.3. Mot. at 11. But that footnote describes *SpeechNow* in explaining factually how Super PACs work. It cannot be read to endorse *SpeechNow*, even in dicta.

"almost equal concern as the danger of actual quid pro quo arrangements," *Buckley*, 424 U.S. at 27, as it risks "the eroding of public confidence in the electoral process." *McConnell*, 540 U.S. at 136. "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Shrink Mo.*, 528 U.S. at 390.

The record shows significant voter concern about the corruption risk posed by unlimited contributions to Super PACs. The legislative history of the Act repeatedly mentions corruption risks. Bolton Decl., Ex. C. The record-breaking vote total and huge margin of victory for the Act at the ballot box, *id.*, Ex. D, show that Maine voters overwhelmingly view large contributions to Super PACs as a pernicious force. *See Shrink Mo.*, 528 U.S. at 394 (citing 74% approval of contribution-limits referendum as "attest[ing] to the perception" by voters of corruption); *Daggett*, 205 F.3d at 458 (citing approval of bill at referendum as "indicative of [Maine voters'] perception of corruption"). The record also includes the testimony of a sitting Maine legislator that Super PACs "create a risk that politicians who benefit from these Super PACs' are beholden to the SuperPACs' contributors and will engage in quid-pro-quo corruption." (ECF No. 17-1, at ¶ 6) The high profile of Super PACs in the 2024 presidential election[9] have only further heightened this appearance of corruption.

In short, *SpeechNow* and its progeny were wrongly decided, as the current landscape only underscores. This Court need not and should not follow those flawed decisions.

---

[9] *See, e.g.*, Schouten, Fredreka et al., "Musk spent more than a quarter-billion dollars to elect Trump, including funding a mysterious super PAC, new filings show," *CNN* (Dec. 5, 2024), at https://www.cnn.com/2024/12/05/politics/elon-musk-trump-campaign-finance-filings/index.html; Goldmacher, Shane and Theodore Schleifer, "Donors to Pro-Biden Super PAC Are Said to Withhold Roughly $90 Million," *New York Times* (July 12, 2024), at https://www.nytimes.com/2024/07/12/us/politics/biden-donors-money.html.

### C.    Alternatively, the Act is constitutional as furthering the State's interest in preventing institutional corruption

State Defendants understand that the prospective intervenors intend to advance originalist arguments, supported by scholarly testimony, concerning the scope of permissible state interests under the First Amendment.  State Defendants agree with the prospective intervenors that, should the Act be found not to further an interest in preventing quid pro quo corruption, the Act should nevertheless be upheld as furthering prevention of corruption as the concept was understood at the time of the Founding.  Should intervention be denied, State Defendants request the opportunity to more fully present this argument for the Court's consideration.

## II.    The Act is not underinclusive

In addition to arguing that the Act is unconstitutional because it curbs too much speech, Plaintiffs alternatively argue that the Act bans too *little* speech, by not extending to contributions made to political parties.  Mot. at 13.  Plaintiffs argue that the Act thereby "entrenches power within political parties."  *Id.* at 14.

As the Supreme Court has explained in the campaign-finance context, "the First Amendment imposes no freestanding 'underinclusiveness limitation.'":

> A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny— that conceivably could have restricted even greater amounts of speech in service of their stated interests.

*Williams-Yulee*, 575 U.S. at 449; *accord Buckley*,  424 U.S. at 105; *Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 312 (D. Me. 2018).  Underinclusiveness is relevant to the constitutional analysis not because it is inherently problematic but because it can raise "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Williams-Yulee*, 575 U.S. at 448 (quoting *Brown*

*v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)).

Here there can be no doubt that the Act is directed at corruption, and not at disfavoring any speaker or viewpoint. The Act targets an aspect of the election system that is vulnerable to corruption, as shown above: trading official acts for contributions to Super PACs that serve as de facto campaign entities for specific candidates or groups of candidates. Moreover, the Act has no partisan bent, as evidenced by the proliferation of Super PACs across party lines, Braseth Decl., Ex. A at 8, and the huge margin of victory of the Act at the polls, Bolton Decl., Ex. D.

Initiators and voters could have reasonably believed that the risk of Super PAC–related corruption is substantially greater than the risk of party-related corruption. Parties exist to elect their members to office. For a major party, that means supporting potentially hundreds of candidates in a given election. Super PACs, in contrast, can be much more selective in the candidates they support, sometimes supporting only a single candidate. It is reasonable to expect that candidates seeking quid pro quo arrangements with contributors would be more likely to select a Super PAC with a narrow focus on their candidacy as the vehicle for their scheme.

The Act's proponents also had good reason to be cautious about extending it to political parties. The Supreme Court has recognized that the right to associate with a political party is a "particularly important political right." *Randall v. Sorrell*, 548 U.S. 230, 256 (2006) (plurality op.). The *Randall* plurality recognized "the need to allow individuals to participate in the political process by contributing to political parties that help elect candidates," striking down Vermont's limits in part because the law, "to an unusual degree, . . . would discourage those who wish to contribute small amounts of money to a party." *Id.* Lower courts have also suggested that political parties may be entitled to heightened constitutional protection from campaign finance restrictions. *Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1123 (N.D. Ill. 2012)

15

(observing that the predominant view of then-sitting Supreme Court Justices is that "the First Amendment *requires* that political parties be treated more favorably than non-party contributors"); *Anh Cao v. Fed. Election Comm'n*, 688 F. Supp. 2d 498, 547 (E.D. La. 2010) ("The unique purpose of parties, as compared to other political associations like PACs, arguably entitles it to heightened constitutional protection").

Indeed, the Second Circuit has expressly recognized that differences between political parties and other groups can justify differing treatment concerning acceptance of contributions. In *Upstate Jobs Party v. Kosinski*, 106 F.4th 232 (2d Cir. 2024), a New York political organization challenged a state law that imposed lower limits on making contributions to "independent bodies"—organizations that nominated candidates but were not qualified as political parties—than on contributions to parties. The Court rejected the plaintiff's equal protection challenge, concluding that the two types of entities were not similarly situated, noting the "range of structural and operational requirements" that apply to political parties. *Id.* at 246.

Maine law similarly recognizes the distinct nature of parties. To qualify as a party in Maine, a group must demonstrate a significant base of public support. *See* 21-A M.R.S.A. §§ 301–303. Once qualified, parties must hold various public proceedings, such biennial municipal caucuses, *see* 21-A M.R.S.A. § 312, and state conventions, *see* 21-A M.R.S.A. § 321. In exchange, parties are granted easier ballot access. *See id.* § 331. Given the close associational links between parties, their members, and their candidates, and the quasi-public nature of parties, they are not similarly situated to PACs and it is reasonable—indeed, possibly even constitutionality required—for state law to treat contributions to parties differently.

Finally, the record shows that the Act does not seem likely to produce a landscape in which party IEs dominate other election spending. PACs can continue to raise large sums under

the Act for IEs given its generous $5,000 limit on contributions. Since 2021, for example, Plaintiff Dinner Table PAC has received more than half its funding—over $600,000—through contributions of $5,000 or less, which remain legal under the Act. Wayne Decl. ¶¶ 25–26. Moreover, in many elections since 2010, including the 2022 and 2024 elections, party IEs have played a relatively small role compared to PAC IEs and candidate spending. *Id.* ¶ 27.

### III.    The disclosure requirement is constitutional

Plaintiffs also separately attack § 3 of the Act, which amends the IE reporting law to require IE reports to contain, in addition to the previously required information, "the total contributions from each contributor." 21-A M.R.S.A. § 1019-B(4)(B).

Because disclosure requirements do not limit campaign-related activities or prevent anyone from speaking, they are subject to a "less intense standard of constitutional review" known as "exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021). Under exacting scrutiny "a law or regulation must be narrowly tailored to serve a sufficiently important governmental interest." *Id.* Disclosure requirements "need not reflect the least restrictive means available to achieve the [state's] goals, but they need to achieve a reasonable fit." *Id.* at 88. When a reporting threshold is challenged, the First Circuit gives "judicial deference to plausible legislative judgments as to the appropriate location of a reporting threshold," and upholds such determinations "unless they are wholly without rationality." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 60 (1st Cir. 2011) (quoting *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 32–33 (1st Cir.1993)) (cleaned up).

Moreover, preventing quid pro quo corruption is not the only permissible interest. The First Circuit has also recognized as valid governmental interests "providing the electorate with information as to who supports a candidate and where political funding comes from," "keeping the electorate informed about which constituencies may command a candidate's loyalties," and

"gathering data essential to detect violations of contribution limits."  *Daggett*, 205 F.3d at 465–66.  The disclosure requirement in the Act serves precisely these interests.

Maine law has long required PACs to publicly disclose received contributions over $50, *see* 21-A M.R.S.A. § 1060(6), a provision that the First Circuit has described as "well tailored to Maine's informational interest."  *Nat'l Org. for Marriage*, 649 F.3d at 58.  Maine law also requires parties to report contributions over $200, 21-A M.R.S.A. § 1017-A(1), and anyone who makes an IE over $250, whether an individual, PAC, or party, to report it to the Commission.  *See* 94-270 C.M.R. ch. 1, § 10(3).  Against this regulatory backdrop, the Act adds a requirement that these IE reports list, in addition to the other itemized information about the disclosable IEs, "the total contributions from each contributor."  21-A M.R.S.A. § 1019-B(4)(B).  Commission staff interprets this language to require IE reports to identify all contributions used for the IEs itemized in the report.  Wayne Decl. ¶ 30.  Contributions that are not actually used to fund the IEs need not be disclosed in the IE report.

This requirement is narrowly tailored to at least three important interests.  First, it directly furthers the interest in "gathering data essential to detect violations of contribution limits." *Daggett*, 205 F.3d at 466.  By requiring disclosure of contributions used to finance particular IEs—even small ones—the Commission and the public will be able to investigate whether a PAC has spent money on IEs from contributions exceeding the $5,000 threshold over the course of an election cycle by reviewing the IE reports for a particular PAC.  Second, the requirement furthers the government's interest in detecting and deterring quid pro quo corruption.  Disclosure of contributors and association of those contributors with specific IEs will make it more difficult to conceal the sort of quid pro quo between candidate and contributor alleged in the Menendez case.  And, finally, the requirement furthers the interest in "keeping the electorate informed

about which constituencies may command a candidate's loyalties." *Id.* When a generically named Super PAC spends $1 million in IEs to support a candidate, the relevant information to the public will often not be the identity of the PAC itself—which might be nothing more than a generically named entity run by campaign professionals. Rather, the public's informational interest will be often better served by knowing the identities of the individuals, business, or other entities that provided the funds used by the Super PAC to generate IEs.

Further, while very small contributions may be unlikely to be illegal bribes, their disclosure still furthers, at the very least, the state's interest in an informed electorate. *See Fam. PAC v. McKenna*, 685 F.3d 800, 810 (9th Cir. 2012) (observing that "small contributions may provide useful information to voters when considered in the aggregate"); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1251 (11th Cir. 2013) (upholding a zero-dollar disclosure threshold); *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 41 (1st Cir. 2012). Indeed, the Supreme Court in dicta has expressly endorsed zero-dollar disclosure thresholds, stating that "if it is thought wise, legislation can outlaw anonymous contributions." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 300 (1981).

Plaintiffs' argument that the disclosure provision is underinclusive is also meritless. The Act's contribution disclosure requirement applies not just to PACs, but anyone who makes IEs. *See* 21-A M.R.S.A. § 1019-B(4). Moreover, the provision does not disfavor particular speakers or viewpoints. The Act's purpose is to regulate contributions for IEs and it thus, quite reasonably, targets its disclosure provision to such contributions, without meddling with longstanding disclosure requirements for candidate contributions. As explained above, even if these disclosure frameworks are not identical, the initiators of the Act were not required to perfectly harmonize every aspect of Maine's overall disclosure regime in order for the Act to

survive constitutional challenge. *Williams-Yulee*, 575 U.S. at 449. Here, the proponents were attempting to address a risk created specifically by the rise of Super PACs; their amendment of IE reporting requirements is a reasonable fit to the problem they were seeking to address.

## IV.    Any portions of the Act determined to be unconstitutional should be severed

Whether the Act is severable is a question of state law. *Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.*, 324 F. Supp. 2d 71, 72 (D. Me. 2004). And Maine law expressly provides that Maine statutes are severable. *See* 1 M.R.S.A. § 71(8). Thus, under Maine law "[a]n invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole." *Nat'l Fire Adjustment Co., Inc. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019) (quoting *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183).

The Act contains two interrelated yet distinct requirements: the limits on contributions (and subsidiary limit on spending illegal contributions) and the contribution disclosure requirement. Both serve the same purpose of combatting quid pro quo corruption and, while they would be most effective in combination, each can further that purpose absent the other. Moreover, as argued above, the disclosure provision serves additional valid purposes. There is no reason to think that the voters who approved the Act would wish for the disclosure provisions to be struck down if only the limits are found unconstitutional, or vice versa. The Court should therefore follow Maine's presumption of severability and save the remainder of the Act if it finds a portion of it to be unconstitutional.

## Conclusion

The Court should deny the motion for permanent injunction and enter judgment for the State Defendants.

Dated: February 14, 2025

AARON M. FREY
Attorney General


/s/ Jonathan R. Bolton

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

*Counsel for William J. Schneider, David R.*
*Hastings III, Sarah E. LeClaire, Dennis*
*Marble, Beth N. Ahearn, and Aaron M. Frey*