# MAINE STATE LEGISLATURE

The following document is provided by the

## LAW AND LEGISLATIVE DIGITAL LIBRARY

at the Maine State Law and Legislative Reference Library
http://legislature.maine.gov/lawlib



Reproduced from scanned originals with text recognition applied
(searchable text may contain some errors and/or omissions)

# 131st Maine State Legislature
## Committee Activity

---

Committee: Veterans and Legal Affairs

LD: 2232

Title: An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures

---

Public Hearing(s): 03/06/24 1:05 PM

Work Session(s): 03/12/24 1:30 PM

Reported Out: 03/19/2024

Committee Report(s): ONTP

Committee History: 3/12/2024 2:16:49 PM    Work Session Held
3/12/2024 2:17:03 PM    Voted



# 131st MAINE LEGISLATURE

## SECOND REGULAR SESSION-2024

| Legislative Document | No. 2232 |
|---|---|

| I.B. 5 | House of Representatives, February 28, 2024 |
|---|---|

**An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures**

Transmitted to the Clerk of the 131st Maine Legislature by the Secretary of State on February 27, 2024 and ordered printed.

*R(t B. Hunt*

ROBERT B. HUNT
Clerk

Printed on recycled paper

1    Be it enacted by the People of the State of Maine as follows:

2    **Sec. 1. 21-A MRSA §1015, sub-§2-C** is enacted to read:

3    **2-C.    Contributions by individuals to political action committees making**
4    **independent expenditures.**  An individual may not make contributions aggregating more
5    than $5,000 in any calendar year to a political action committee for the purpose of making
6    independent expenditures under section 1019-B, subsection 1. Beginning December 1,
7    2024, contribution limits in accordance with this subsection are adjusted every 2 years
8    based on the Consumer Price Index as reported by the United States Department of Labor,
9    Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The
10    commission shall post the current contribution limit and the amount of the next adjustment
11    and the date that it will become effective on its publicly accessible website and include this
12    information with any publication to be used as a guide for candidates.

13    **Sec. 2. 21-A MRSA §1015, sub-§2-D** is enacted to read:

14    **2-D. Contributions by political action committees and business entities to political**
15    **action committees making independent expenditures.**  A leadership political action
16    committee, a separate segregated fund committee, a caucus political action committee, any
17    other political action committee or any business entity may not make contributions
18    aggregating more than $5,000 in any calendar year to a political action committee for the
19    purpose of making independent expenditures under section 1019-B, subsection 1.
20    Beginning December 1, 2024, contribution limits in accordance with this subsection are
21    adjusted every 2 years based on the Consumer Price Index as reported by the United States
22    Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount
23    divisible by $25. The commission shall post the current contribution limit and the amount
24    of the next adjustment and the date that it will become effective on its publicly accessible
25    website and include this information with any publication to be used as a guide for
26    candidates.  For purposes of this subsection, "business entity" includes a firm, partnership,
27    corporation, incorporated association, labor organization or other organization, whether
28    organized as a for-profit or a nonprofit entity.

29    **Sec. 3. 21-A MRSA §1019-B, sub-§4, ¶B,** as amended by PL 2023, c. 324, §12,
30    is further amended to read:

31    B.  A report required by this subsection must contain an itemized account of the total
32    contributions from each contributor, each expenditure in excess of $250 in any one
33    candidate's election, the date and purpose of each expenditure and the name of each
34    payee or creditor.  The report must state whether the expenditure is in support of or in
35    opposition to the candidate and must include, under penalty of unsworn falsification,
36    as provided in Title 17-A, section 453, a statement whether the expenditure is made in
37    cooperation, consultation or concert with, or at the request or suggestion of, the
38    candidate or an authorized committee or agent of the candidate.

39    **Sec. 4. 21-A MRSA §1019-B, sub-§6** is enacted to read:

40    **6.  Segregated contributions required.**  A political action committee may use only
41    funds received in compliance with section 1015, subsection 2-C or 2-D when making
42    independent expenditures.  A political action committee that makes independent
43    expenditures shall keep an account of any contributions received for the purpose of making
44    those expenditures.

1                        **SUMMARY**

2        This initiated bill limits the amount of contributions that may be made by individuals
3    and by political action committees and business entities to political action committees that
4    make independent expenditures. In both cases, the aggregate limit is $5,000 in any calendar
5    year.

STATE OF MAINE

131ST LEGISLATURE

———————————————

LEGISLATIVE NOTICES

JOINT STANDING COMMITTEE ON VETERANS AND LEGAL AFFAIRS

Sen. Craig Hickman, Senate Chair

Rep. Laura Supica, House Chair

PUBLIC HEARING:        Wednesday, March 6, 2024, 1:05 PM, State House, Room 437

(L.D. 2232)        Bill "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" (IB0005)

———————————————

———————————————

CONTACT PERSON:        Michelle Hebert

100 State House Station

Augusta, ME 04333-0100

287-1310

WORK SESSION AGENDA

VETERANS AND LEGAL AFFAIRS

3/12/2024

1:30 PM

State House, Room 437

(L.D. 1695)    Bill "An Act to Provide for the Direct Shipment of Spirits to Consumers" (SP0682) (Presented by Senator STEWART, T. of Aroostook) (Cosponsored by Senator POULIOT, M. of Kennebec, Senator HICKMAN, C. of Kennebec, Senator PIERCE, T. of Cumberland, Representative RUDNICKI, S. of Fairfield, Representative O'CONNELL, K. of Brewer, Representative DILL, J. of Old Town)

(L.D. 2014)    Bill "An Act Regarding Spirits Price Regulation " (SP0836)

(L.D. 2232)    Bill "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" (IB0005)

(L.D. 2259)    Bill "An Act to Prohibit Receiving Compensation for Assisting a Person to Obtain Veterans' Benefits Except as Permitted Under Federal Law" (SP0976) (Presented by Senator FARRIN, B. of Somerset) (Cosponsored by Representative FAULKINGHAM, B. of Winter Harbor, President JACKSON, T. of Aroostook, Senator STEWART, T. of Aroostook, Senator DAUGHTRY, M. of Cumberland, Senator HICKMAN, C. of Kennebec, Senator KEIM, L. of Oxford, Senator TIMBERLAKE, J. of Androscoggin, Speaker TALBOT ROSS, R. of Portland, Representative ARATA, A. of New Gloucester) Approved for introduction by a majority of the Legislative Council pursuant to Joint Rule 205.

_____

_____

CONTACT PERSON:        Michelle Hebert

100 State House Station

Augusta, ME 04333-0100

287-1310

## IN-PERSON TESTIMONY SIGN IN SHEET

Committee: JLA

Date: 3-6-24

L.D. #: 2232

Title:

| Name (PLEASE PRINT LEGIBLY) | Town/Affiliation | Proponent | Opponent | Neither | Written Testimony Provided |
|---|---|---|---|---|---|
| Cara Brown McCormick | Cape Eliz ME | ✓ | | | |
| Lawren Cess | Blabe MA | ✓ | | | |
| MAIA COOh | New Haven | ✓ | | | |
| Adam Cote | Springvale | ✓ | | | |
| Ride Bennett | Oxford | ✓ | | | |
| Jack McCormick | Cape Elizabeth | ✓ | | | |
| Kate Knox | Portland | | | ✓ | |
| Will Hayward | MCCE | | | ✓ | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**TESTIMONY SIGN IN SHEET**



Richard A. Bennett
Senator, District 18

3 State House Station
Augusta, Maine 04333

**THE MAINE SENATE**
131st Legislature

### Joint Standing Committee on Veterans and Legal Affairs on
### LD 2232, An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures
### March 6, 2024

Senator Hickman, Representative Supica, and esteemed members of the Joint Standing Committee on Veterans and Legal Affairs: I am Senator Rick Bennett of Oxford, and I have the honor of serving 14 communities in Western Maine in the State Senate. I am pleased to speak in favor of LD 2232, "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures."

Our politics is broken. Our government is corrupted by money and large donors. The nation we love is imperiled. Profound changes are needed. LD 2232 could provide one of the solutions to save our country.

As you know from my work on earlier bills before your committee, I am very passionate about reforming our campaign finance system. There are serious issues with money's influence on our democracy. I worry that a small number of people have too much influence on our politics.

The bill before you comes from the people of Maine who overwhelming agree with this sentiment. Indeed, 76,081 Mainers have petitioned their legislature to ask us for action. And act we must.

Voters are tired of the incredible amounts of spending done during election season, increasingly by dark money sources. Maine voters continue to support Clean Elections, which is an attempt to get big money out of our politics. However, despite our Clean Election laws, political action committees are allowed to spend unlimited amounts in support or against Clean Election candidates.

People are fed up and motivated to fix this problem. The petition to get this proposal before you began circulating at the end of last October. It took a mere three months for advocates to collect and turn in 76,081 valid signatures from across the state. The people of Maine deserve and want a political system both free of corruption and the appearance of corruption.

Furthermore, this proposal is popular. According to an October 2023 Pew Research Center, 72% of US adults believe that there should be limits on the amount of money individuals and organizations can spend on political campaigns. Only 11% believe individuals and organizations should be able to spend as much as they want and 16% are unsure. Additionally, 80% of US adults believe people who donate money to political campaigns have too much influence on decisions their elected officials make.

The Legislature should enact this law now. It is one of the best changes we can make to improve the accessibility of our democracy. I have no doubt there will be legal challenges after its enactment – there always are by the monied interests eagerly protecting their entrenched power. But I am confident that we will win that legal battle. Harvard Law School's Lawrence Lessig, who has been spearheading this effort, said, "SuperPACs have been with us for more than 13 years so it is understandable that most lawyers believe the Supreme Court has upheld them. It has not. Likewise, it is understandable that many political organizations, including reform organizations on the Left and Right, have become dependent on the super-wealthy to do their work. Some of them now support SuperPACs, as do many of the most wealthy in America who use SuperPACs to influence American politics. But we know that the vast majority of Americans on both the Left and Right hate the corruption of big money in American politics."

Thank you for your time. I urge you to vote "ought to pass" on LD 2232 to give citizens the chance to get our democracy back.

# Report on Contributions to Super PACs Making Independent Expenditures in Maine *Federal* Elections

Prepared by Maia Cook for the Public Hearing on LD2232:

*An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures*

March 6, 2024

# Report on Contributions to Super PACs Making Independent Expenditures in Maine *Federal* Elections

### Prepared by Maia Cook

### March 6, 2024

## Facts about the dataset

- The dataset used for this analysis was received from OpenSecrets

- This dataset only looks at contributions greater than or equal to $5,000.

- This dataset look at Maine elections from 2010-2022.

- This dataset looks exclusively at Super PACs. It does not account for hybrid independent-expenditure-only groups, otherwise known as 'Carey Committees.'

- This analysis concerns unlimited contributions to committees that make independent expenditures, not the spending of these PACs.

## Conclusions from the analysis

1. Independent money is playing an increasingly important role in modern elections.

2. The vast majority of independent money is out-of-state money.

3. Candidates are increasingly dependent on money from super PACs.

## Responses to anticipated FAQs:

- Our analysis, and subsequent argument in favor of the proposed initiative, has *nothing* to do with limiting independent expenditures.

- It would be a mistake to infer that our argument opposes *Citizens United v. FEC*. We embrace the logic of *Citizens United v. FEC* to prove that contributions to super PACs should have limits *because* there is a risk of quid pro quo corruption.

- We are not challenging the First Amendment.

1

FEDERAL REPORT

# 1   Summary Statistics of *Federal* Dataset

Table 1: Number of Contributions over $5,000 to Super PACs per ME Cycle

| Year | # Contributions |
|------|-----------------|
| 2010 | 149 |
| 2012 | 244 |
| 2014 | 1318 |
| 2016 | 775 |
| 2018 | 1922 |
| 2020 | 7143 |
| 2022 | 417 |

Table 2: Total Contributions to Super PACs per ME Cycle

| Cycle | ContribTotal |
|-------|--------------|
| 2010 | $4,919,000 |
| 2012 | $21,162,880 |
| 2014 | $192,267,915 |
| 2016 | $148,501,150 |
| 2018 | $399,825,729 |
| 2020 | $1,478,892,397 |
| 2022 | $58,565,122 |

Table 3: Summary Statistics of Contributions ($5,000+) Spent in ME Federal Elections, 2010-2022

| Statistic | Value |
|-----------|-------|
| Minimum | $5,000 |
| 1st Quartile | $5,000 |
| Median | $20,000 |
| Mean | $192,525 |
| 3rd Quartile | $100,000 |
| Maximum | $27,500,000 |

2

FEDERAL REPORT



Figure 1: Density Plot of the 95th Percentile of Contribution Sizes

Note: I took the 95th percentile because the plot is illegible when massive outliers in the top 5% of contributions were included.



Figure 2: Time Series Analysis of Contributions from super PACs in Maine Federal Elections

3

FEDERAL REPORT

## 2   Top 25 Contributors to Super PACs Spending in Maine Elections (2010-2022)

Table 4: Top 25 Contributors to Super PACs Spending in Maine Elections (2010-2022)

| Rank | Contributor | Total Contributions |
|---|---|---|
| 1 | STEYER, THOMAS F | $113,860,431 |
| 2 | ADELSON, MIRIAM | $98,750,000 |
| 3 | ONE NATION | $85,065,000 |
| 4 | Senate Leadership Fund | $80,170,000 |
| 5 | ADELSON, SHELDON | $68,750,000 |
| 6 | AMERICAN   ACTION NETWORK | $57,716,526 |
| 7 | MAJORITY FORWARD | $53,323,000 |
| 8 | MELLON, TIMOTHY | $50,000,000 |
| 9 | ADELSON, SHELDON G | $40,000,000 |
| 10 | GRIFFIN, KENNETH C | $38,000,000 |
| 11 | SCHWARZMAN, STEPHEN A | $32,950,000 |
| 12 | YASS, JEFF | $32,068,000 |
| 13 | NATIONAL   ASSOCIATION OF REALTO | $30,603,098 |
| 14 | UIHLEIN, RICHARD | $27,500,000 |
| 15 | EYCHANER, FRED | $27,000,000 |
| 16 | SIXTEEN   THIRTY FUND | $25,998,410 |
| 17 | Working   for   Working Americans | $24,015,000 |
| 18 | NATIONAL   EDUCATION ASSOCIATION | $23,814,149 |
| 19 | AMERICA VOTES | $21,826,500 |
| 20 | LEAGUE OF CONSERVATION VOTERS, INC | $21,550,000 |
| 21 | SUSSMAN, S DONALD | $21,525,000 |
| 22 | Democracy PAC | $19,215,908 |
| 23 | BLOOMBERG, MICHAEL | $18,750,000 |
| 24 | DUTY AND HONOR | $15,900,000 |
| 25 | NATIONAL   EDUCATION, ASSOCIATION | $15,000,000 |

4

FEDERAL REPORT

# 3   Top 25 Super PACs making the Largest Independent Expenditures, (2010:2022))

Table 5: Top PACs by Total Independent Expenditures (2010-2022)

| Rank | PAC | Total |
|:---:|:---:|:---:|
| 1 | Senate Majority PAC | $27,907,444 |
| 2 | Senate Leadership Fund | $12,614,118 |
| 3 | Congressional Leadership Fund | $12,489,281 |
| 4 | 1820 PAC | $10,387,507 |
| 5 | House Majority PAC | $8,321,477 |
| 6 | Women Vote! | $4,789,414 |
| 7 | Family Friendly Action PAC | $3,571,573 |
| 8 | Maine Way PAC | $3,550,404 |
| 9 | Priorities USA Action | $3,215,025 |
| 10 | American Crossroads | $2,207,856 |
| 11 | National Assn of Realtors Congressional Fund | $2,104,568 |
| 12 | LCV Victory Fund | $1,955,231 |
| 13 | VoteVets.org | $1,867,755 |
| 14 | With Honor Fund | $1,748,351 |
| 15 | Planned Parenthood Votes | $1,680,005 |
| 16 | The Lincoln Project | $1,675,944 |
| 17 | Maine Liberty PAC | $1,432,726 |
| 18 | Change Now PAC | $1,219,705 |
| 19 | America First Action | $1,089,171 |
| 20 | Patients for Affordable Drugs Action | $1,072,839 |
| 21 | Future Forward USA | $1,067,663 |
| 22 | Club for Growth Action | $841,713 |
| 23 | Moderate PAC | $749,160 |
| 24 | Protect Freedom PAC | $737,021 |
| 25 | NEA Advocacy Fund | $645,331 |

Note: *Total* refers to the total independent expenditures made by super PACs from 2010-2022. This is not looking at the total contributions to PACs from individuals, organizations, corporations, or labor unions. Verify this from Andrew

5

FEDERAL REPORT

## 4   In vs Out-of-State Contributions

Table 6: Summary of Contribution Totals (2010-2022)

| State | Total | Pct |
|-------|-------|-----|
| In | $7,116,000 | 0.003 |
| Out | $2,006,706,545 | 0.870 |
| Unknown | $290,311,648 | 0.125 |
| Grand Total | $2,304,134,193 | 1.000 |

Table 7: Contributions to Super PACs per Cycle

| Cycle | Total Contributions | Pct OutState |
|-------|---------------------|--------------|
| 2010 | $4,919,000 | 0.712 |
| 2012 | $21,162,880 | 0.977 |
| 2014 | $192,267,915 | 0.908 |
| 2016 | $148,501,150 | 0.872 |
| 2018 | $399,825,729 | 0.888 |
| 2020 | $1,478,892,397 | 0.868 |
| 2022 | $58,565,122 | 0.693 |
| Total | $2,302,134,193 | - |

Note: The discrepancy in the Grand Total values between Table 6 and Table 7 can be explained by the fact that 9% of the data was not available for Table 7's out-of-state analysis.

6

FEDERAL REPORT



Summary of Contribution Totals (2010-2022)

Pct

FEDERAL REPORT

Table 8: Contribution Totals per State, 2010-2022

| Rank | State | Contrib Total |
|------|-------|---------------|
| 1 | DC | $355,863,470 |
| 2 | CA | $318,798,954 |
| 3 | NA | $288,726,648 |
| 4 | NV | $235,300,719 |
| 5 | NY | $232,291,112 |
| 6 | IL | $177,609,710 |
| 7 | VA | $96,455,347 |
| 8 | FL | $94,187,692 |
| 9 | TX | $74,213,326 |
| 10 | MA | $61,917,900 |
| 11 | WY | $51,984,776 |
| 12 | PA | $39,909,359 |
| 13 | WA | $35,943,642 |
| 14 | CO | $22,830,503 |
| 15 | AR | $22,725,000 |
| 16 | IN | $21,861,201 |
| 17 | GA | $17,717,165 |
| 18 | CT | $16,976,197 |
| 19 | TN | $15,296,808 |
| 20 | NJ | $15,252,324 |
| 21 | MD | $15,156,965 |
| 22 | OH | $14,882,068 |
| 23 | MI | $12,363,036 |
| 24 | NC | $8,934,533 |
| 25 | OK | $8,812,660 |
| **26** | **ME** | **$7,116,000** |
| 27 | NE | $4,157,500 |
| 28 | KS | $4,130,600 |
| 29 | WI | $3,592,519 |
| 30 | AL | $3,181,900 |
| 31 | MO | $2,806,050 |
| 32 | ID | $2,796,997 |
| 33 | AZ | $2,223,499 |
| 34 | NM | $2,083,000 |
| 35 | KY | $1,804,598 |
| 36 | LA | $1,637,000 |
| 37 | NULL | $1,585,000 |
| 38 | UT | $1,460,000 |
| 39 | MN | $1,435,214 |
| 40 | DE | $1,328,800 |
| 41 | NH | $1,170,000 |
| 42 | SC | $1,070,600 |
| 43 | OR | $1,045,100 |
| 44 | MS | $695,000 |
| 45 | VT | $490,000 |
| 46 | HI | $474,000 |
| 47 | IA | $430,000 |
| 48 | SD | $287,500 |
| 49 | RI | $267,943 |
| 50 | WV | $259,500 |
| 51 | MT | $171,000 |
| 52 | ND | $145,000 |
| 53 | AK | $143,758 |

8

FEDERAL REPORT

## 5   Time Series Analysis of Contributions per State



Figure 3: Time series of Maine IN STATE Contributions ($> 5k$)

FEDERAL REPORT



Figure 4: Time Series of OUT-OF-STATE Contributions (> 5k) from DC

Note: The large amount of contributions coming from DC can be explained by the fact that a lot
of super PAC groups are headquartered in Washington, DC.

10

FEDERAL REPORT

# 6    Contributions to Super PACs Organized by Partisanship

Note: The following categorizations were made by a team of researchers at OpenSecrets, the nation's premier research and government transparency group tracking money in politics and its effect on elections and policy.

Note: I do not have a codebook on this dataset, but I infer that viewpt = X means that OpenSecrets was unable to place the Super PAC into strictly binary partisan categories.



Figure 5: Enter Caption

Table 9: Contributions Organized by Partisanship

| Cycle | Pct Consv | Pct Libl | Pct Other | Election Total |
|---|---|---|---|---|
| 2010 | 0.10 | 0.90 | NA | $4,919,000 |
| 2012 | 0.87 | 0.10 | 0.02 | $21,162,880 |
| 2014 | 0.11 | 0.89 | NA | $192,267,915 |
| 2016 | 0.35 | 0.65 | NA | $148,501,150 |
| 2018 | 0.47 | 0.43 | 0.01 | $399,825,729 |
| 2020 | 0.54 | 0.44 | 0.02 | $1,478,892,397 |
| 2022 | 0.30 | 0.60 | 0.11 | $58,565,122 |
| Grand Total | | | | $2,304,133,193 |

11

FEDERAL REPORT

# Supplementary Materials

## (1) Information about Super PACs

### (1.1) Routes Contributions take to get to Super PACs

Individual → 501(c)(4) → Super PAC
Individual → Super PAC
Corporate Treasury → 501(c)(4) → Super PAC
Union Treasury → 501(c)(4) → Super PAC
Corporate Treasury → Super PAC
Union Treasury → Super PAC
Super PAC → Super PAC
Ordinary PAC → Super PAC
Super PAC ⇐≠⇒ Campaign Committee

### (1.2) Differences between Super PACs and Ordinary PACs (at the federal level)

| Super PACs | Ordinary PACs |
|---|---|
| Super PACs cannot give directly to campaign committees. Coordination is legally prohibited. | Ordinary PACs can give directly to campaign committees. Coordination is legally permissible. |
| Super PACs have *no limits* on how much they can receive from a contributor. | Ordinary PACs are *limited* in how much they can receive from a contributor. |
| Super PACs can receive contributions from:<br>- Individuals<br>- Corporate Treasuries<br>- Union Treasuries<br>- 501(c)(4)s<br>- Other Super PACs<br>- Ordinary PACs | PACs can receive contributions from:<br>- Individuals<br><br>PACs cannot receive contributions from:<br>- Corporate Treasuries<br>- Union Treasuries |

12

FEDERAL REPORT

### (1.3) *Contributions* vs *Expenditures*

Contribution → **Super PAC** → Independent Expenditures
Contribution → **PAC** → Expenditures

A Note on Contributions vs Expenditures:

- *Independent Expenditures*, at the federal level, refers to uncoordinated election spending by super PACs.

- *Contributions*, in this analysis, refers to the contributions made by individuals, organizations, corporations, or unions to super PACs. Our argument in favor of LD2232 concerns contributions, not independent expenditures.

- See 1.2 (above) for an idea of what kinds of paths exist to get contributions to super PACs.

# Report on Contributions to PACs Making Independent Expenditures in Maine *State* Elections

Prepared by Maia Cook for the Public Hearing on LD2232:

*An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures*

March 6, 2024

# Report on Contributions to PACs Making Independent Expenditures in Maine *State* Elections

Prepared by Maia Cook

March 6, 2024

## Facts about the dataset

- This data was pulled from OpenSecrets' sister website: FollowtheMoney.

- This data looks at all contributions greater than or equal to $5,000 – with the exception of the out-of-state section of this report, which will also look at all contributions less than or equal to $5,000.

- This data looks at contributions Maine state elections from 2010-2022.

STATE REPORT

# 1    Summary Statistics of *State* Dataset

Table 1: Number of Contributions > $5,000 per Cycle

| Cycle | Contributions |
|-------|---------------|
| 2010 | 125 |
| 2011 | 70 |
| 2012 | 188 |
| 2014 | 361 |
| 2016 | 504 |
| 2017 | 37 |
| 2018 | 255 |
| 2020 | 181 |
| 2022 | 336 |

Table 2: Summary Statistics of Contributions > $5,000 (2010:2022)

| Statistic | Value |
|-----------|-------|
| Min. | $5,011 |
| 1st Qu. | $10,000 |
| Median | $20,000 |
| Mean | $59,111 |
| 3rd Qu. | $50,000 |
| Max. | $1,700,000 |

STATE REPORT



Figure 1: Time Series of IN & OUT-OF-STATE Contributions to Independent Expenditure PACs (2010-2022)

3

STATE REPORT

## 2   Total Contributions by Party and ME Election Year

Table 3: Total of *Expressly* Partisan Contributions per ME Election

| Election | Total Democrat/Lib | Total Republican/Cons |
|---|---|---|
| 2010 | $1,899,594.9 | $1,215,793.8 |
| 2011 | $382,961.8 | $571,428.3 |
| 2012 | $3,295,910.7 | $2,387,474.6 |
| 2014 | $8,594,919.8 | $7,366,530.9 |
| 2016 | $4,965,765.7 | $1,598,969.1 |
| 2018 | $6,729,388.6 | $3,733,076.2 |
| 2020 | $3,838,206.0 | $1,424,869.3 |
| 2022 | $6,581,644.8 | $8,458,433.2 |
| Grand Total | $36,388,392.3 | $26,756,575.4 |



Figure 2: Total Contributions by Party and ME Election Year

4

STATE REPORT

# 3    Top 25 Largest Contributors to Independent Expenditure Groups (2010:2022)

Table 4: Largest Contributors to Independent Expenditure Groups, (2010:2022)

| Rank | CFS Entity | Total Contributions |
|---|---|---|
| 1 | DEMOCRATIC GOVERNORS ASSOCIATION | $16,750,095 |
| 2 | REPUBLICAN GOVERNORS ASSOCIATION | $15,373,742 |
| 3 | SENATE DEMOCRATIC CAMPAIGN CMTE OF MAINE | $8,582,601 |
| 4 | NATIONAL EDUCATION ASSOCIATION | $5,340,483 |
| 5 | HOUSE DEMOCRATIC CAMPAIGN CMTE OF MAINE | $4,590,813 |
| 6 | EVERYTOWN FOR GUN SAFETY | $4,372,908 |
| 7 | SCOTT, LISA | $4,058,965 |
| 8 | DEMOCRATIC LEGISLATIVE CAMPAIGN CMTE | $3,445,571 |
| 9 | LEAGUE OF CONSERVATION VOTERS | $3,385,000 |
| 10 | KLINGENSTEIN, THOMAS | $3,045,000 |
| 11 | NEXTGEN CLIMATE ACTION | $2,795,550 |
| 12 | NEW APPROACH PAC | $2,407,372 |
| 13 | MAINE SENATE REPUBLICAN MAJORITY | $2,156,359 |
| 14 | REPUBLICAN STATE LEADERSHIP CMTE | $2,144,500 |
| 15 | SUSSMAN, SELWYN DONALD (S D) | $2,076,188 |
| 16 | NATIONAL RIFLE ASSOCIATION / NRA | $2,031,551 |
| 17 | MAINE EDUCATION ASSOCIATION | $1,612,105 |
| 18 | UNITEMIZED DONATIONS | $1,143,388 |
| 19 | MAINE PEOPLES ALLIANCE | $1,113,354 |
| 20 | EMILYS LIST | $1,093,000 |
| 21 | PLANNED PARENTHOOD FEDERATION OF AMERICA | $1,031,408 |
| 22 | CITIZENS WHO SUPPORT MAINES PUBLIC SCHOOLS | $886,900 |
| 23 | SERVICE EMPLOYEES INTERNATIONAL UNION / SEIU | $880,000 |
| 24 | BLANK | $850,000 |
| 25 | MAINE REPUBLICAN PARTY | $789,532 |

5

STATE REPORT

# 4   In vs Out-of-State Contributions: Maine State Elections

Table 5: In vs Out-of-State Contribution Totals for Contributions OVER $5,000 (2010-2022)

| State | Total | Pct |
|---|---|---|
| Out | $82,386,338 | 67.7% |
| In | $38,142,719 | 31.3% |
| Unknown | $1,062,009 | 0.08% |
| **Grand Total** | **$121,591,066** | **100.0%** |



Out-of-State Contributions (Over $5000)

6

STATE REPORT

Table 6: In vs Out-of-State Contribution Totals for Contributions UNDER $5,000 (2010-2022)

| State | Total | Pct |
|---|---|---|
| Out | $4,057,295.00 | 27.7% |
| In | $10,517,740.00 | 71.8% |
| Unknown | $54,196.13 | 0.3% |
| **Grand Total** | $14,629,231.13 | 100.0% |

## Out-of-State Contributions (Under $5000)



Based on an analysis in R, we account for more observations by measuring state using an indicator variable from the dataset called CFS_InState instead of a variable called SAT_State.

7

STATE REPORT

Table 7: Number of Out-of-State Contributions > $5,000, 2010-2022

| State | Count |
|-------|-------|
| DC | 467 |
| **ME** | **1154** |
| NY | 84 |
| FL | 43 |
| *NULL* | 49 |
| PA | 38 |
| MD | 26 |
| CA | 28 |
| VA | 34 |
| CT | 7 |
| GA | 7 |
| IL | 9 |
| MA | 12 |
| NC | 12 |
| OH | 12 |
| NH | 16 |
| CO | 18 |
| MN | 2 |
| TN | 2 |
| VT | 2 |
| WA | 4 |
| KS | 4 |
| KY | 4 |
| MO | 4 |
| TX | 11 |
| AZ | 2 |
| WI | 1 |
| RI | 1 |
| NJ | 1 |
| OK | 1 |
| AK | 1 |
| AR | 1 |

8

STATE REPORT

Table 8: Contribution Totals by State (2010-2022)

| Rank | Contrib_State | Total |
|------|---------------|-------|
| 1 | DC | $57,479,818.71 |
| **2** | **ME** | **$36,668,032.49** |
| 3 | NY | $9,690,322.18 |
| 4 | FL | $4,670,275.64 |
| 5 | VA | $3,285,813.78 |
| 6 | PA | $2,115,032.54 |
| 7 | *NULL* | $2,051,033.25 |
| 8 | CO | $1,089,000.00 |
| 9 | MD | $724,235.44 |
| 10 | NC | $698,500.00 |
| 11 | TX | $545,000.00 |
| 12 | CA | $484,075.57 |
| 13 | MA | $408,000.00 |
| 14 | NH | $315,000.00 |
| 15 | IL | $276,006.28 |
| 16 | WA | $233,000.00 |
| 17 | GA | $214,999.00 |
| 18 | AZ | $125,000.00 |
| 19 | CT | $104,000.00 |
| 20 | OH | $84,500.00 |
| 21 | KS | $74,500.00 |
| 22 | MN | $46,920.55 |
| 23 | MO | $41,000.00 |
| 24 | KY | $40,000.00 |
| 25 | VT | $37,500.00 |
| 26 | WI | $25,500.00 |
| 27 | TN | $15,500.00 |
| 28 | OK | $15,300.00 |
| 29 | AK | $10,000.00 |
| 30 | AR | $10,000.00 |
| 31 | RI | $6,700.00 |
| 32 | NJ | $6,500.00 |

9

STATE REPORT



Figure 3: Time Series Plot of IN STATE Contributions (> 5k)

Note: The large amount of contributions coming from DC can be explained by the fact that a lot of super PAC groups are headquartered in Washington, DC.

10

STATE REPORT



Figure 4: Time Series Plot of DC Contributions (> 5k) to ME Elections

# 5   Contributions by Industry



Figure 5: Total Contributions to Independent Expenditure PACs per Industry in ME elections (2010:2022)

STATE REPORT

Analyses of contributions by industry are not available for election cycles before 2016.

Table 9: Ranked Industry Contributions in 2016 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Gun Control | $5,693,750.20 |
| 2 | Democratic Party committees | $3,708,329.04 |
| 3 | Drug Legalization Advocates | $3,104,632.28 |
| 4 | Public School Advocates | $2,977,302.08 |
| 5 | Uncoded | $2,178,637.03 |
| 6 | Gun Rights | $2,071,015.93 |
| 7 | Other single-issue or ideological groups | $1,714,474.99 |
| 8 | Republican Party committees | $1,538,969.15 |
| 9 | Democratic/Liberal | $1,257,436.66 |
| 10 | Abortion policy, pro-choice | $186,054.18 |
| 11 | Real estate | $82,903.98 |
| 12 | Environmental policy | $66,000.00 |
| 13 | Republican/Conservative | $60,000.00 |
| 14 | Trucking | $25,560.00 |
| 15 | Hunting & wildlife | $10,000.00 |
| 16 | Restaurants & drinking establishments | $7,500.00 |
| **Grand Total** | | **$24,447,615.92** |

Table 10: Ranked Industry Contributions in 2018 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Uncoded | $5,993,414.20 |
| 2 | Democratic Party committees | $4,610,648.40 |
| 3 | Republican Party committees | $3,733,076.20 |
| 4 | Democratic/Liberal | $2,118,740.20 |
| 5 | Environmental policy | $1,540,000.00 |
| 6 | Abortion policy, pro-choice | $258,000.00 |
| 7 | Real estate | $57,450.00 |
| 8 | Gun Rights | $30,007.90 |
| **Grand Total** | | **$17,341,337.90** |

12

STATE REPORT

Table 11: Ranked Industry Contributions in 2020 ME Election Cycle

| Rank | Business | Total Industry |
|------|----------|----------------|
| 1 | Democratic Party committees | $3,313,127.50 |
| 2 | Republican Party committees | $1,424,869.30 |
| 3 | Public School Advocates | $671,000.00 |
| 4 | Democratic/Liberal | $525,078.60 |
| 5 | Uncoded | $464,375.10 |
| 6 | Abortion policy, pro-choice | $355,295.00 |
| 7 | Health & welfare policy | $103,704.00 |
| 8 | Environmental policy | $45,000.00 |
| **Grand Total** | | **$6,902,449.50** |

Table 12: Ranked Industry Contributions in 2022 ME Election Cycle

| Rank | Business | Total Industry |
|------|----------|----------------|
| 1 | Uncoded | $14,825,767.50 |
| 2 | Republican Party committees | $8,458,433.20 |
| 3 | Democratic Party committees | $5,680,844.80 |
| 4 | Environmental policy | $1,065,514.90 |
| 5 | Democratic/Liberal | $900,799.90 |
| 6 | Abortion policy, pro-choice | $895,500.00 |
| 7 | Public School Advocates | $729,000.00 |
| 8 | Term limits | $156,160.40 |
| 9 | Gun Rights | $35,887.50 |
| **Grand Total** | | **$32,647,798.20** |

13

**TESTIMONY BEFORE THE JOINT STANDING COMMITTEE**

**ON VETERANS AND LEGAL AFFAIRS**

**IN SUPPORT OF**

**LD 2232**

**"AN ACT TO LIMIT CONTRIBUTIONS TO POLITICAL ACTION COMMITTEES THAT MAKE INDEPENDENT EXPENDITURES"**

Good afternoon, Senator Hickman, Representative Supica and distinguished members of the Committee on Veterans and Legal Affairs. My name is Adam Cote, I am an attorney at Drummond Woodsum. I am here to testify in favor of LD 2232, "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures."

I have been working with Professor Larry Lessig and his organization, Equal Citizens, and Cara McCormick's Ballot Question Committee, Citizens to End SuperPACs to get this issue before Maine voters as a referendum in the November election.

As an attorney, I find this bill fascinating because although, from a drafting perspective, it is remarkably simple – limiting to $5,000 per year the amount of contributions by individuals, PACs and businesses to PACs that make independent expenditures – yet this simple bill effectively works to challenge the lower courts' interpretation to the Supreme Court's decisions in *Buckley v Valeo* and *Citizen's United*.

As a former candidate for statewide office, I find this bill enormously important to help limit the disproportionate role single donors have in our election process. This is an issue I dealt with in the most personal of ways having spent the better part of two years trying to raise campaign funds with a $1,600 per donor limit only to have a SuperPAC formed two weeks before the primary election to spend hundreds of thousands of dollars against my campaign.

But the biggest reason I am supportive of this initiative is because I am a citizen of the State and great country and like many of you, I am concerned about our democracy. Democracies are very fragile and, in our country, today – regardless of your political beliefs – I think you can acknowledge that wealthy donors contributing to SuperPACs is one of the most corrupting and truly undemocratic forces that enjoys a grossly disproportionate share of influence over our election process.  While this bill does not solve all of those problems, I believe it is a large step forward.  And as a final point, I think that this November's election could likely be the most divisive one in our country's history – which is saying a lot.  I kind of like the idea of having Mainers going to the polls this November with at least one unifying issue they can all agree upon.

I would be happy to answer any of your questions.



Senator Craig Hickman, Senate Chair
Representative Laura Supica, House Chair
Committee on Veterans & Legal Affairs
Maine State Legislature

RE:    IB 5, LD 2232 (An Act to Limit Contributions to Political Action Committees
       That Make Independent Expenditures)

March 5, 2024

Dear Chair Hickman and Chair Supica,

I am the Legal Director of Free Speech For People, a national non-partisan non-profit organization that works to renew our democracy and to limit the influence of money in our elections. I write in support of LD 2232, which will limiting contributions to independent expenditure PACs, more commonly known as "super PACs."

Super PACs are political committees that make only "independent" expenditures. Under current law, there are absolutely no limits on contributions to these committees. This creates some unfortunate, illogical, and harmful effects. For example, it is illegal for a wealthy donor to contribute a penny more than $1,950 to a candidate for governor, because the legislature has determined that contributions above that amount pose an unacceptable risk of corruption or the appearance of corruption.[1] Yet that same wealthy donor may contribute $100,000, or $1 million, if not $10 million, to the candidate's super PAC. As just one example, in 2022, a super PAC funded by a single donor spent some $300,000 on the primary in the Cumberland County district attorney's race—four times as much as the total raised by both candidates combined.[2]

This bill amends Title 21-A to impose a contribution limit of $5,000 from any individual or other PAC to a super PAC. This is two-and-a-half times the limit on contributions to gubernatorial candidates, and over ten times the limit on contributions to legislative candidates. It is more than enough to enable contributors to support their favored candidates without posing an unacceptable risk of corruption.

_____

[1] Me. Rev. Stat. ch. 21-A, § 1015.
[2] See David Sharp, *National groups flooding local prosecutor races with money*, NewsCenter Maine, https://www.newscentermaine.com/article/news/nation-world/local-prosecutor-races-get-national-funding/507-5a575486-fff2-469c-b4ca-8f4c65172638 (June 10, 2022).

Some believe that U.S. Supreme Court decisions, including the 2010 *Citizens United* decision, ban limits on contributions to independent expenditure PACs. But that is incorrect. While some federal courts of appeals in other parts of the country, have interpreted *Citizens United* to require this result,[3] as explained in detail below, the reasoning of those decisions is incorrect. In any event, no court with jurisdiction over Maine—neither in the state court system nor any federal court—has ever adopted the reasoning of those courts or otherwise indicated that limits on contributions to super PACs would be unconstitutional.

And since 2010, empirical evidence has mounted against the assumptions underlying that decision. For example, as explained in more detail in two reports by political scientist Stephen Weissman,[4] the actual relationships between "independent" super PACs and their large donors provides ample opportunities for quid pro quo corruption.[5] Recent empirical research shows that, as one might expect, this also leads to the *appearance* of corruption.[6]

LD 2332 would help increase the integrity of Maine's elections by banning deep-pocketed donors from contributing unlimited amounts to super PACs, thus reducing

---

[3] *See, e.g.,* SpeechNow.org v. Fed. Election Comm'n, 599 F.3d 686 (2010).

[4] See Stephen R. Weissman, *The* SpeechNow *Case and the Real World of Campaign Finance* (Oct. 2016), *available at* https://freespeechforpeople.org/wp-content/uploads/2016/10/FSFP-Weissman-Report-final-10-24-16.pdf; Stephen R. Weissman, *The* SpeechNow *Case and the Real World of Campaign Finance: Undermining Federal Limits on Contributions to Political Parties (Part II)* (May 2017), *available at* https://freespeechforpeople.org/wp-content/uploads/2017/05/Research-Report-2017_01.pdf.

[5] Indeed, a federal grand jury indicted a sitting U.S. Senator for bribery for a contribution to a super PAC, and a federal judge upheld the indictment as consistent with *Citizens United,* although the jury later deadlocked and the judge dismissed some of the charges for insufficient evidence. *See* United States v. Menendez, No. CR 15-155, 2018 WL 526746, at *9 (D.N.J. Jan. 24, 2018). Relatedly, in 2011 the U.S. Court of Appeals for the Eleventh Circuit upheld a bribery conviction against Alabama Governor Don Siegelman where the bribe in question was given to a charitable organization that engaged only in issue advocacy. *See* United States v. Siegelman, 640 F.3d 1159, 1175 (11th Cir. 2011). The fact that a federal court found quid pro quo corruption from a contribution to a group that spent only on issue advocacy is striking because courts consider issue advocacy to pose no greater (and probably less) risk of corruption than "independent" expenditures in candidate races.

[6] *See* Christopher Robertson et al., *The Appearance and the Reality of Quid Pro Quo Corruption: An Empirical Investigation,* 8 Journal of Legal Analysis 375 (Winter 2016), *available at* https://academic.oup.com/jla/article/8/2/375/2502553.

the risk of quid pro quo corruption or the appearance of quid pro quo corruption. The remainder of this memorandum provides a detailed legal explanation why the U.S. Supreme Court's campaign finance precedent does not block Maine from protecting its elections in this way.

Thank you for considering LD2332 and I would be happy to discuss it further at your convenience.

Sincerely,
Ron Fein, Legal Director
Free Speech For People
617-244-0234
rfein@freespeechforpeople.org


I.     **Limits on contributions to candidates and closely affiliated political actors, including super PACs, are constitutional means of preventing quid pro quo corruption and its appearance.**

1. Under U.S. Supreme Court precedent, campaign finance limits must serve "the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Cruz*, 142 S. Ct. 1638, 1652 (2022). But the Court has long held that restrictions on contributions are different in kind from expenditure limits and accordingly are subject to a more deferential constitutional scrutiny.

Expenditure limitations directly restrict communication and are therefore subject to "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 19, 44-48 (1976). But contribution limits are "merely marginal speech restrictions" that "lie closer to the edges than to the core of political expression." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (internal quotation marks and citation omitted). A contribution serves only "as a general expression of support for the candidate and his views." *Buckley*, 424 U.S. at 21. It "does not communicate the underlying basis for the support." *Id.* "[T]he transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* A contribution limit thus moderates only "the symbolic expression of support evidenced by a contribution." *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality opinion) (quoting *Buckley*, 424 U.S. at 21).[7] It does "not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* (quoting *Buckley*, 424 U.S. at 21).

Thus, contribution limits are subject to less rigorous scrutiny than expenditure limits. *Id.* at 196-97. Contribution limits are valid when "closely drawn" to prevent quid pro quo corruption or its appearance. *See id.* at 197-98, 207-08; *Buckley*, 424

---

[7] All subsequent citations to *McCutcheon* are to the plurality opinion unless otherwise noted.

U.S. at 25-29. This "relatively complaisant" test, *Beaumont*, 539 U.S. at 161, does not permit the public to limit "mere influence or access" to political officials, *McCutcheon*, 572 U.S. at 208. But the public may permissibly limit "'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." *Id.* at 207 (quoting *Buckley*, 424 U.S. at 27).

2. Consequently, the Supreme Court has "routinely struck down limitations on independent expenditures by candidates, other individuals, and groups, while repeatedly upholding contribution limits." *FEC v. Colo. Republican Fed. Campaign Comm.* ("*Colorado II*"), 533 U.S. 431, 441-42 (2001) (citations omitted). Especially relevant here, the Court has repeatedly upheld statutes limiting the amount of money people may contribute to candidates or third parties with close ties to particular candidates.

First, in *Buckley*, the Court upheld the Federal Election Campaign Act's ("FECA") limits on contributions directly to candidates. 424 U.S. at 28-29. Candidates, the Supreme Court explained, "depend on financial contributions from others to provide the resources necessary to conduct a successful campaign." *Id.* at 26. Absent regulation, therefore, large contributions might be given "to secure a political quid pro quo from current and potential office holders." *Id.* "[T]he opportunities for abuse inherent in a regime of large individual financial contributions" would also create an "appearance of corruption" that could erode "confidence in the system of representative Government." *Id.* at 27 (citation omitted).

In *California Medical Association v. FEC*, 453 U.S. 182 (1981) ("*CalMed*"), the Court applied *Buckley*'s rationale and upheld a limit on contributions to multicandidate political committees that, *inter alia*, made independent expenditures. *Id.* at 184-85. Without these limits, the restrictions on contributions to candidates themselves "could be easily evaded" simply "by channelling funds through a multicandidate political committee." *Id.* at 198 (plurality opinion). Thus, capping contributions to outside groups is "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley*." *Id.* at 199.

In *McConnell v. FEC*, 540 U.S. 93 (2003), the Court similarly applied *Buckley*'s rationale to uphold limits on donations of "soft money"—contributions to national, state, and local political parties for activities that included issue advertising. *Id.* at 122-24, 131, 168. Even assuming that money was not spent in coordination with particular candidates, *see id.* at 152 & 152 n.48, the Court recognized that soft-money contributions "create[d] a significant risk of actual and apparent corruption," *id.* at 168. "[O]fficeholders were well aware of the identities of the donors" who contributed large amounts of soft money to parties. *Id.* at 147. And given the "close

4

ties" between parties and the parties' candidates, *id.* at 161, the activities funded by soft money "confer[red] substantial benefits on federal candidates," *id.* at 168. Parties, therefore, could serve as "intermediaries" between big donors seeking "to create debt on the part of officeholders" and candidates seeking "to increase their prospects of election." *Id.* at 146.

3. The Supreme Court's cases since 2010, including *Citizens United v. FEC*, 558 U.S. 310 (2010), are in accord. In *Citizens United*, the Court invalidated a federal statute that forbade corporations from making political *expenditures* close to elections. *Id.* at 318-19. Reiterating that expenditures are "political speech," and that "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," the Court reasoned that "[t]he anticorruption interest is not sufficient" to restrict such expenditures. *Id.* at 339-40, 357 (internal quotation marks and citation omitted). "[I]ndependent expenditures," the Court further stated, "do not give rise to corruption or the appearance of corruption." *Id.* at 357. At the same time, the Court emphasized that it had "sustained limits on direct *contributions* in order to ensure against the reality or appearance of corruption." *Id.* at 357 (emphasis added); *see also id.* at 345, 361 (stressing that *Citizens United* dealt only with expenditures).

After *Citizens United*, the Court again recognized that "Congress may regulate campaign contributions to protect against corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 191. In *McCutcheon*, the Court invalidated a statute limiting *aggregate* candidate contributions. *Id.* at 193, 221. But it reiterated *Buckley*'s holding that FECA's "base" limits themselves "serv[e] the permissible objective of combatting corruption." *Id.* at 192-93; *see also id.* at 197-98. The Court also stressed that "*McConnell*'s holding about 'soft money'" was unaffected by its ruling. *Id.* at 209 n.6.

Crucially, the Court in recent years has twice summarily reaffirmed FECA's restrictions on soft money contributions, ***even where the recipients of the prospective donations sought to spend the money independently—i.e., without coordinating with a candidate or campaign***. *See Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 96-97 (D.D.C. 2016), *aff'd*, 137 S. Ct. 2178 (2017); *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 157 (D.D.C. 2010), *aff'd*, 561 U.S. 1040 (2010). In the second of those cases, the Solicitor General's 2017 filing stressed "the distinction between expenditure limits and contribution limits" and agreed that Congress may limit soft-money *contributions* that political parties intend to use exclusively for independent *expenditures*. Mot. to Dismiss or Affirm at 18-22, *Republican Party of La. v. FEC*, 137 S. Ct. 2178 (2017) (No. 16-865), 2017 WL 1352870, at *18, *22. Only two Justices would have set the case for argument. *Republican Party of La.*, 137 S. Ct. at 2178.

Finally, nothing in the Court's most recent campaign finance decision, *FEC v. Cruz*, 142 S. Ct. 1638 (2022), alters this framework.

## II. Contrary to the D.C. Circuit's view, *Citizens United* does not prohibit limits on contributions to independent expenditure groups.

In *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), the D.C. Circuit asserted that *Citizens United* dictates, "as a matter of law," that contributions to committees that make only independent expenditures cannot be limited. *Id.* at 695. The court of appeals reasoned: "[B]ecause *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." *Id.* at 696.

But *SpeechNow*'s reasoning is fallacious. ***Even when an organization's spending does not corrupt, a contribution to that organization can still corrupt***.

1. Bribery law makes clear that donations to actors other than candidates or organizations under their control can give rise to quid pro quo corruption. Even when the recipient of a donation is independent and incorruptible, the donation can corrupt an actor who is interested in seeing the organization funded and successful—and who may be willing to grant favors in return.

Bribery laws incorporate that commonsense insight. Because a payment can corrupt even when it is directed to an entity the bribed official does not control, the federal bribery statute forbids a public official from corruptly seeking "anything of value personally *or for any other person or entity*" in exchange for official action. 18 U.S.C. § 201(b)(2) (emphasis added); *see, e.g., United States v. Brewster*, 506 F.2d 62, 68-69 (D.C. Cir. 1974) (emphasizing the import of the "any other person or entity" coverage).

For instance, a senator "who agreed to vote in favor of widget subsidies in exchange for a widget maker's donation to the Red Cross" would be guilty of bribery even if he had no connection to the Red Cross or role in determining how the organization spent the funds. Albert W. Alschuler et al., *Why Limits on Contributions to Super PACs Should Survive* Citizens United, 86 Fordham L. Rev. 2299, 2310 (2018). Even though the Red Cross's expenditures would be virtuous, the widget maker's contribution would be corrupt. *Id.*

Bribery through corrupt donations to autonomous third-party entities themselves engaged in non-corrupting spending is not merely a hypothetical concern. Affirming the conviction of a former governor, the Eleventh Circuit has recognized that soliciting a donation to an issue-advocacy foundation—which engages solely in non-corrupting issue advocacy speech—can violate the bribery

6

statute, even though donations to such organizations "do not financially benefit the individual politician in the same way that a candidate-election campaign contribution does." *United States v. Siegelman*, 640 F.3d 1159, 1169 n.13 (11th Cir. 2011); *see also, e.g.*, *United States v. Gross*, No. 15-cr-769, 2017 WL 4685111, at *42 (S.D.N.Y. Oct. 18, 2017) (bribery through donation to a church).

2. In *Citizens United*, the Supreme Court reiterated that "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.'" 558 U.S. at 357 (quoting *Buckley*, 424 U.S. at 47). It then further stated that "independent expenditures . . . *do not* give rise to corruption or the appearance of corruption." *Id.* (emphasis added).

That statement arose in the context of independent expenditures. In that context, the *spender*—the person(s) involved in selecting, e.g., where to buy TV ads, or how to frame a message about the opponent—is not communicating with the *politician*. But if the *spender* is isolated from the *politician*, then the spender's independent spending ("quid") cannot be connected with favors from the politician ("quo") because they have no opportunity to discuss that exchange (no "pro").

That, however, says nothing about a donor who contributes to the spender at the request of the politician. Even if a super PAC (the spender) does not coordinate its campaign strategy with a supported candidate, a contributor is free to discuss both the "quid" and the "quo" with the candidate. *See* Albert W. Alschuler, *Limiting Political Contributions after* McCutcheon, Citizens United, *and* SpeechNow, 67 Fla. L. Rev. 389, 475 (2015). Interviews with former Members of Congress and political operatives suggest how such quid pro quo agreements could occur. *See* Daniel B. Tokaji & Renata E.B. Strause, *The New Soft Money: Outside Spending in Congressional Elections* (2014). As one campaign operative explained: "So the Member calls and says 'Hey, I know you're maxed out – and I can't take any more money from you – but there's this other group. I'm not allowed to coordinate with them, but can I have someone call you?'" *Id.* at 68. The conversation could then discuss official matters, including an agreement to take official action in exchange for the donor's contributions to the "other group," *i.e.*, the super PAC.

Put another way, the *spender* (e.g., the media consultant running the super PAC) does not want widget subsidies—the *donor* does. A quid pro quo transaction is thus perfectly plausible: The donor and politician agree that the donor will contribute a large sum to the super PAC in exchange for widget subsidies; the politician agrees; the donor makes the corrupt contribution; and the super PAC—which can be isolated from the widget subsidy conversation—spends the money, *non-corruptly*, to buy independent ads in support of the politician. Thus, the condition described in *Citizens United* is maintained (the independent spending

does not corrupt) but the facile syllogism in *SpeechNow* (that money contributed for the purpose of non-corrupt spending cannot be part of a separate corrupt transaction) is refuted.

In fact, Chief Justice Roberts has refuted the idea that independent spending has no value to candidates—that there is no corrupting "quid." He explained, "We have said in the context of independent expenditures that '[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate.' *But probably not by 95 percent*." *McCutcheon*, 572 U.S. at 214 (cleaned up; emphasis added; citation omitted). Thus, independent spending *does* have value to candidates. The reason it can't corrupt is because the independent spender is isolated from the politician and thus has no chance to discuss an exchange. But a super PAC provides a cut-out, leaving the donor and politician free to communicate.

Indeed, the federal government has repeatedly charged individuals with bribery arising from donations to super PACs themselves.[8] In 2020, the federal government convicted insurance magnate Greg Lindberg of "orchestrating a bribery scheme involving independent expenditure accounts and improper campaign contributions." Press Release, U.S. Dep't of Justice, *Federal Jury Convicts Founder and Chairman of a Multinational Investment Company and a Company Consultant of Public Corruption and Bribery Charges* (Mar. 5, 2020), perma.cc/38BH-JD4V. Lindberg funneled $1.5 million to a super PAC he created for the purpose of bribing a state insurance commissioner to replace an official investigating Lindberg's company. Ian Vandewalker, *10 Years of Super PACs Show Courts Were Wrong on Corruption Risks*, Brennan Ctr. for Justice (Mar. 25, 2020), perma.cc/4DJN-DSKT.[9]

---

[8] These examples may appear few, but "'the scope of such pernicious practices can never be reliably ascertained.'" *Citizens United*, 558 U.S. at 356 (quoting *Buckley*, 424 U.S. at 27). Moreover, *SpeechNow* rested on a syllogistic conclusion that such quid pro quo corruption was logically impossible, so the existence of *any* quid pro quo corrupt transaction via a contribution to a super PAC illustrates its fallacy. *Cf. FEC v. Cruz*, 142 S. Ct. 1638, 1653 (2022) (in reviewing a challenge to a different campaign finance statute, noting that "the Government is unable to identify a single case of *quid pro quo* corruption in this context.")

[9] Lindberg was caught on tape telling the commissioner, "I think the play here is to create an independent-expenditure committee for your reelection specifically, with the goal of raising $2 million or something." Ames Alexander, *Watch Secretly Recorded Videos from the Bribery Sting that Targeted Durham Billionaire*, Charlotte Observer, at 00:16-30 (Mar. 10, 2020), bit.ly/35aPKvV (quotation transcribed from first video posted in article). Lindberg emphasized that "the beauty of" such a committee is that it can receive "unlimited" donations. *Id.* at 00:35-45.

8

In 2015, the Government prosecuted a sitting U.S. Senator and a donor for an alleged bribery scheme involving a $300,000 contribution to a super PAC supporting the Senator's reelection. *See United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015). The case resulted in a hung jury, but the court did not question the validity of prosecutors' theory that contributions to super PACs can corrupt.

If the D.C. Circuit were right that "contributions to groups that make only independent expenditures . . . cannot corrupt or create the appearance of corruption," *SpeechNow*, 599 F.3d at 694, these prosecutions would all have been illegitimate. The quid pro quo corruption the federal government alleged would be impossible. When something theorized to be impossible actually occurs, the theory, not the reality, requires correction.

2. The Supreme Court's campaign finance precedents underscore the impropriety of the D.C. Circuit's leap from the proposition that independent *expenditures* do not corrupt to the conclusion that *contributions* to independent-expenditure-only organizations cannot corrupt. In *Colorado Republican Federal Campaign Committee v. FEC ("Colorado I")*, 518 U.S. 604 (1996), the Court invalidated limits on independent expenditures by political parties as insufficiently justified by a danger of corruption. *See id.* at 617-18. But the opinion recognized a valid interest in limiting *contributions to the very organizations making those independent expenditures* to fight the "danger of corruption" that would inhere in allowing "large financial contributions [to those organizations] for political favors." *Id.* at 615-17 (opinion of Breyer, J.).

In *McConnell*, the Supreme Court likewise explained that, because of the "close connection and alignment of interests" between officeholders and parties, "large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, *regardless of how those funds are ultimately used.*" 540 U.S. at 155 (emphasis added). And in *Republican Party of Louisiana*, which the Supreme Court summarily affirmed in 2017, 137 S. Ct. 2178, a three-judge federal court recognized that contributions to political parties can corrupt even when the parties' expenditures do not. 219 F. Supp. at 97. Writing for the panel, Judge Srinivasan reasoned that "the inducement occasioning the prospect of indebtedness on the part of a federal officeholder is not the *spending* of soft money by the political party. The inducement instead comes from the *contribution* of soft money to the party in the first place." *Id.*

That logic applies here. It does not matter whether super PACs' *expenditures* present a risk of corruption. The question instead is whether large *contributions* to these organizations risk corruption or the appearance of corruption. *See McCutcheon*, 572 U.S. at 191.

9

### III.   Limiting contributions to super PACs is a valid means of preventing quid pro quo corruption and its appearance.

Just like the limits on contributions the Supreme Court upheld in *Buckley* and subsequent cases, limits on contributions to super PACs "protect against corruption or the appearance of corruption." *Id.*

1. Many super PACs are functionally alter egos of candidates' campaigns themselves—raising the same prospects of corruption that direct contributions present.[10] This is most obviously true for super PACs that spend the money they receive to promote a single candidate. Many of these super PACs are run by "former staff of candidates who understand what will help the candidate and make expenditures intended to help the candidate, such as funding events about more general issues that feature the candidate." U.S. Gov't Accountability Off., GAO-20-66R, *Campaign Finance: Federal Framework, Agency Roles and Responsibilities, and Perspectives* 52 (2020). Indeed, such super PACs conduct "a wide array of activities typically the province of the candidates"—including "provid[ing] rapid response to charges against their candidate" and "build[ing] lists of persuadable voters." Bipartisan Policy Ctr., *Campaign Finance in the United States: Assessing an Era of Fundamental Change* 39 (2018). Candidates also "often openly support and associate with" such organizations, appearing at their fundraising events and the like. *Id.* at 33. Similarly, super PACs that promote multiple candidates of the same party often function as alter egos for parties.

Donor activity with respect to super PACs confirms that limiting contributions to such organizations is necessary to prevent the limits on contributions to candidates from being "functionally meaningless." Richard Briffault, *Super PACs*, 96 Minn. L. Rev. 1644, 1684 (2012). A small handful of exceptionally wealthy people not only contribute the maximum permissible amount to candidates; they donate huge amounts of money to super PACs supporting those same candidates.[11] And consider the 2021 Boston mayor's race, where the legal contribution limit (i.e., the threshold at which the legislature has found a risk of corruption) for a contribution

---

[10] That applies even to relationships that are *permitted* under anti-coordination rules. Under those rules, donors typically still view a contribution to a super PAC as functionally indistinguishable from a contribution to a candidate himself. The real-world practices described herein do not constitute "coordination" under these rules, and there is no reason to believe that these practices fit within the U.S. Supreme Court's conception of "coordination." The fundamental issue is not the coordination or lack thereof; it is potential for corruption and the appearance of corruption. Accordingly, the only pathway available to prevent the potential corruption—and obvious appearance of corruption—enabled by super PACs is through contribution limits.

[11] See Stephen R. Weissman, *The SpeechNow Case and the Real World of Campaign Finance* (Oct. 2016), https://bit.ly/3MT3FLC.

to a candidate was $1,000. *See* M.G.L. ch. 55, § 7A(a)(1). Notwithstanding this $1,000 limit, one donor (legally) contributed over one *million* dollars to a super PAC that spent 100% of its money supporting a particular candidate.[12] Meanwhile, the super PAC supporting that candidate's opponent received multiple $50,000 contributions (50 times the limit for a direct contribution) and many just under.[13]

In short, the Supreme Court has held that Maine may prohibit a donor from contributing more than $1,950 to candidate Smith because larger contributions would risk actual or apparent corruption. But, under the D.C. Circuit's logic, the Constitution confers upon that same donor the constitutional right to give over one *million* to a super PAC that is dedicated exclusively to Smith's election, and to hold a freewheeling conversation with Smith about both the contribution and what Smith can do for the donor in return. According to the D.C. Circuit, Maine cannot restrict such a massive contribution because it does not raise *any risk of corruption at all*. That cannot be right.

2. Finally, large contributions to super PACs present the *appearance* of quid pro quo corruption. Intuitively, if a contribution directly to a candidate of $1,951 risks the appearance of corruption, then a contribution of $1,950,000 to that candidate's super PAC risks at least the same appearance of corruption.

Elected officials agree. During the 2016 campaign, then-candidate Donald Trump decried super PACs as "[v]ery corrupt." Alschuler et al., *supra*, at 2339. Trump continued: "There is total control of the candidates . . . . I know it so well because I was on both sides of it . . . ." *Id.* Senator Lindsey Graham made a similar observation in 2015, stating that "basically 50 people are running the whole show." *Id.* at 2341. The late Senator John McCain said that super PACs have "made a contribution limit a joke." *Id.* Consistent with these comments from elected officials, surveys show that the general public overwhelmingly perceives that unlimited contributions to super PACs "lead to corruption."[14]

---

[12] See OCPF, *81065 Real Progress Boston Independent Expenditure Political Action Committee*, https://m.ocpf.us/Filers/FilerInfo?q=81065. The donor in question is James Davis.

[13] See OCPF, *81057 Boston Turnout Project Independent Expenditure Political Action Committee*, https://m.ocpf.us/Filers/FilerInfo?q=81057.

[14] Brennan Ctr. for Justice, *National Survey: Super PACs, Corruption, and Democracy* (Apr. 24, 2012), https://bit.ly/3NVKt17 (summary and appendix) (noting that 69% of respondents, including broad supermajorities of both Republicans and Democrats, endorsed this proposition). In the same survey, 75% of Republicans and 78% of Democrats agreed specifically that "there would be less corruption if there were limits on how much could be given to Super PACs." *Id.*

Finally, the aforementioned bribery prosecutions involving super PAC contributions illustrate what these officials openly admit: super PAC contributions can—and do—facilitate quid pro quo arrangements. Of course, bribery prosecutions capture "only the most blatant and specific attempts" to corrupt candidates and public officials. *Buckley*, 424 U.S. at 28. But the fact that they have occurred underscores the reasonableness of a judgment that contributions to independent expenditure political committees should be limited to prevent the appearance, as well as actuality, of quid pro quo corruption.

###



TO:        The Honorable Craig Hickman
           The Honorable Laura Supica, Co-Chairs
           Members of the Joint Standing Committee on Veterans and Legal Affairs

DATE:      March 6, 2024

RE:        LD 2232 - An Act to Limit Contributions to Political Action Committees That Make
           Independent Expenditures

---

Good morning Senator Hickman and Representative Supica.

My name is Will Hayward.  I am here today as the Advocacy Program Director on behalf of Maine Citizens for Clean Elections (MCCE). I am testifying Neither For Nor Against LD 2232.

Maine Citizens for Clean Elections has been the leading campaign finance organization in Maine for almost thirty years and one of the nation's most respected state-based organizations advocating for democratically funded elections. We are proud of our national reputation. But we are all Mainers, and our nonpartisan mission has always been with and for the people of this state. No one in Maine has lamented the disastrous 2010 Supreme Court decision in *Citizens United v FEC* more strenuously or consistently than MCCE. The Appellate Court decision in *SpeechNow v FEC* followed soon after, and no one has worked harder over all these years to find a way to rein in contributions to PACs, including independent expenditure PACs (aka Super PACs) than MCCE. Even now, we fervently long for reform, even as the U.S. Supreme Court has left precious few grounds for hope.

Today in our country, we have more concentrated wealth and income than at any time since the beginning of the last century.  There is nothing more antithetical to the rights of citizens in a democratic republic than concentrated wealth and power. The size of this gap now threatens confidence in capitalism itself.[1]

Research at the federal level shows that legislators and policymakers are vastly more attentive to the interests of the affluent than they are to those of everyone else.[2] Affluent donors get what they want. The rest of us get what we want when, and only when, we want what they want. American democracy is

---

[1] Christopher Zara, "Davos Dialogs," Fast Company, January 11, 2024, https://www.fastcompany.com/91008803/future-capitalism-survey-2024-threat-steakholders-income-inequality [March 3, 2024]
[2] Martin Gilens, "Inequality and Democratic Responsiveness," Russell Sage Foundation, http://www.russellsage.org/research/inequality-and-democratic-responsiveness [March 17 2013]

---

MCCE Action to VLA                                                                 2
LD 2232                                                                   March 6, 2024

failing to serve the needs of the vast majority of its citizens. And our people know it.[3] That's why so many of them signed the petition to put this question on the ballot. That's why this measure is sure to pass when put to voters in November.

The most extreme individual example of this recently in Maine – no one else comes close – is Tom Klingenstein, who from 2021 to 2022 single-handedly underwrote over $2.5 million in independent expenditures from the Maine Families First PAC. Yes, that's right. He personally donated almost $3 million to support Maine candidates. It's too much. That's just one example.

And so, we wholeheartedly support the aspirations of this bill and believe the U.S. Constitution could and should be interpreted to sustain a functioning democracy, including allowing states and Congress to regulate money in politics.

Thank you for the opportunity to testify. I would be happy to answer any questions from the Committee.

---

[3] Katherine J. Cramer and Jonathan D. Cohen, "Many Americans Believe the Economy Is Rigged," New York Times, February 21, 2024, https://www.nytimes.com/2024/02/21/opinion/economy-research-greed-profit.html?unlocked_article_code=1.Z00.7COE.zDq03bGvwKYC&smid=url-share [March 3, 2024]

Testimony of Peter L. Murray in Support of LD 2232 – An Act to Limit Contributions to

Political Actions Committees that Make Independent Expenditures.

**Before the 131 Maine Legislature, Committee on Veterans and Legal Affairs**

March 6, 2024

Senator Hickman, Representative Supica, Members of the Veterans and Legal Affairs

Committee:

My name is Peter Murray.  I have lived and practiced law in Portland, Maine since 1967.

Thank you for permitting me to present my testimony via Zoom.  My wife underwent a serious

foot operation yesterday, which requires me to be at home to take care of her.

My testimony is submitted in support of LD 2232, "An Act to Limit Contributions to

Political Action Committees that Make Independent Expenditures."  This legislation offers the

State of Maine an opportunity to lead our nation in coming to terms with the flood of big

money in the form of contributions to SuperPACS that threaten to submerge the will of the

Maine electorate in important contested elections.

While contributions to political candidates to support their campaigns are currently

regulated in terms of source and amount, contributions to so called SuperPACS that often make

massive and unregulated "independent" expenditures in political campaigns have not been

effectively regulated either here in Maine or elsewhere in the United States since shortly after

the Supreme Court decided *Citizens United v. FEC* in 2010.  The result of this lack of regulation

has been huge increases in dark money contributions and expenditures designed to influence

key races such as the recent Senatorial contest between Susan Collins and Sara Gideon and the

Pine Tree Power referendum last year.

For more than a decade since *Citizens United* was decided, it has been generally assumed that the Supreme Court's reasoning in that case would prevent states or the Federal Government from effectively regulating the limitless sums currently being expended to influence political races.  Recently, however, some reform-minded legal scholars have taken another hard look at *Citizens United*.  Although that decision makes clear that "independent" political expenditures enjoy a high degree of protection under the First Amendment, there may be some room for constitutional regulation of contributions to the political action committees that make the expenditures.  It is hard to believe that large contributions to a SuperPAC that then made independent expenditures to influence an election would not affect the behavior of an office holder whose candidacy had been benefited by such contributions.  For example, Senator Robert Menendez is alleged to have provided political favors in exchange for contributions to a designated SuperPAC.  Under the current system, neither the SuperPAC nor the public would be aware of such an arrangement.   Even though large PAC expenditures may be immune from regulation, large contributions to PAC's can raise a sufficient issue of *quid pro quo* corruption or the appearance of this kind of corruption to support regulation according to principles accepted in *Citizens United*.

LD 2232 puts this proposition to the test.  The bill sets a $5,000 annual limit on any individual's or corporate entity's contributions to any single political action committee that makes direct expenditures for the purpose of influencing an election.  It also requires political action committees that make expenditures to report to the Maine Commission on Governmental Ethics and Election Practices on the total amount of contributions received from each contributor.

The bill does not forbid contributions to PACS that make expenditures, it merely sets a generous limit on the amount of such contributions per contributor per PAC per year and requires that the identify of the contributors and amount of the contributions be reported.  It should be noted that this regulation does not apply to those PACS which make regulated contributions to candidates.  It only tries to limit, to some extent, the huge flow of unregulated money that is flowing to PACS that make "independent" expenditures directly.

In my opinion, and the opinions of other lawyers who have looked hard at this approach, the regulation incorporated in LD 2232 would not unconstitutionally trammel anyone's First Amendment rights.   By focusing on the contributions, rather than the expenditures, the regulation addresses the appearance of corruption that is generated by big contributions to PACs that make expenditures to influence elections.  Candidates are strictly limited in the size of contributions they may accept for their campaigns.  However, the large contributors who wish to influence a candidate's performance in office need only make their excess contributions to a SuperPAC that will make independent expenditures in support of the favored candidate.  The corrupting effect is pretty much the same as if the money had been given to the candidate directly.   By limiting a contributor's annual contributions to any one PAC to $5,000, LD 2332 makes it hard for any one contributor to deploy a large enough sum for any candidate that would exercise a corrupting influence.

There is no doubt that the enactment of LD 2232 by the Legislature, or its enactment by referendum if the Legislature does not take its opportunity to step up on this one, will lead to legal challenges by the big money contributors and perhaps by the media purveyors that these contributions enrich.  In my judgment, this is a battle that the State of Maine, with the support

of national groups dedicated to reducing the influence of big money in politics, can win. And if it does win, Maine's law will be a model for the nation. We will finally be able to make some progress in regulating and reducing the influence of big money on American elections.

It may be tempting to the Committee and to the Legislature simply to pass on this one, to allow the citizen-initiated bill that is LD 2232 to go out to the people in referendum this fall. However, the results of the last referendum dealing with election finance should give us all a pretty good idea where the people of Maine stand. LD 2232 is a challenge to us all to do anything we can to save our political system. Please report this remarkable piece of legislation "Ought to Pass",

Peter L. Murray



**Maine Education Association**
Grace Leavitt President | Jesse Hargrove Vice President | Beth French Treasurer
Rebecca Cole NEA Director | Rachelle Bristol Executive Director

March 6, 2024

Re: LD 2232

Senator Hickman, Representative Supika, and members of the Joint Standing Committee on Veterans and Legal Affairs,

My name is Ben Grant and I am the General Counsel of the Maine Education Association. The MEA represents nearly 24,000 educators in our Maine system of public education, in pre-K-12 schools as well as in our institutions of higher education, and both retired and aspiring educators.

I am here to testify in opposition to LD 2232. While MEA has long stood behind the notion that Citizens United was a bad decision and has produced significant negative impacts on elections, we oppose this bill because of the cynical way it purports to address the issue. While we all battle the erosion of campaign finance regulation, we all must also battle the seemingly endless rise in cynicism among the citizenry about the whole business of politics and government. Far too often, like in this case, that cynicism is justified.

What I mean by this is that we are once again facing the prospect of the voters of Maine being used as pawns in a legal strategy. If this matter moves forward, the voters are going to be asked to vote for something that even the proponents agree is blatantly unconstitutional – all for the purpose of ginning up a case to bring back to the Courts. Measures like this are superficially very popular, so we can all expect it to pass at the ballot box. But, like the ban on foreign spending or even the original RCV question, under the surface are serious constitutional problems. The reason this is important is because the referendum process has the added effect of ratcheting up public expectations about actually getting the result the people voted to implement. How many times are we going to put a question before the people that we <u>know</u> they cannot have – even with a "yes" vote? How much more cynicism are we willing to intentionally sew?

This is as good a time as any to say "Stop" – and so the MEA urges the Committee to take whatever steps necessary to prevent this measure from going to the ballot.

Thank you,

Ben Grant
General Counsel, MEA

35 Community Drive, Augusta, ME 04330 | 1349 Broadway, Bangor, ME 04401
7 Hatch Drive, Suite 220, Caribou, ME 04736 | 29 Christopher Toppi Drive, South Portland ME 04106

207-622-5866 | 207-888-2070 fax | www.maineea.org



**Maine State Legislature**
## OFFICE OF POLICY AND LEGAL ANALYSIS
www.mainelegislature.gov/opla
13 State House Station, Augusta, Maine 04333-0013
(207) 287-1670

### BILL ANALYSIS

| | |
|---|---|
| **TO:** | Members, Joint Standing Committee on Veterans and Legal Affairs |
| **FROM:** | Rachel Olson, Legislative Analyst |
| **DATE:** | March 12, 2024 |
| **RE:** | **IB 5/LD 2232, An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures** (initiated bill) |

**Bill Summary**
This initiated bill limits the amount of contributions that may be made by individuals and by political action committees and business entities to political action committees that make independent expenditures. In both cases, the aggregate limit is $5,000 in any calendar year. A political action committee may only use funds received in this manner when making independent expenditures and the political action committee is required to keep an account of any contributions received for the purpose of making those expenditures.

This initiated bill also requires that a report by a person, party committee or political action committee that makes any independent expenditure in excess of $250 during any one candidate's election must contain an itemized account of the total contributions from each contributor.

**Testimony:** (This section is not intended to reflect all comments.)          Date of public hearing: *March 6, 2024*
List of individuals and entities/organizations submitting testimony:

*In favor:* Cara McCormick, Citizens to End Super PACs; Lawrence Lessig, EqualCitizens; Maia Cook, Research Assistant to Lawrence Lessig and Yale University student; Adam Cote, Drummond Woodsum; Senator Rick Bennett; Jack McCormick, Cape Elizabeth High School student; Sandra Heart, Cape Elizabeth High School student; Peter Murray, Portland, ME; Ron Fein, Legal Director, Free Speech For People;
*In opposition:* Ben Grant, General Counsel, Maine Education Association;
*Neither for, nor against:* Kate Knox, Bernstein Shur, Rebuild Maine; Will Hayward, Maine Citizens for Clean Election;

    \*\**Written testimony, if submitted, is available online through legislature.maine.gov*\*\*

**Potential Issues, Technical Problems or Issues for Consideration:**
- Title 21-A no longer has definitions for "leadership political action committee" or "separate segregated fund committee".

- It was noted by those who testified, that this proposal would most likely result in a court challenge related to the First Amendment and the decision in *Citizens United v. Federal Election commission* (2010). Those testifying in favor of the proposal see this as an opportunity to challenge aspects of that ruling regarding money in politics. Others who testified against the proposal or neither for nor against the proposal were concerned about using Maine as a test case,

the impact on the expectations of voters in the state, and the potential unintended consequences of such a case.

**Committee Requests for Additional Information:**

- Senator Timberlake request data regarding contributions to the ballot question committee that put forward this bill, Citizens to End Super PACs.

  *The initial filing report, January quarterly report and a major contributor report from EqualCitizens can be found with these materials. These reports can also be found on the Maine Ethics Commission website.*

**Additional Information:**

- As an initiated bill, the following paths/options apply:
  - **OTP report** (no change) – approved by both houses and the governor – enacted into law
  - **OTP-A report** – approved by both houses and the governor – sent to voters as a competing measure with the original bill
  - **ONTP report** – sent to voters

- **§1015** and **§1019-B**, which are being amended by the bill, are attached.

- **Relevant definitions:**

| Citation/Source | Definition |
|---|---|
| 21-A MRSA §1019-B Reports of independent expenditures | **1. Independent expenditures; definition.** For the purposes of this section, an "independent expenditure" means any expenditure made by a person, party committee or political action committee that is not made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized political committee or an agent of either and that:<br><br>A. Is made to design, produce or disseminate any communication that expressly advocates the election or defeat of a clearly identified candidate; or<br><br>B. Unless the person, party committee or political action committee making the expenditure demonstrates under subsection 2 that the expenditure did not have a purpose or effect of influencing the nomination, election or defeat of the candidate, is made to design, produce or disseminate a communication that names or depicts a clearly identified candidate and is disseminated during the 28 days, including election day, before a primary election; during the 35 days, including election day, before a special election; or from Labor Day to a general election day. |
| "business entity" can be found in **Sec. 2** of the bill, on lines 26-28 | … "For the purposes of this subsection, "business entity" includes a firm, partnership, corporation, incorporated association, labor organization or other organization, whether organized as a for-profit or a nonprofit entity." |
| 21-A MRSA §1001. **Definitions** subchapter 1 – General Provisions | **1-A. Caucus political action committee.** "Caucus political action committee" means a political action committee designated under section 1053-C to promote the election of nominees of a political party to the Senate or the House of Representatives. |

| | |
|---|---|
| **21-A MRSA §1052.**<br>**Definitions**<br>subchapter 4 – Reports<br>by PAC & BQC | **5. Political action committee.** The term "political action committee":<br><br>A. Includes:<br><br>(1) Any separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization that receives contributions or makes expenditures aggregating more than \$2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate to political office; and<br><br>(5) Any person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than \$2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office; and<br><br>B. Does not include:<br><br>(1) A candidate or a candidate's treasurer under section 1013-A, subsection 1;<br><br>(2) A candidate's authorized political committee under section 1013-A, subsection 1, paragraph B;<br><br>(3) A party committee under section 1013-A, subsection 3; or<br><br>(4) An exempt donor. (See below)<br><br>**3-A. Exempt donor.** "Exempt donor" means a person that has not received contributions for the purpose of influencing a campaign in the prior 2 years and whose only payments of money to influence a campaign in the prior 2 years are:<br><br>A. Contributions of money to candidates, party committees, political action committees or ballot question committees registered with the commission or a municipality; or<br><br>B. Payments for goods or services with an aggregate value of no more than \$100,000 contributed to candidates, party committees, political action committees or ballot question committees registered with the commission or a municipality. |

**Preliminary Fiscal Impact Statement:** No preliminary fiscal note at this time.

## §1015. Limitations on contributions and expenditures

**1. Contributions by individuals.** An individual may not make contributions to a candidate in support of the candidacy of one person aggregating more than $1,950 in any election for a gubernatorial candidate, more than $475 for a legislative candidate, more than $575 for a candidate for municipal office and more than $975 in any election for any other candidate. This limitation does not apply to contributions in support of a candidate by that candidate or that candidate's spouse or domestic partner. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates.
[PL 2023, c. 244, §4 (AMD).]

**2. Contributions by party committees, ballot question committees and political action committees.**

[PL 2023, c. 244, §5 (RP).]

**2-A. Contributions by business entities.**
[PL 2023, c. 244, §6 (RP).]

**2-B. Committees; corporations; associations.** A political committee, political action committee, ballot question committee or other committee, firm, partnership, corporation, association or organization may not make contributions to a candidate in support of the candidacy of one person aggregating more than $1,950 in any election for a gubernatorial candidate, more than $475 for a legislative candidate, more than $575 for a candidate for municipal office and more than $975 in any election for any other candidate. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates.
[PL 2023, c. 244, §7 (NEW).]

**3. Aggregate contributions.**
[PL 2023, c. 324, §9 (RP).]

**4. Political committees; intermediaries.** For the purpose of the limitations imposed by this section, contributions made to any political committee authorized by a candidate to accept contributions on the candidate's behalf are considered to be contributions made to that candidate. If the campaign activities of a political action committee within a calendar year primarily promote or support the nomination or election of a single candidate, contributions to the committee that were solicited by the candidate are considered to be contributions made to the candidate for purposes of the limitations in this section. For purposes of this subsection, solicitation of contributions includes but is not limited to the candidate's appearing at a fundraising event organized by or on behalf of the political action committee or suggesting that a donor make a contribution to that committee.

For the purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, that are in any way earmarked or otherwise directed through an intermediary or conduit to the candidate are considered to be contributions from that person to the candidate. The intermediary or conduit shall report the original source and the intended recipient of the contribution to the commission and to the intended recipient.
[PL 2011, c. 389, §14 (AMD).]

**5. Other contributions and expenditures.** Any expenditure made by any person in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's political committee or their agents is considered to be a contribution to that candidate.

The financing by any person of the dissemination, distribution or republication, in whole or in part, of any broadcast or any written or other campaign materials prepared by the candidate, the candidate's political committee or committees or their authorized agents is considered to be a contribution to that candidate.
[PL 1989, c. 504, §§7, 31 (AMD).]

**6. Prohibited expenditures.** A candidate, a treasurer, a political committee, a party or party committee, a person required to file a report under this subchapter or their authorized agents may not make any expenditures for liquor to be distributed to or consumed by voters while the polls are open on election day.
[PL 1991, c. 839, §11 (AMD); PL 1991, c. 839, §34 (AFF).]

**7. Voluntary limitations on political expenditures.** A candidate may voluntarily agree to limit the total expenditures made on behalf of that candidate's campaign as specified in section 1013-A, subsection 1, paragraph C and subsections 8 and 9.
[PL 1995, c. 384, §2 (NEW).]

**8. Political expenditure limitation amounts.** Total expenditures in any election for legislative office by a candidate who voluntarily agrees to limit campaign expenditures as provided in subsection 7 are as follows:

A. For State Senator, $25,000; and  [PL 2007, c. 443, Pt. A, §14 (AMD).]

B. For State Representative, $5,000.  [PL 2007, c. 443, Pt. A, §14 (AMD).]

C.  [PL 2007, c. 443, Pt. A, §14 (RP).]

Expenditure limits are per election and may not be carried forward from one election to another. For calculation and reporting purposes, the reporting periods established in section 1017 apply.
[PL 2007, c. 443, Pt. A, §14 (AMD).]

**9. Publication of list.** The commission shall publish a list of the candidates for State Representative and State Senator who have agreed to voluntarily limit total expenditures for their campaigns as provided in section 1013-A, subsection 1, paragraph C.

For the purposes of subsections 7 and 8 and this subsection, "total expenditures" means the sum of all expenditures made to influence a single election that are made by a candidate or made on the candidate's behalf by the candidate's political committee or committees, the candidate's party or the candidate's immediate family.
[PL 1995, c. 384, §2 (NEW).]

**10. Business entity defined.**
[PL 2023, c. 244, §8 (RP).]

SECTION HISTORY

PL 1985, c. 161, §6 (NEW). PL 1989, c. 504, §§7,31 (AMD). PL 1991, c. 839, §11 (AMD). PL 1991, c. 839, §34 (AFF). IB 1995, c. 1, §11 (AMD). PL 1995, c. 384, §2 (AMD). PL 1999, c. 729, §§2,3 (AMD). PL 2007, c. 443, Pt. A, §§10-14 (AMD). PL 2009, c. 286, §§2, 3 (AMD). PL 2011, c. 382, §§1, 2 (AMD). PL 2011, c. 389, §14 (AMD). PL 2019, c. 51, §§1, 2 (AMD). PL 2019, c. 51, §3 (AFF). PL 2021, c. 274, §§4-7 (AMD). PL 2021, c. 274, §13 (AFF). PL 2021, c. 607, §1 (AMD). PL 2021, c. 607, §5 (AFF). PL 2023, c. 244, §§4-8 (AMD). PL 2023, c. 324, §9 (AMD).

### §1019-B. Reports of independent expenditures

**1. Independent expenditures; definition.** For the purposes of this section, an "independent expenditure" means any expenditure made by a person, party committee or political action committee that is not made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized political committee or an agent of either and that:

A. Is made to design, produce or disseminate any communication that expressly advocates the election or defeat of a clearly identified candidate; or [PL 2021, c. 132, §7 (AMD).]

B. Unless the person, party committee or political action committee making the expenditure demonstrates under subsection 2 that the expenditure did not have a purpose or effect of influencing the nomination, election or defeat of the candidate, is made to design, produce or disseminate a communication that names or depicts a clearly identified candidate and is disseminated during the 28 days, including election day, before a primary election; during the 35 days, including election day, before a special election; or from Labor Day to a general election day. [PL 2023, c. 324, §10 (AMD).]

[PL 2023, c. 324, §10 (AMD).]

**2. Commission determination.** A person, party committee or political action committee may request a determination that an expenditure that otherwise meets the definition of an independent expenditure under subsection 1, paragraph B is not an independent expenditure by filing a signed written statement with the commission within 7 days of disseminating the communication stating that the cost was not incurred with a purpose of influencing the nomination, election or defeat of a candidate, supported by any additional evidence the person, party committee or political action committee chooses to submit. The commission may gather any additional evidence it determines relevant and material. The commission shall determine by a preponderance of the evidence whether the cost was incurred with a purpose of, or had the effect of, influencing the nomination, election or defeat of a candidate. In order to make this determination, the commission shall consider whether the language and other elements of the communication would lead a reasonable person to conclude that the communication had a purpose of, or had the effect of, influencing an election. The commission may consider other factors, including, but not limited to, the timing of the communication, the recipients of the communication or, if the communication is a digital communication, any links to publicly accessible websites related to the nomination, election or defeat of a candidate. The commission's executive director shall make an initial determination on the request, which must be posted on the commission's publicly accessible website. Any person may appeal the initial determination, which must be considered by the commission at the next public meeting that is feasible.

[PL 2023, c. 324, §11 (AMD).]

**3. Report required; content; rules.**

[PL 2009, c. 524, §6 (RPR); MRSA T. 21-A §1019-B, sub-§3 (RP).]

**4. Report required; content; rules.** A person, party committee or political action committee that makes any independent expenditure in excess of $250 during any one candidate's election shall file a report with the commission. In the case of a municipal election, the report must be filed with the municipal clerk.

A. A report required by this subsection must be filed with the commission according to a reporting schedule that the commission shall establish by rule that takes into consideration existing campaign finance reporting requirements. Rules adopted pursuant to this paragraph are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A. [PL 2011, c. 558, §2 (AMD).]

B. A report required by this subsection must contain an itemized account of each expenditure in excess of $250 in any one candidate's election, the date and purpose of each expenditure and the name of each payee or creditor. The report must state whether the expenditure is in support of or

in opposition to the candidate and must include, under penalty of unsworn falsification, as provided in Title 17-A, section 453, a statement whether the expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, the candidate or an authorized committee or agent of the candidate. [PL 2023, c. 324, §12 (AMD).]

C. A report required by this subsection must be on a form prescribed and prepared by the commission. A person filing this report may use additional pages if necessary, but the pages must be the same size as the pages of the form. The commission may adopt procedures requiring the electronic filing of an independent expenditure report, as long as the commission adopts an exception for persons who lack access to the required technology or the technological ability to file reports electronically. [PL 2023, c. 324, §13 (AMD).]

[PL 2023, c. 324, §§12, 13 (AMD).]

**5. Exclusions.** An independent expenditure does not include:

A. [PL 2021, c. 132, §9 (RP).]

B. A telephone survey that meets generally accepted standards for polling research and that is not conducted for the purpose of changing the voting position of the call recipients or discouraging them from voting; [PL 2011, c. 389, §21 (NEW).]

C. A telephone call naming a clearly identified candidate that identifies an individual's position on a candidate, ballot question or political party for the purpose of encouraging the individual to vote, as long as the call contains no advocacy for or against any candidate; and [PL 2011, c. 389, §21 (NEW).]

D. A voter guide that consists primarily of candidates' responses to surveys and questionnaires and that contains no advocacy for or against any candidate. [PL 2011, c. 389, §21 (NEW).]

[PL 2021, c. 132, §9 (AMD).]

SECTION HISTORY

PL 2003, c. 448, §3 (NEW). PL 2007, c. 443, Pt. A, §20 (AMD). PL 2009, c. 366, §5 (AMD). PL 2009, c. 366, §12 (AFF). PL 2009, c. 524, §§6, 7 (AMD). PL 2011, c. 389, §§20, 21 (AMD). PL 2011, c. 389, §62 (AFF). PL 2011, c. 558, §2 (AMD). PL 2013, c. 334, §§15, 16 (AMD). IB 2015, c. 1, §§5, 6 (AMD). PL 2015, c. 350, §6 (AMD). PL 2019, c. 323, §§15-17 (AMD). PL 2021, c. 132, §§7-9 (AMD). PL 2023, c. 324, §§10-13 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular Session and the First Special Session of the 131st Maine Legislature and is current through November 1, 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.



Commission on Governmental Ethics and Election Practices
Mail: 135 State House Station, Augusta, Maine 04333
Office: 45 Memorial Circle, Augusta, Maine
Website: www.maine.gov/ethics
Phone: 207-287-4179
Fax: 207-287-6775

## 2023 CAMPAIGN FINANCE REPORT

### FOR POLITICAL ACTION COMMITTEES

| COMMITTEE | TREASURER |
|---|---|
| COMMITTEE TO END SUPERPACS<br>PO BOX 2122<br>SOUTH PORTLAND, ME 04116<br>PHONE:(207) 310-4527<br>EMAIL: committeetoendsuperpacs@gmail.com | Ms. AVERY ARENA<br>PO Box 2122<br>South Portland, ME 04116<br>PHONE:<br>EMAIL: avery.arena@gmail.com |

| REPORT | DUE DATE | REPORTING PERIOD |
|---|---|---|
| Initial Financial Report | 11/01/2023 | 01/01/2023 - 10/25/2023 |

### FINANCIAL ACTIVITY SUMMARY

| RECEIPTS | TOTAL FOR PERIOD | TOTAL FOR YEAR |
|---|---|---|
| 1. CASH CONTRIBUTIONS (SCHEDULE A) | $100.00 | $100.00 |
| 2. OTHER CASH RECEIPTS (INTEREST, ETC.) | $0.00 | $0.00 |
| 3. LOANS (SCHEDULE C) | $0.00 | $0.00 |
| 4. TOTAL RECEIPTS (LINE 1 + 2 + 3) | $100.00 | $100.00 |
| **EXPENDITURES** | | |
| 5. EXPENDITURES TO SUPPORT OR OPPOSE (SCHEDULE B) | $0.00 | $0.00 |
| 6. OPERATING EXPENDITURES (SCHEDULE B-1) | $0.00 | $0.00 |
| 7. LOAN REPAYMENTS (SCHEDULE C) | $0.00 | $0.00 |
| 8. TOTAL PAYMENTS (LINE 5 + 6 + 7) | $0.00 | $0.00 |
| **CASH SUMMARY** | | |
| 9. CASH BALANCE AT BEGINNING OF PERIOD | $0.00 | |
| 10. PLUS TOTAL RECEIPTS THIS PERIOD (LINE 4) | $100.00 | |
| 11. MINUS TOTAL PAYMENTS THIS PERIOD (LINE 8) | $0.00 | |
| 12. CASH BALANCE AT END OF PERIOD | $100.00 | |
| **OTHER ACTIVITY** | | |
| 13. IN-KIND CONTRIBUTIONS (SCHEDULE A-1) | $0.00 | $0.00 |
| 14. TOTAL LOAN BALANCE AT END OF PERIOD (SCHEDULE C) | $0.00 | |
| 15. TOTAL UNPAID DEBTS AT END OF PERIOD (SCHEDULE D) | $0.00 | |

I, CARA MCCORMICK, CERTIFY THAT THE INFORMATION CONTAINED IN THIS REPORT IS TRUE, ACCURATE, AND COMPLETE TO THE BEST OF MY KNOWLEDGE.

REPORT FILED BY: CARA MCCORMICK
REPORT FILED ON: 10/27/2023 5:17:20 PM
LAST MODIFIED:
COMMITTEE ID: 483635

**SCHEDULE A**
**CASH CONTRIBUTIONS**

- For contributors who gave more that $50, the names, address, occupation, and employer must be reported. If "information requested" is listed instead of occupation and employer, the candidate is waiting to receive that information.
- Cash contributions of $50 or less can be added together and reported as a lump sum.
- Contributor Types

| | |
|---|---|
| 1 = Individual | 9 = Candidate / Candidate Committee |
| 2 = Candidate/ Spouse/ Domestic Partner | 10 = General Treasury Transfer |
| 3 = Commercial Source | 11 = Transfer from Previous Campaign |
| 4 = Nonprofit Organization | 12 = Contributors giving $50 or less |
| 5 = Political Action Committee | 13 = Contributors giving $100 or less |
| 6 = Political Party Committee | 14 = Contributors giving $200 or less |
| 7 = Ballot Question Committee | 15 = MCEA Payment |
| 8 = Other Candidate/ Candidate Committee | 16 = Financial Institution |

| DATE RECEIVED | CONTRIBUTOR | EMPLOYER AND OCCUPATION | TYPE | AMOUNT |
|---|---|---|---|---|
| 10/25/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04116 | SELF EMPLOYED<br>General Business | 1 | $100.00 |
| | | **TOTAL CASH CONTRIBUTIONS** | | $100.00 |





Commission on Governmental Ethics and Election Practices
Mail: 135 State House Station, Augusta, Maine 04333
Office: 45 Memorial Circle, Augusta, Maine
Website: www.maine.gov/ethics
Phone: 207-287-4179
Fax: 207-287-6775

## 2024 CAMPAIGN FINANCE REPORT

### FOR POLITICAL ACTION COMMITTEES

| COMMITTEE | TREASURER |
|---|---|
| Citizens to End SuperPACs<br>PO BOX 2122<br>SOUTH PORTLAND, ME 04116<br>PHONE:(207) 310-4527<br>EMAIL: committeetoendsuperpacs@gmail.com | Ms. AVERY ARENA<br>PO Box 2122<br>South Portland, ME 04116<br>PHONE:<br>EMAIL: avery.arena@gmail.com |

| REPORT | DUE DATE | REPORTING PERIOD |
|---|---|---|
| Committee January Quarterly | 01/16/2024 | 10/26/2023 - 12/31/2023 |

### FINANCIAL ACTIVITY SUMMARY

| RECEIPTS | TOTAL FOR PERIOD | TOTAL FOR YEAR |
|---|---|---|
| 1. CASH CONTRIBUTIONS (SCHEDULE A) | $1,005.00 | $1,105.00 |
| 2. OTHER CASH RECEIPTS (INTEREST, ETC.) | $0.00 | $0.00 |
| 3. LOANS (SCHEDULE C) | $0.00 | $0.00 |
| 4. TOTAL RECEIPTS (LINE 1 + 2 + 3) | $1,005.00 | $1,105.00 |
| **EXPENDITURES** | | |
| 5. EXPENDITURES TO SUPPORT OR OPPOSE (SCHEDULE B) | $85.98 | $85.98 |
| 6. OPERATING EXPENDITURES (SCHEDULE B-1) | $0.00 | $0.00 |
| 7. LOAN REPAYMENTS (SCHEDULE C) | $0.00 | $0.00 |
| 8. TOTAL PAYMENTS (LINE 5 + 6 + 7) | $85.98 | $85.98 |
| **CASH SUMMARY** | | |
| 9. CASH BALANCE AT BEGINNING OF PERIOD | $100.00 | |
| 10. PLUS TOTAL RECEIPTS THIS PERIOD (LINE 4) | $1,005.00 | |
| 11. MINUS TOTAL PAYMENTS THIS PERIOD (LINE 8) | $85.98 | |
| 12. CASH BALANCE AT END OF PERIOD | $1,019.02 | |
| **OTHER ACTIVITY** | | |
| 13. IN-KIND CONTRIBUTIONS (SCHEDULE A-1) | $1,012,709.00 | $1,012,709.00 |
| 14. TOTAL LOAN BALANCE AT END OF PERIOD (SCHEDULE C) | $0.00 | |
| 15. TOTAL UNPAID DEBTS AT END OF PERIOD (SCHEDULE D) | $3,717.18 | |

I, CARA MCCORMICK, CERTIFY THAT THE INFORMATION CONTAINED IN THIS REPORT IS TRUE, ACCURATE, AND COMPLETE TO THE BEST OF MY KNOWLEDGE.

REPORT FILED BY: CARA MCCORMICK
REPORT FILED ON: 1/16/2024 12:22:39 PM
LAST MODIFIED:
COMMITTEE ID: 483635

## SCHEDULE A
## CASH CONTRIBUTIONS

- For contributors who gave more that $50, the names, address, occupation, and employer must be reported. If "information requested" is listed instead of occupation and employer, the candidate is waiting to receive that information.
- Cash contributions of $50 or less can be added together and reported as a lump sum.
- Contributor Types

| | |
|---|---|
| 1 = Individual | 9 = Candidate / Candidate Committee |
| 2 = Candidate/ Spouse/ Domestic Partner | 10 = General Treasury Transfer |
| 3 = Commercial Source | 11 = Transfer from Previous Campaign |
| 4 = Nonprofit Organization | 12 = Contributors giving $50 or less |
| 5 = Political Action Committee | 13 = Contributors giving $100 or less |
| 6 = Political Party Committee | 14 = Contributors giving $200 or less |
| 7 = Ballot Question Committee | 15 = MCEA Payment |
| 8 = Other Candidate/ Candidate Committee | 16 = Financial Institution |

| DATE RECEIVED | CONTRIBUTOR | EMPLOYER AND OCCUPATION | TYPE | AMOUNT |
|---|---|---|---|---|
| 11/2/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04116 | SELF EMPLOYED<br>General Business | 1 | $10.00 |
| 11/2/2023 | L LESSIG<br>20 AMORY ST<br>BROOKLINE, MA, 02446 | Harvard Law School<br>Teacher/Education | 1 | $250.00 |
| 11/3/2023 | SAM AUCIELLO<br>548 OLD COUNTY ROAD<br>ROCKLAND, ME, 04841 | EMPLOYMENT INFO REQUESTED | 1 | $25.00 |
| 11/8/2023 | JEFFREY SAFFER<br>22 HUNTS POINT RD<br>CAPE ELIZABETH, ME, 04107 | Unknown<br>Healthcare/Medical | 1 | $50.00 |
| 12/4/2023 | BARRY KOHLER<br>97 Brydon Way<br>Westbrook, ME, 04092 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| 12/4/2023 | CYNTHIA HOWLAND<br>25 Water Street<br>Brunswick, ME, 04011 | EMPLOYMENT INFO REQUESTED | 1 | $50.00 |
| 12/4/2023 | EDDIE ANDERSON<br>275 RAMPART WAY<br>APT 207<br>DENVER, CO, 80230 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| 12/4/2023 | ELLEN GRANT<br>57 MACKWORTH STREET<br>PORTLAND, ME, 04103 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |

| | | | | |
|---|---|---|---|---|
| 12/4/2023 | FREDERICK MILLER<br>35 LAMBERT RD<br>FREEPORT, ME, 04032 | EMPLOYMENT INFO<br>REQUESTED | 1 | $50.00 |
| 12/4/2023 | GILLIAN BURNES<br>17 COTTAGE ST<br>GARDINER, ME, 04345 | EMPLOYMENT INFO<br>REQUESTED | 1 | $5.00 |
| 12/4/2023 | HALSEY SNOW<br>58 OVERLOOK LN<br>CASCO, ME, 04015 | EMPLOYMENT INFO<br>REQUESTED | 1 | $25.00 |
| 12/4/2023 | JOHN MCCALL<br>14 Karynel Drive<br>South Portland, ME, 04106 | EMPLOYMENT INFO<br>REQUESTED | 1 | $50.00 |
| 12/4/2023 | MICHAEL BOYSON<br>82 Mackworth Street<br>Portland, ME, 04103 | EMPLOYMENT INFO<br>REQUESTED | 1 | $100.00 |
| 12/4/2023 | MICHAEL ERIC BERUBE<br>210 FESSENDEN HILL ROAD<br>DENMARK, ME, 04022 | EMPLOYMENT INFO<br>REQUESTED | 1 | $10.00 |
| 12/4/2023 | PETER FELSENTHAL<br>9 GOLDFINCH DRIVE<br>TOPSHAM, ME, 04086 | EMPLOYMENT INFO<br>REQUESTED | 1 | $10.00 |
| 12/4/2023 | REINHOLD WAPPLER<br>362 Allen Road<br>Pownal, ME, 04069 | EMPLOYMENT INFO<br>REQUESTED | 1 | $100.00 |
| 12/4/2023 | RICHARD OCONNOR<br>84 CEDAR STREET<br>BELFAST, ME, 04915 | SELF EMPLOYED<br>General Business | 1 | $50.00 |
| 12/4/2023 | RICHARD WOLFE<br>43 Blanchard Rd<br>Cumberland, ME, 04021 | EMPLOYMENT INFO<br>REQUESTED | 1 | $5.00 |
| 12/4/2023 | SALLY NG<br>72 BOWDOIN ST<br>PORTLAND, ME, 04102 | EMPLOYMENT INFO<br>REQUESTED | 1 | $50.00 |
| 12/4/2023 | SANDY PARENT<br>7 MACAVITY DRIVE<br>TURNER, ME, 04282 | EMPLOYMENT INFO<br>REQUESTED | 1 | $5.00 |
| 12/4/2023 | THOMAS GOETTING<br>18 WASHINGTON ST<br>LUBEC, ME, 04652 | EMPLOYMENT INFO<br>REQUESTED | 1 | $10.00 |

| | | | | |
|---|---|---|---|---|
| 12/4/2023 | TOM MIKULKA<br>6 ARROW POINT ROAD<br>CAPE ELIZABETH, ME, 04107 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| 12/4/2023 | VITTORIA MCILHENNY<br>PO BOX 574<br>NORTHEAST HARBOR, ME, 04662 | EMPLOYMENT INFO REQUESTED | 1 | $25.00 |
| 12/4/2023 | WILLIAM JENKS<br>29 ROBIE STREET<br>GORHAM, ME, 04038 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| 12/4/2023 | WILLIAM WILLAUER<br>8 SANCTUARY LANE<br>SCARBOROUGH, ME, 04074 | EMPLOYMENT INFO REQUESTED | 1 | $5.00 |
| 12/5/2023 | BILL BAKER<br>43 WEST CHIPMUNK LANE<br>HARFORDS POINT, ME, 04442 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| 12/8/2023 | PAGE CLASON<br>PO BOX 146<br>ISLESBORO, ME, 04848 | EMPLOYMENT INFO REQUESTED | 1 | $50.00 |
| 12/10/2023 | ELEANOR WEISMAN<br>1300 Belfast Rd<br>Knox, ME, 04986 | EMPLOYMENT INFO REQUESTED | 1 | $10.00 |
| | | **TOTAL CASH CONTRIBUTIONS** | | $1,005.00 |

## SCHEDULE A - 1
## IN-KIND CONTRIBUTIONS

- In-kind contributions are goods and services (including facilities) that a candidate received at no cost or at a cost less than the fair market value. they include all goods and services purchased for the campaign by the candidate or supporters if the campaign does not expect to reimburse the candidate or supporter. These contributions may come from the candidate, candidate's family, supporters, PACs, party committees, or other entities.
- For contributors who gave more than $50, the names, address, occupation, and employer must be reported. If "information requested" is listed instead of occupation and employer, the candidate is waiting to receive that information.
- In-kind contributions of $50 or less can be added together and reported as a lump sum.
- If the candidate received a discount on goods and services, the amount of the discount must be reported as an in-kind contribution.
- Total contributions (cash and in-kind) from the same source (except the candidate and candidate's spouse or domestic partner) may NOT exceed $350 in any election for the legislative candidates, $750 for county candidates, or $1500 for gubernatorial candidates. For party candidates, the primary and general elections are considered separate election. For non-party candidates, there is only one election, the general election.

| | |
|---|---|
| 1 = Individual | 9 = Candidate / Candidate Committee |
| 2 = Candidate/ Spouse/ Domestic Partner | 10 = General Treasury Transfer |
| 3 = Commercial Source | 11 = Transfer from Previous Campaign |
| 4 = Nonprofit Organization | 12 = Contributors giving $50 or less |
| 5 = Political Action Committee | 13 = Contributors giving $100 or less |
| 6 = Political Party Committee | 14 = Contributors giving $200 or less |
| 7 = Ballot Question Committee | 15 = MCEA Payment |
| 8 = Other Candidate/ Candidate Committee | 16 = Financial Institution |

| DATE RECEIVED | CONTRIBUTOR'S NAME, ADDRESS, ZIP | EMPLOYER AND OCCUPATION | DESCRIPTION (of goods, services, facilities, or discounts received) | TYPE | AMOUNT |
|---|---|---|---|---|---|
| 10/27/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | 4 | $100,000.00 |
| 10/30/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | 4 | $300,000.00 |
| 10/30/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR LEGAL AND CONSULTING SERVICES PAID TO DRUMMOND WOODSUM | 4 | $4,098.00 |
| 11/8/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | 4 | $600,000.00 |

| 12/11/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR LEGAL AND CONSULTING SERVICES PAID TO DRUMMOND WOODSUM. | 4 | $8,320.00 |
|---|---|---|---|---|---|
| 12/14/2023 | EQUALCITIZENS.US 1690 BOSTON RD #1118 SPRINGFIELD, MA, 01129 | | INKIND CONTRIBUTION FOR LEGAL AND CONSULTING SERVICES PAID TO DRUMMOND WOODSUM. | 4 | $291.00 |
| | | | **TOTAL IN-KIND CONTRIBUTIONS** | | $1,012,709.00 |

**SCHEDULE B**
**EXPENDITURES TO SUPPORT OR OPPOSE**

| EXPENDITURE TYPES | | | |
|---|---|---|---|
| APP | Apparel (t-shirts, hats, embroidery, etc.) | CON | Contribution to party committee, non-profit, other candidate, etc. |
| EQP | Equipment of $50 or more (computer, tablet, phone, furniture, etc.) | EVT | Campaign and fundraising events (venue or booth rental, entertainment, supplies, etc.) |
| FOD | Food for campaign events or volunteers, catering | HRD | Hardware and small tools (hammer, nails, lumber, paint, etc.) |
| LIT | Printed campaign materials (palmcards, signs, stickers, flyers, etc.) | MHS | Mail house and direct mail (design, printing, mailing, and postage all included) |
| NEW | Newspaper and print media ads only | OFF | Office supplies, rent, utilities, internet service, phone minutes and data |
| ONL | Social media and online advertising only | OTH | Other and fees (bank, contribution, and money order fees, etc.) |
| PER | Personnel and campaign staff, consulting, and independent contractor costs | PHO | Phones (phone banking, robocalls and texts) |
| POL | Polling and survey research | POS | Postage for U.S. Mail and mail box fees |
| PRO | Professional services (graphic design, legal services, web design, etc.) | RAD | Radio ads, production costs |
| TKT | Entrance cost to event (bean suppers, fairs, party events, etc.) | TRV | Travel (fuel, mileage, lodging, etc.) |
| TVN | TV/cable ads, production, and media buyer costs only | WEB | Website and internet costs (website domain and registration, etc.) |

| DATE OF EXPENDITURE | PAYEE | REMARK | TYPE | AMOUNT |
|---|---|---|---|---|
| 12/31/2023 | STRIPE 354 OYSTER POINT BLVD. SOUTH SAN FRANCISCO, CA, 90480 | FEES<br><br>PAYMENT OF $85.98 TO SUPPORT: Limiting contributions to political action committees that make independent expenditures | OTH | $85.98 |
| | | **TOTAL EXPENDITURES TO SUPPORT OR OPPOSE:** | | $85.98 |

**SCHEDULE D**
**UNPAID DEBTS AND OBLIGATIONS**

- A debt or obligation is incurred if a committee places an order for a good or service without making a payment; makes a promise or agreement to pay for a good or service; signs a contract for a good or service; or receives delivery of a good or service for which the committee has not paid.
- This schedule is a list of all debts and obligations of the committee as of the end of this reporting period.

| DATE OF OBLIGATION | CREDITOR | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10/26/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>SQUARESPACE MONTHLY PAYMENT | $33.00 |
| 10/30/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Office supplies, rent, utilities, internet service, phone minutes and data<br>PURCHASE OF VOTER FILE DATA FROM CORP ELECTIONS VERIFONE - CROSS BUILDING, 4TH FLOOR, AUGUSTA, ME 04330 | $2,200.00 |
| 11/14/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Personnel and campaign staff, consulting, and independent contractor costs<br>PAYMENT TO AVERA ARENA FOR CAMPAIGN CONSULTING SERVICES | $1,207.50 |
| 11/25/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>ISTOCKPHOTO MONTHLY PAYMENT | $73.85 |
| 11/25/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>SQUARESPACE INC. MONTHLY CHARGE | $33.00 |
| 11/29/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>CANVA MONTHLY PAYMENT | $14.99 |
| 12/25/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>ISTOCKPHOTO MONTHLY PAYMENT | $73.85 |
| 12/25/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>SQUARESPACE MONTHLY PAYMENT | $33.00 |
| 12/26/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>ACTIONNETWORK TOOLS - MONTHLY PAYMENT | $33.00 |
| 12/29/2023 | CARA MCCORMICK<br>PO BOX 2122<br>SOUTH PORTLAND, ME, 04106 | Website and internet costs (website domain and registration, etc.)<br>CANVA.COM MONTHLY PAYMENT | $14.99 |
| | | TOTAL UNPAID DEBTS AND OBLIGATIONS | $3,717.18 |



Commission on Governmental Ethics and Election Practices
Mail: 135 State House Station, Augusta, Maine 04333
Office: 45 Memorial Circle, Augusta ME, 04333

Website: www.maine.gov/ethics
Phone: 207-287-4179
Fax: 207-287-6775

## Major Contributor Report
## 2023 Election

| Regular Reporting Deadlines | | |
|---|---|---|
| **Name of Report:** | **Filing Deadline** | **If the Notice is received between:** |
| April Quarterly Report | **April 10, 2023** | **January 1 – March 31, 2023** |
| July Quarterly Report | **July 17, 2023** | **April 1 – June 30, 2023** |
| 42-Day Pre-Election Report | **September 26, 2023** | **July 1 – September 19,2023** |
| 11-Day Pre-Election Report | **October 27, 2023** | **September 20 – October 24, 2023** |
| January Quarterly Report | **January 16, 2024** | **October 25 – December 31, 2023** |

| Deadline - Last 13 Days before an Election | | |
|---|---|---|
| **Name of Report:** | **If the Notice is received between:** | **The Report is due on or before:** |
| 2-Day Election Report | During the last 13 days before an election | Within 2 business days of receiving notice. |

NOTE: if the Notice is receiving during the last 13 days before a primary, general, or special election then the Report is due within 2 business days and **not** by the due date of a Regular Finance Report.

| Organization Information | |
|---|---|
| Organization Name<br>EqualCitizens.US | |
| Mailing Address<br>1690 Boston Rd, #1118 | Phone:<br>+1-857-285-2805 |
| City, State Zip<br>Springfield, MA 01129 | Email<br>info@equalcitizens.us |
| Responsible Officer Name and Position<br>Lawrence Lessig, CEO | |
| Form of Organization and Purpose<br>Non-profit, dedicated to reforms that will achieve citizen equality | |

| Tax Status |
|---|
| Does this Organization currently have a tax-exempt status with the Internal Revenue Service? |
| Yes ✔    No ☐ |
| If Yes, under what section of the tax code does it claim an exemption?<br>501(C)(4) |
| Please list all jurisdictions with which this Organization files campaign finance reports |
| 1. United States |
| 2. Massachusetts |
| 3. |
| 4. |

## Recipient Information

Name of Recipient
Citizens to End SuperPACs

Mailing Address of Recipient
PO BOX 2122, Portland, ME 04116

Date of First Contribution to Recipient
10/27/23

Total Amount Given to Recipient to Date
$1,012,709.00

## Itemized Contributions Given to Recipient Committee to Date
### (If additional space is needed, continue on the "Schedule B-MC-2" Worksheet)

| Date | Type of Contribution (e.g. cash or in-kind. If in-kind, describe goods or services given.) | Amount |
|---|---|---|
| 10/27/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | $100,000.00 |
| 10/30/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | $300,000.00 |
| 10/30/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO DrummondWoodsum | $4,098.00 |
| 11/08/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO SIGN2VOTE, INC. | $600,000.00 |

## Organization Source of Funds

(continued)

**Please provide the names of the five largest sources of funds received by this organization during the period beginning six months prior to the first contribution this organization made to the recipient ballot question committee or political action committee. Do not include the names of sources of funds that are restricted to purposes unrelated to a direct initiative or people's veto referendum campaign.**

1. Arjun Rao

2. Steve Jurvetson

3. Vin Ryan

4.

5.

## Certification of receipt of contributions to influence a Maine ballot question

Has this organization received contributions, in whole or in part, for the purpose of initiating or influencing a direct initiative or people's veto referendum campaign in Maine?

[✔] Yes (*If so, complete and attach the "Contributions Received to Influence Maine Ballot Question" Worksheet*)

[ ] No

**I Certify that the information in this report is true, correct, and complete.**

_____    1/16/2024
Signature of Responsible Officer of Organization        Date

Organization Name: _____ EqualCitizens.US _____

Page __1__ of __13__
Schedule B-MC-1 only

# SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 10/17/23 | Steve Jurvetson<br>465 1st St.<br>Los Altos, CA 94022 | Cash | $125,000.00 |
| 10/20/23 | Arjun Rao<br>5911 Down Valley Ct<br>Austin, TX 78731 | Cash | $250,000.00 |
| 10/25/23 | Vincent Ryan<br>10705 Charlseton Blvd.<br>Vero Beach, FL 32963 | Cash | $50,000.00 |
| 10/30/23 | Kevin Brennan<br>10 Pumpkin Hill Rd<br>Westport, CT 06880 | Cash | $20,000.00 |
| 10/31/23 | Jeanne North<br>41 Warren Street<br>Concord, NH 03301 | Cash | $50.00 |
| 10/31/23 | Graeme Sephton<br>623 Wendell Rd<br>Shutesbury, MA 01072 | Cash | $10.00 |
| 11/1/23 | Steve Jurvetson<br>465 1st St.<br>Los Altos, CA 94022 | Loan (repaid) | $500,000.00 |
| 11/3/23 | Omid Kordestani<br>3053 Fillmore Street<br>San Francisco, CA 94123 | Cash | $25,000.00 |
| 11/4/23 | Marcia Morris<br>220 Boylston St<br>Boston, MA 02116 | Cash | $7,500.00 |
| 11/4/23 | John Ford<br>1500 N. Post Oak Rd. Ste. 190<br>Houston, TX 77055 | Cash | $500.00 |
| 11/4/23 | Thomas Kehler<br>5 River Ridge Road<br>Hanover, NH 03755 | Cash | $500.00 |
| 11/4/23 | Avinash Kaushik<br>12577 Plymouth Dr.<br>Saratoga, CA 95070 | Cash | $250.00 |
| 11/4/23 | Christopher Kohnert<br>13328 NE 97th St<br>Redmond, WA 98052 | Cash | $250.00 |

# SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Robin Chase<br>40 Cottage Street<br>Cambridge, MA 02139 | Cash | $250.00 |
| 11/4/23 | Alison Heiser<br>2830 Oakridge Road<br>Neenah, WI 54956 | Cash | $100.00 |
| 11/4/23 | Barbara Davis<br>10820 N. Stargazer Dr<br>Tucson, AZ 85737 | Cash | $100.00 |
| 11/4/23 | Barbara Katzenberg<br>37 Moon Hill Road<br>Lexington, MA 02421 | Cash | $100.00 |
| 11/4/23 | Barbara Rogers<br>220 N. Zapata Hwy.<br>Laredo, TX 78043 | Cash | $100.00 |
| 11/4/23 | Chris Sells<br>12290 Southwest Marion Street<br>Tigard, OR 97223 | Cash | $100.00 |
| 11/4/23 | David Glazer<br>263 Glenwood Ave<br>Woodside, CA 94062 | Cash | $100.00 |
| 11/4/23 | Ellie Marks<br>77207 Tribecca Street<br>Indian Wells, CA 92210 | Cash | $100.00 |
| 11/4/23 | Frances Lappe<br>37 Goden Street<br>Belmont, MA 02478 | Cash | $100.00 |
| 11/4/23 | Georges Brun-Cottan<br>34 Baker Street<br>Belmont, MA 02478 | Cash | $100.00 |
| 11/4/23 | Jon Kauffman<br>822 Long Dr<br>Aberdeen, MD 21001 | Cash | $100.00 |
| 11/4/23 | Michael Keller<br>809 San Francisco Terrace<br>Stanford, CA 94305 | Cash | $100.00 |
| 11/4/23 | Perry Naughton<br>4219 Starflower<br>Fort Collins, CO 80526 | Cash | $100.00 |

# SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Susan Swartz 349 Marshman St. Highland Park, IL 60035 | Cash | $100.00 |
| 11/4/23 | Tyler Pepper 3831 S Lindas Way Bloomington, IN 47401 | Cash | $100.00 |
| 11/4/23 | Leon Campise 2310 W 8th St Austin, TX 78703 | Cash | $66.00 |
| 11/4/23 | George Maker 5951 Crystal Dr Beulah, MI 49617 | Cash | $50.00 |
| 11/4/23 | Greg Bond 325 Palisade Ave Jersey City, NJ 07307 | Cash | $50.00 |
| 11/4/23 | Jake Eagle PO BOX 190811 Hawi, HI 96719 | Cash | $50.00 |
| 11/4/23 | Jeff Atwood 410 Clayton Avenue El Cerrito, CA 94530 | Cash | $50.00 |
| 11/4/23 | Jim Snyder-Grant 18 Half Moon Hill Acton, MA 01720 | Cash | $50.00 |
| 11/4/23 | John Fioretta 195 Arroyo Way San Jose, CA 95112 | Cash | $50.00 |
| 11/4/23 | John Gerth 2094 Touraine Lane Half Moon Bay Half Moon Bay, CA 94019 | Cash | $50.00 |
| 11/4/23 | Joshua Jones 1093 Courtney Marie Ln Fallon, NV 89406 | Cash | $50.00 |
| 11/4/23 | Leanne Watt 766 East Colorado Blvd Suite 203 Pasadena, CA 91101 | Cash | $50.00 |
| 11/4/23 | Lena Plamondon 680 Kings Mountain Road Woodside, CA 94062 | Cash | $50.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Mark Germer<br>18 Whitney Way<br>Topsham, ME 04086 | Cash | $50.00 |
| 11/4/23 | Melissa Brenneman<br>3209 Orlando Street<br>Knoxville, TN 37917 | Cash | $50.00 |
| 11/4/23 | Nell L Farr<br>22 Cadillac Dr Apt 348<br>Sacramento, CA 95825 | Cash | $50.00 |
| 11/4/23 | Peeter Vilms<br>1217 14th Street<br>Santa Rosa, CA 95404 | Cash | $50.00 |
| 11/4/23 | Richard Price<br>111 Clifford Terrace<br>San Francisco, CA 94117 | Cash | $50.00 |
| 11/4/23 | Shawn Tabai<br>1340 Dahlia Loop<br>San Jose, CA 95126 | Cash | $50.00 |
| 11/4/23 | Tom Parks<br>5892 Whitewater Drive<br>Salt Lake City, UT 84121 | Cash | $50.00 |
| 11/4/23 | Harry Sleeper<br>10 Alpine Way POBox513<br>Alton Bay, NH 03810 | Cash | $35.00 |
| 11/4/23 | Dwight Rousu<br>13824 NE 70th Pl<br>Redmond, WA 98052 | Cash | $33.33 |
| 11/4/23 | David Christie<br>915 Peggy Ln<br>Menlo Park, CA 94025 | Cash | $27.00 |
| 11/4/23 | Alan Sukoenig<br>915 West End Ave. - Apt. 706<br>New York, NY 10025 | Cash | $25.00 |
| 11/4/23 | Andre Ryland<br>8355 Banberry Rd.<br>Pensacola, FL 32514 | Cash | $25.00 |
| 11/4/23 | Brian Reed<br>4040 SW Tualatin Ave<br>Portland, OR 97239 | Cash | $25.00 |

# SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Candace Brower<br>1304 Rook Dr<br>Port Angeles, WA 98362 | Cash | $25.00 |
| 11/4/23 | Dav Yaginuma<br>126 Bridgeview Drive<br>San Francisco, CA 94124 | Cash | $25.00 |
| 11/4/23 | David Auger<br>116 Lancaster Road<br>Groveton, NH 03582 | Cash | $25.00 |
| 11/4/23 | David Malterre<br>70 W 107th St #3A<br>New York, NY 10025 | Cash | $25.00 |
| 11/4/23 | Donn Carroll<br>38 Bank Street<br>Newfield, NY 14867 | Cash | $25.00 |
| 11/4/23 | Eduardo Zambrano<br>3051 Augusta St. #3<br>San Luis Obispo, CA 93401 | Cash | $25.00 |
| 11/4/23 | Hannah Williams<br>305 Arrowhead Dr<br>Montgomery, AL 36117 | Cash | $25.00 |
| 11/4/23 | James J. Serrell<br>25 Great Pond Rd<br>Kingston, NH 03848 | Cash | $25.00 |
| 11/4/23 | Katharine Coon<br>10 Elm Street<br>Peterborough, NH 03458 | Cash | $25.00 |
| 11/4/23 | Larry Burks<br>978 Chestnut Hill<br>Cambridge, NY 12816 | Cash | $25.00 |
| 11/4/23 | Linda Wood<br>111 Sagamore Ridge Pl<br>The Woodlands, TX 77389 | Cash | $25.00 |
| 11/4/23 | Philip Faulconer<br>83 Merry Lane<br>Eugene, OR 97404 | Cash | $25.00 |
| 11/4/23 | Raymond Scruggs<br>101 Ridge Rd.<br>San Anselmo, CA 94960 | Cash | $25.00 |

# SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Richard Hamilton<br>1111 Hyland Ave<br>Ames, IA 50014 | Cash | $25.00 |
| 11/4/23 | Rob Price<br>4016 Sierra Dr<br>Austin, TX 78731 | Cash | $25.00 |
| 11/4/23 | Santhosh Nair<br>10662 Toston Lane<br>Glen Allen, VA 23060 | Cash | $25.00 |
| 11/4/23 | Sonya Dunne<br>101 Beverly Street 12U<br>Boston, MA 02114 | Cash | $25.00 |
| 11/4/23 | Teresa Fry<br>73 Sanford St.<br>Glens Falls, NY 12801 | Cash | $25.00 |
| 11/4/23 | Tom Stites<br>48 Kent Street Apt. 2<br>Newburyport, MA 01950 | Cash | $25.00 |
| 11/4/23 | Chris Hansen<br>4556 Sprucedale Place<br>Boulder, CO 80301 | Cash | $23.00 |
| 11/4/23 | George Starrett<br>249 Shasta Drive<br>Pittsburgh, PA 15239 | Cash | $20.00 |
| 11/4/23 | Broderick Shoemaker<br>100 W. 138th St 3d<br>New York, NY 10030 | Cash | $10.00 |
| 11/4/23 | D. James Lawrie<br>1458 Popinjay Drive<br>Reno, NV 89509 | Cash | $10.00 |
| 11/4/23 | Earl Gray<br>2505 Meadow Dr<br>Lake Stevens, WA 98258 | Cash | $10.00 |
| 11/4/23 | Jeffrey D Shaffer<br>192 Village Lane<br>Rochester, NY 14610 | Cash | $10.00 |
| 11/4/23 | Jody Dana<br>6733 Old Royalton Rd<br>Cleveland, OH 44141 | Cash | $10.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/4/23 | Jon Yeager<br>5016 McDougal Rd<br>Deer Park (Williams Valley), WA 990 | Cash | $10.00 |
| 11/4/23 | Kishore Shetty<br>403 North Wabash Avenue Unit 40<br>Chicago, IL 60611 | Cash | $10.00 |
| 11/4/23 | Leslie Lakind<br>127 Ridgecrest Drive<br>Santa Fe, NM 87505 | Cash | $10.00 |
| 11/4/23 | Paul Silver<br>1900 Bremen St<br>Austin, TX 78703 | Cash | $10.00 |
| 11/4/23 | Penelope M Fine<br>4411 S Parkview Dr<br>Salt Lake City, UT 84124 | Cash | $10.00 |
| 11/4/23 | Riley Nelson<br>710 W Grace St Apt 1<br>Chicago, IL 60613 | Cash | $10.00 |
| 11/4/23 | Scott Miller<br>7806 Rosewood Ave APT 4<br>Los Angeles, CA 90036 | Cash | $10.00 |
| 11/4/23 | T. Ferree<br>2490 N. County Hospital Rd.<br>Douglas, AZ 85607 | Cash | $10.00 |
| 11/4/23 | Tony Notto<br>11621 Olive ST NW<br>Coon Rapids, MN 55448 | Cash | $10.00 |
| 11/4/23 | Nadezhda Karastoyanova<br>8360 118th St Apt 7B<br>Queens, NY 11415 | Cash | $5.00 |
| 11/4/23 | Sarah Soebbing<br>803 Dwight St<br>Ypsilanti, MI 48198 | Cash | $10.00 |
| 11/4/23 | Gregory Busch<br>203 N Kenilworth Ave<br>Oak Park, IL 60302 | Cash | $25.00 |
| 11/5/23 | Judith Setla<br>990 7th N St<br>Liverpool, NY 13088 | Cash | $100.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/5/23 | Wilhelm Neuefeind<br>7128 Kingsbury Blvd<br>Saint Louis, MO 63130 | Cash | $1,000.00 |
| 11/5/23 | Margaret Chew Barringer<br>Box 365<br>Narberth, PA 19072 | Cash | $500.00 |
| 11/5/23 | Brian Behlendorf<br>305 Rancho de Maria<br>Martinez, CA 94553 | Cash | $100.00 |
| 11/5/23 | David Crum<br>2701 Arizona Street<br>Albuquerque, NM 87110 | Cash | $100.00 |
| 11/5/23 | Elizabeth Kamio<br>44 Elm Street<br>Wellesley, MA 02481 | Cash | $100.00 |
| 11/5/23 | Jared Stern<br>PO Box 1027<br>Mountain View, CA 94042 | Cash | $100.00 |
| 11/5/23 | Linda Rost<br>417 Fulton St<br>Palo Alto, CA 94301 | Cash | $100.00 |
| 11/5/23 | Stephen Leake<br>4600 Adeline St Apt 108<br>Emeryville, CA 94608 | Cash | $100.00 |
| 11/5/23 | Sylvia Russell<br>8 Croghan Ln<br>Durham, NH 03824 | Cash | $100.00 |
| 11/5/23 | Harvey Bock<br>202 Rawson Road Unit 1<br>Brookline, MA 02445 | Cash | $50.00 |
| 11/5/23 | Jennifer Christian<br>95 Woodridge Road<br>Wayland, MA 01778 | Cash | $50.00 |
| 11/5/23 | Lev Israel<br>923 Warren Parkway<br>Teaneck, NJ 07666 | Cash | $50.00 |
| 11/5/23 | R O Mitts<br>1221 Eagles Point Ct<br>East Lansing, MI 48823 | Cash | $50.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/5/23 | Rob Bell<br>2164 Princeton Ave<br>Saint Paul, MN 55105 | Cash | $50.00 |
| 11/5/23 | Ronald Quave<br>107 West Circle Drive<br>Lexington, SC 29072 | Cash | $50.00 |
| 11/5/23 | Tyler Freeman<br>3190 24th st #6<br>San Francisco, CA 94110 | Cash | $50.00 |
| 11/5/23 | William Arnold<br>219 E 2nd St #5D (AB)<br>New York, NY 10009 | Cash | $50.00 |
| 11/5/23 | Marcia LaHaie<br>511 Eberwhite Blvd<br>Ann Arbor, MI 48103 | Cash | $30.00 |
| 11/5/23 | Anton Raff<br>4396 Longchamp Drive<br>Sarasota, FL 34235 | Cash | $25.00 |
| 11/5/23 | Ben Sutherland<br>2810 Nw Ariel Ter<br>Portland, OR 97210 | Cash | $25.00 |
| 11/5/23 | Diane Abbott<br>69 Highland Terrace<br>Needham, MA 02494 | Cash | $25.00 |
| 11/5/23 | Don Dillinger<br>6121 76th Dr SE<br>Snohomish, WA 98290 | Cash | $25.00 |
| 11/5/23 | Dr Braddlee<br>1321 Upland Dr. # 8235<br>Houston, TX 77043 | Cash | $25.00 |
| 11/5/23 | Jason Imani<br>16223 SE 31st St<br>Bellevue, WA 98008 | Cash | $25.00 |
| 11/5/23 | Jeremiah Cohick<br>2443 Fillmore St # 380-2993<br>San Francisco, CA 94115 | Cash | $25.00 |
| 11/5/23 | Larry Spelts<br>2402 Hanscombe Point Rd<br>Johns Island, SC 29455 | Cash | $25.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/5/23 | Philip Stephens<br>1233 E Laguana Dr<br>Tempe, AZ 85282 | Cash | $25.00 |
| 11/5/23 | Ronald Hylton<br>100 W 89th Street<br>New York, NY 10024 | Cash | $25.00 |
| 11/5/23 | Carolyn Musser<br>1 Glen Court Apt122<br>Glen Rock, NJ 07452 | Cash | $15.00 |
| 11/5/23 | Dave Elvin<br>4610 Bagley Ave N<br>Seattle, WA 98103 | Cash | $10.00 |
| 11/5/23 | Debra Morrison<br>2649 SW 104th St<br>Seattle, WA 98146 | Cash | $10.00 |
| 11/5/23 | Donna Walters<br>5425 Toombs Street<br>Fair Oaks, CA 95628 | Cash | $10.00 |
| 11/5/23 | Lisa Ammann<br>5175 SW Meadow Flower Dr<br>Corvallis, OR 97333 | Cash | $10.00 |
| 11/5/23 | James Jackson<br>1 Elizabeth George Dr<br>Mashantucket, CT 06338 | Cash | $5.00 |
| 11/5/23 | William Wilson<br>3670 Waitts Lake Rd<br>Valley, WA 99181 | Cash | $5.00 |
| 11/6/23 | David Johnson<br>3650 Appleton Street N.W.<br>Washington, DC 20008 | Cash | $1,000.00 |
| 11/6/23 | Kevin Johnson<br>5 Summer St<br>Kingston, MA 02364 | Cash | $500.00 |
| 11/6/23 | Ben Trainer<br>16260 Klondike Canyon Rd<br>Carmel Valley, CA 93924 | Cash | $100.00 |
| 11/6/23 | David Sheeks<br>344 Ridge Springs Dr<br>Chapel Hill, NC 27516 | Cash | $100.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/6/23 | William Hayes<br>5868 Lyon Street<br>Union Dale, PA 18470 | Cash | $100.00 |
| 11/6/23 | Harry Parker<br>129 Rounsaville Rd<br>Hampton, NJ 08827 | Cash | $50.00 |
| 11/6/23 | Nitin Saini<br>1602 Stetson Dr.<br>Wesley Chapel, FL 33543 | Cash | $50.00 |
| 11/6/23 | Roy Clymer<br>713 Norwalk Lane<br>Austin, TX 78703 | Cash | $50.00 |
| 11/6/23 | Sarah Weil<br>1006 Angle Ave<br>Northbrook, IL 60062 | Cash | $50.00 |
| 11/6/23 | Elisabeth Dambolena<br>58 Mayflower Rd<br>Needham, MA 02492 | Cash | $30.00 |
| 11/6/23 | Karl E Fitzke<br>600 Austin Ln<br>Herndon, VA 20170 | Cash | $25.00 |
| 11/6/23 | Matthew Kolon<br>541 Irish Settlement Rd<br>Underhill, VT 05489 | Cash | $25.00 |
| 11/6/23 | Mark Williams<br>514 Americas Way PMB 14365<br>Box Elder, SD 57719 | Cash | $15.00 |
| 11/6/23 | Caron Block<br>716 26th<br>Santa Monica, CA 90402 | Cash | $10.00 |
| 11/6/23 | Cheryl Sjostrom<br>75 Squire Court<br>Dunedin, FL 34698 | Cash | $5.00 |
| 11/7/23 | Gordon Allen<br>21 Summer St<br>Antrim, NH 03440 | Cash | $50.00 |
| 11/7/23 | Al Cannistraro<br>17 Secada Dr<br>Clifton Park, NY 12065 | Cash | $25.00 |

## SCHEDULE B-MC-1

| Date Received | Contributor's Name, Address, Zip | Description | Total Amount |
|---|---|---|---|
| 11/7/23 | Equal Citizens Foundation<br>1032 15th St N.W. Suite 239<br>Washington, DC 20005 | Loan | $38,000.00 |
| 11/8/23 | Judith Eda<br>4655 NE Killingsworth St UNIT 33<br>Portland, OR 97218 | Cash | $25.00 |
| 11/9/23 | Steven Reed<br>10220 E Watson Rd<br>St. Louis, MO 63127 | Cash | $60.00 |
| 11/9/23 | Thomas Shiple<br>18 Phinney Road<br>Lexington, MA 02421 | Cash | $25.00 |
| 11/12/23 | Patricia Westwater-Jong<br>3 Autumn Lane<br>Bolton, MA 01740 | Cash | $10.00 |
| 11/28/23 | Vincent Ryan<br>10705 Charlseton Blvd.<br>Vero Beach, FL 32963 | Loan | $500,000.00 |
| 11/30/23 | Daniel Jones<br>27005 Palomares Road<br>Castro Valley, CA 94552 | Cash | $10.00 |
| 12/4/23 | Thomas Davis<br>516 Canyon Drive<br>Lawrence, KS 66049 | Cash | $30.00 |
| 12/4/23 | Bruce Griffeth<br>Po Box 1766<br>Blue Ridge, GA 30513 | Cash | $20.00 |
| 12/17/23 | Peter Turner<br>600 W Taylor Run Pky<br>Alexandria, VA 22314 | Cash | $15.00 |
| 12/31/23 | Unitemized | Cash | $60.00 |

**SCHEDULE B-MC-2**

**Itemized Contributions to Recipient Worksheet**

- Please indicate the date, type of contribution, and amount.
- If the contribution was in-kind (goods or services), please describe the type of goods or services and provide the estimated fair-market value of the goods and services in the course of ordinary business as the amount of the contribution.
- Duplicate as needed.

| Date | Description (cash or goods, services, or discounts received) | Value |
|---|---|---|
| 12/11/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO DrummondWoodsum | $8,320.00 |
| 12/14/23 | INKIND CONTRIBUTION FOR SIGNATURE GATHERING SERVICES PAID TO DrummondWoodsum | $291.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| | |
|---|---|
| Total contributions to recipient (this page only) | $8,611.00 |
| Total contributions to recipient | **$1,012,709.00** |

*Thurs. NOON*

# COMMITTEE VOTING TALLY SHEET

LD # or Confirmation: 2232

Committee: Veterans and Legal Affairs

Date: 3-12-24

Motion: ONTP

Motion by: Hickman

Seconded by: Rudnicki

| | Those Voting in Favor of the Motion | Recommendation of those opposed to the Motion | | | | | Absent | Abstain |
|---|---|---|---|---|---|---|---|---|

**Senators**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sen. Brenner | ✓ 45 | | | | | | | |
| Sen. Hickman | ✓ | | | | | | | |
| Sen. Timberlake | ✓ | | | | | | | |

**Representatives**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Rep. Collings | ✓ | | | | | | | |
| Rep. Williams | ✓ | | | | | | | |
| Rep. Andrews | | | | | | | X | |
| Rep. Malon | ✓ ~M | | | | | | | |
| Rep. Rudnicki | ✓ | | | | | | | |
| Rep. Supica | ✓ | | | | | | | |
| Rep. Rielly | ✓ | | | | | | | |
| Rep. Hymes | ✓ | | | | | | | |
| Rep. Montell | ✓ RTP | | | | | | | |
| Rep. Boyer | ✓ (DWB) | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# COMMITTEE VOTING TALLY SHEET

LD # or Confirmation:  LD 2232

Committee:  Veterans and Legal Affairs

Date:  03/12/2024

Motion:  Ought Not To Pass

Motion by:  Sen. Hickman

Seconded by:  Rep. Rudnicki

| | Those Voting in Favor of the Motion | Recommendation of those opposed to the Motion | | | | | Absent | Abstain |
|---|---|---|---|---|---|---|---|---|

**Senators**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sen. Hickman | X | | | | | | | |
| Sen. Brenner | X | | | | | | | |
| Sen. Timberlake | X | | | | | | | |

**Representatives**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Rep. Supica | X | | | | | | | |
| Rep. Andrews | | | | | | | X | |
| Rep. Boyer | X | | | | | | | |
| Rep. Collings | X | | | | | | | |
| Rep. Hymes | X | | | | | | | |
| Rep. Malon | X | | | | | | | |
| Rep. Montell | X | | | | | | | |
| Rep. Rielly | X | | | | | | | |
| Rep. Rudnicki | X | | | | | | | |
| Rep. Williams | X | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

SENATE

CRAIG V. HICKMAN, DISTRICT 14, CHAIR
STACY F. BRENNER, DISTRICT 30
JEFFREY L. TIMBERLAKE, DISTRICT 17

————

RACHEL OLSON, LEGISLATIVE ANALYST
LYNNE CASWELL, LEGISLATIVE ANALYST
MICHELLE HEBERT, COMMITTEE CLERK

HOUSE

LAURA D. SUPICA, BANGOR, CHAIR
MORGAN J. RIELLY, WESTBROOK
BENJAMIN T. COLLINGS, PORTLAND
MARC G. MALON II, BIDDEFORD
KAREN L. MONTELL, GARDINER
JOHN ANDREWS, PARIS
DAVID W. BOYER, JR., POLAND
BENJAMIN C. HYMES, WALDO
SHELLEY RUDNICKI, FAIRFIELD
LYNNE WILLIAMS, BAR HARBOR



**STATE OF MAINE**
**ONE HUNDRED AND THIRTY-FIRST LEGISLATURE**
**COMMITTEE ON VETERANS AND LEGAL AFFAIRS**

March 19, 2024

Honorable Troy Dale Jackson, President of the Senate
Honorable Rachel Talbot Ross, Speaker of the House
131st Legislature
State House
Augusta, Maine 04333

Dear President Jackson and Speaker Talbot Ross:

Pursuant to Joint Rule 310, we are writing to notify you that the Joint Standing Committee on Veterans and Legal Affairs has voted unanimously to report the following bill(s) out "Ought Not to Pass":

| L.D. 48 | An Act to Clarify Provisions of the Cannabis Legalization Act Regarding Labels, Packaging and Testing |
| L.D. 2232 | An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures |

This is notification of the Committee's action.

Sincerely,

S/Sen. Craig V. Hickman
Senate Chair

S/Rep. Laura Supica
House Chair