# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, FOR OUR FUTURE, and ALEX TITCOMB, | |
| *Plaintiffs.* | Case No. 24-cv-00430-KFW |
| v. | Magistrate Judge<br>Karen Frink Wolf |
| WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; and AARON M. FREY, in his official capacity as Attorney General of Maine, | |
| *Defendants.* | |

## PLAINTIFFS' REPLY
## IN SUPPORT OF PERMANENT INJUNCTION

This is an easy and straightforward case. Under binding precedent, Maine's "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act") is unconstitutional. Pursuant to *Buckley v. Valeo*, 424 U.S. 1 (1976), independent expenditures may not be limited. Under *Citizens United v. FEC*, 558 U.S. 310 (2010), organizations that do not directly contribute to candidates are free to make independent expenditures, and accept contributions from any non-foreign source, in any amount, to do so. Since *Citizens United*, beginning with the seminal, unanimous, *en banc* decision of the D.C. Circuit in *SpeechNow.org v. Federal Election Commission*, 599 F.3d 686 (D.C. Cir. 2010), every Court of Appeals—indeed every Circuit Judge—to hear such a case has so held.

Thus, as discovery has made clear, those who instigated the Act, Intervenor EqualCitizens and its founder Larry Lessig, have a singular, ambitious goal—to enact a law somewhere to allow them to once again attempt to tee up a Supreme Court challenge to *Citizens United*. First, they tried in Alaska. *Alaska Pub. Offices Comm'n v. Patrick*, 494 P.3d 53 (AK 2021), *cert. denied*, __ U.S. __, 142 S. Ct. 779 (Jan. 10, 2022). When the Supreme Court denied their petition for certiorari, they tried a ballot initiative in Massachusetts. *Herrmann v. Attorney General*, 208 N.E.3d 727 (Mass. 2023). When Massachusetts refused to allow the unconstitutional initiative to appear on the ballot, they turned to Maine because it doesn't require preclearance. This effort is also doomed to fail. The State of Maine is left in the lurch—required to defend the indefensible.

Faced with a wall of precedent, the Intervenors argue that all these judges are wrong. If originalist judges truly understood "originalism," they would see the error of their ways and decline to follow *SpeechNow*. But Intervenors' purported expert on originalism—an avid non-originalist—acknowledged that under his theory of originalism, not only would *SpeechNow.org*

1

fall, but *Citizens United* would too. Dep. Tr. of Jonathan Gienapp 97:11-19 (attached hereto as Exhibit 1). This Court cannot sidestep *SpeechNow.org* and remain faithful to *Citizens United*.

Lessig says so himself in a forthcoming article which, using the argument Intervenors advance here, attacks not just *SpeechNow.org* and *Citizens United*, but also *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). *See* Lawrence Lessig, *The* Buckley *Overreach*, at 1 (Sept. 1, 2024) available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4957609 ("*Buckley* is a policy-driven decision masquerading as constitutional law.") (internal quotation omitted). In his view, "for an originalist," which Lessig isn't, "the *Buckley* rule cannot be defended." *Id*. at 20. In truth, the logical result of their argument that the Free Speech Clause is not judicially enforceable would extend beyond campaign finance law to eviscerate courts' ability to enforce the Free Speech Clause, writ large. There is no limiting principle.

The role of this Court here is simple: Faithfully apply *Citizens United* and its progeny to void the Act. Defendants can then assess whether to continue to pursue Lessig's White Whale.

## I.    DEFENDANTS' LEGAL ARGUMENTS FAIL

The core argument of the Defendants and Intervenors is that the Maine statute survives *Buckley*, survives *Randall v. Sorrell*, 548 U.S. 230 (2006) (striking down Vermont's candidate contribution limits), and survives *Citizens United*, and that every circuit judge to consider the question presented here was wrong. But *Buckley* did not create a rule that any "contribution" to any entity (e.g., a "contribution" to a retirement plan, a literary anthology, or much else) can be restricted. The ruling was limited to: 1, contributions to a candidate's campaign, directly under the candidate's control; 2, gifts to a political party, which could directly coordinate with the candidate; and 3, gifts to traditional PACs, which could legally pass the funds to the candidate's campaign. These were the only contributions regulated by *Buckley*.

2

*Buckley* also held that independent expenditures could not be limited. The fundamental reason was that the funds did not, and could not *legally,* pass to the candidate. This buffer substantially reduced the possibilities for quid pro quo exchanges. "Independent advocacy . . . does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." *Buckley*, 424 U.S. at 46. "Expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution," noted the Court, thus, "such controlled or coordinated expenditures are treated as contributions." *Id*. at 46-47. Simply put: Only directly or indirectly contributing to a candidate, not just contributing to any entity, can be regulated under *Buckley*.

The appellate courts that have, without dissent, ruled that contributions to independent expenditure committees may not be limited, have all understood that the focus of regulation must be on the giving of money to a candidate. The Supreme Court has specifically rejected the idea that influence or gratitude is inherently corrupting. *Citizens United*, 558 U.S. at 359-360 ("The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt. … Ingratiation and access … are not corruption."). It has subsequently made clear that there is "only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). This is why contributions to candidates can be regulated, but contributions for expenditures independent of a candidate cannot. Nothing Defendants or Intervenors argue changes this.

A.    *As a Matter of Law, The Act is Not Needed to Prevent Quid Pro Quo Corruption*

The Supreme Court has held that election activity independent of a candidate is not a source of quid pro quo corruption. Defendants argue the opposite.  They then claim the authority

3

to impose tight limits on donations for independent expenditures ("IEs"). Defendants argue that the *en banc* DC Circuit in *Speechnow.com* (and all the 30+ circuit judges who have *unanimously* ruled the same way) lacked imagination by not seeing this possible bribe. Not so.

Circumvention concerns existed, and were resolved, before independent expenditure committees ("IECs") existed. Congress addressed this concern by applying the candidate's applicable contribution limits to all election-related solicitations for contributions to any entity. *See* 52 U.S.C 30125(e)(1)(A). The Court explained, "Large soft-money ***donations at a candidate's or officeholder's behest*** give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder." *McConnell v. FEC*, 540 U.S. 93, 182-183 (2003) (emphasis added). The Court noted the effectiveness of Congress's tailored solution. "Without some restriction on solicitations, federal candidates and officeholders could easily avoid FECA's contribution limits by soliciting funds from large donors and restricted sources to like-minded organizations engaging in federal election activities." *Id*. at 183. The solution to candidates soliciting funds for outside entities is to restrict the candidate's ability to make these requests—not to restrict the ability of the other entities to raise funds on their own.

This preexisting law applies equally to solicitations for IECs. FEC Advisory Op. 2011-12 ("Federal officeholders and candidates, and officers of national party committees, remain subject to the [Federal Elections Campaign] Act's amount limitations and source prohibitions when they solicit contributions on behalf of the [IE] Committees."), *applying* 52 U.S.C 30125(e)(1)(A). Defendants and Intervenors cannot presume these restrictions will be evaded.

Additionally, Maine requires disclosure of donations for IEs. There is no need for a prophylaxis-upon-prophylaxis-upon-prophylaxis approach (IEC donation limit on top of candidate solicitation restrictions, on top of disclosure requirements). *Ted Cruz for Senate*, 596

U.S. at 306 ("Such a prophylaxis-upon-prophylaxis approach, we have explained, is a significant indicator that the regulation may not be necessary for the interest it seeks to protect."). Maine cannot presume less restrictive regulations will be ignored.

Defendants' argument has repeatedly been rejected, starting in *Buckley* itself. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S., at 47. The Court expanded upon the reasoning nine years later:

> The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by the PACs can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view. It is of course hypothetically possible here, as in the case of the independent expenditures forbidden in *Buckley*, that candidates may take notice of and reward those responsible for PAC expenditures by giving official favors to the latter in exchange for the supporting messages. But here, as in *Buckley*, the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.

*FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 498 (1985). Because a donation for an IE is further removed from a candidate than an IE itself, as a matter of law, there is insufficient risk of quid pro quo corruption for Maine to regulate these donations.

B. *Contributing to an IE Is No More Problematic than the IE Itself.*

Defendants fail to explain how contributing to an IE without a candidate solicitation is somehow worse than making an IE. Take the example of Elon Musk that Defendants raise in their brief. They link to a CNN article that reads, "[Recent] filings with the Federal Election Commission show that the Tesla and SpaceX executive gave a total of $238 million to a super PAC that he founded this year, America PAC, which worked to turn out voters on Trump's behalf

in key states." *See* ECF No. 45, PageID 227, n.9.[1] The obvious question Defendants fail to grapple with is: How is Musk making this $238 million IE through America PAC, an IEC he created and controls, more corrupting than Musk making the expenditure in his own name? It isn't, which is why *Citizens United* controlled *Speechnow.com*, and controls here.

 *Buckley* and *Citizens United* drew a line at where political speech could be limited out of fear of an appearance of quid pro quo corruption. Regulations can go no further. An independent expenditure cannot be regulated. Axiomatically, a donation for an IE cannot either.

C.  *The Act is not Narrowly Tailored to Address Single Candidate Committees.*

Defendants claim their concern is focused on single-candidate affiliated super-PACs. Even if *Citizens United* did not control to prevent this reasoning, then the law would be overbroad. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). Defendants admit that half of all IEs in Maine are by entities that are not single-candidate focused. Yet, contributions to all IECs are restricted. IECs such as Priorities USA, Family Friendly Action PAC, and Democracy PAC II, are not single-candidate IECs. These mission driven IECs are where the bulk of IE contributions and expenditures happen. Defendants do not find these likely to corrupt for the same reason they defend allowing unlimited contributions to political party led committees. Executive Director Wayne testified that the risk of corruption through donations to political party and IECs is the same. Dep. Tr. of Wayne at 22-23. Yet only one is restricted. The law, simultaneously too broad and too narrow, simply does not target the purported corruption Defendants claim to fear.

D.  *Limiting donations to IECs Does Not Serve a Government Interest*

Finally, Defendants argue that donations to IECs can be limited because the Supreme Court reasoned in *Buckley* that "[t]he quantity of communication by the contributor does not increase

---

[1] The FCC database confirms this. *Individual Contributions*, Federal Election Commission, available at: https://bit.ly/43fTb4u

perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Buckley*, 424 U.S. at 21. Keep in mind, this aspect of *Buckley* was limited to addressing direct contributions to candidates. It viewed the "symbolism" of the campaign contribution as being significant—as though merely checking a box is all the speech that is protected. "[B]ut [this restriction] does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id*. The reason it did not infringe on contributor's freedom was because the contributor had other means of engaging in "political communication"—independent expenditures—and thus maintained "freedom to discuss candidates and issues." *Id*. The Act takes away this freedom. Which, if allowed to stand, would render the entire contribution limits regime constitutionally suspect.

Capping contributions for IEs will result in less speech by those of us whose are not named Soros or Musk. Under *Citizens United*, billionaires are free to use their billions to speak and be heard. Under the Act, those of lesser finances will not be able to pool resources to communicate their own messages. "To say that their collective action in pooling their resources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources." *Nat'l Conservative PAC*, 470 U.S. at 495. In this way, *Speechnow.com* perfects *Citizens United* by allowing the full colophony of voices necessary for our republic to flourish.

## II. INTERVENORS' ARGUMENTS DO NOT SAVE THE ACT

Intervenors stake their case on convincing the Supreme Court that originalism requires upholding the Act. They argue that the founders were concerned with "influence corruption" and "institutional corruption" by cobbling together historic bits unrelated to the First Amendment.

From there, they jump to an unsupportable conclusion that the Free Speech Clause isn't judicially enforceable. This, they claim, is the originalism that Justice Thomas, in particular, demands. As Lessig has colorfully stated regarding this case, Intervenors' "success will depend upon demonstrating to the Scalia-wanna-be originalists on the Court (those keen to show that their originalism is principle, not just politics) that the original meaning of the First Amendment certainly doesn't give judges the power to strike down laws that advance core and valid anti-corruption (or anti-aristocratic) ideals." Lawrence Lessig, "The Right's fight to silence 'originalism'" (Feb. 17, 2025), available at https://lessig.medium.com/the-rights-fight-to-silence-originalism-a25bb3b1c475.

The Supreme Court held that preventing quid pro quo corruption is the only justification for limiting election-related speech. When the Court articulated this principle, it was not attempting to use language from the 1700's. It was not discussing an exhaustive list of forms of corruption at the founding. Nor was it discussing the meaning of the term "corruption" as it appears in the Constitution—because the term isn't in the Constitution.

Rather, the Court was using modern parlance to express the protections afford by the First Amendment. Thus, other forms of corruption that existed in the early days, or the meaning of the term "corruption" at that time wasn't relevant to *Buckley's* use of the term "corruption," and it isn't relevant now.

As the Intervenors themselves note, the Founders addressed broad issues of corruption by providing for an electoral college, frequent House elections, an emoluments clause; and other provisions, *see* Intervenors Opposition to Motion for Injunction, p. 13-15. The Founders also fought corruption by protecting speech. The Free Speech Clause is an anti-corruption device, preventing those in power from silencing critics—particularly during elections.

Intervenors focus on Justice Thomas's views. The Court may find his views persuasive, but they do not lead where Intervenors want to go. Justice Thomas has relied on original sources, such as the Federalist Papers, to conclude that the Free Speech Clause as envisioned by Madison, would not allow contribution limits. *See, e.g., Nixon v. Shrink Mo. Gov't Pac*, 528 U.S. 377, n.9 (2000) (Thomas, J. dissenting) ("Contribution caps are an example of the first method [destroying liberty], which Madison contemptuously dismissed.").

Professor Anthony Gaughn's research has shown, "[t]he threat posed by corruption was not lost on James Madison." *See* Gaughn*, James Madison, Citizens United, and the Constitutional Problem of Corruption,* 69 Am. U. L. Rev. 1485 (2020). Madison and Jefferson formed the Republican Party and "developed innovative electioneering tactics that dramatically increased the cost of campaigns. … Yet, during his long career in office, Madison gave no indication that he thought that campaign contributions or expenditures constituted a form of corruption that could be banned or restricted under the Constitution." *Id*. at 1538-39. "His support for a broad and sweeping freedom of expression extended to all speakers, including politicians, business leaders, journalists, voters, and ordinary citizens alike." *Id*. at 1539.

Independent expenditures were at the heart of presidential campaigns at the founding. As Gienapp testified, the earliest campaigns for President were not conducted by the candidates themselves. Dep. Tr. Gienapp at 26:10-18. Rather, others campaigned on their behalf, using independent dollars to fund partisan newspapers, pamphlets, and personal letters. *Id*. at 26:24-29:1. The candidates remained aloof from the campaigns, not wanting to appear personally ambitious. *Id*., at 26:21-23. In this way, the original campaigns should be seen as being conducted by independent expenditures.

Thus, the resurgence of independent expenditures, which reduce the power of factions, *i.e.* political parties, takes us closer to the style of campaigning at the founding. "There are no easy answers, but the Constitution relies on one: open, robust, honest, unfettered speech that the voters can examine and assess in an ever-changing and more complex environment." *Nixon*, 528 U.S. at 409 (Kennedy, J., dissenting). This was true at the founding and is true now. Any concern about "undue influence" generated by a speaker's large expenditures or contributions is outweighed "by the loss for democratic processes resulting from the restrictions upon free and full public discussion." *Citizens United*, 558 U.S. at 344.

## III. DEFENDANTS' AND INTERVENORS' EVIDENCE DOESN'T REMOVE THIS CASE FROM *CITIZENS UNITED* CONTROL

Neither Defendants nor Intervenors supply any evidence to suggest that this case is not controlled by the holdings of *Citizens United* and its progeny.

### A. Defendants' Evidentiary Submissions Do Not Aid Their Defense

For their part, Defendants' two experts simply supply data that detail campaign related giving and spending over time. This information is quantitative, not qualitative. Dep. Tr. of Jonathan Wayne at 9-10 (attached hereto as Exhibit 2); Dep Tr. of Hilary Braseth at 8:20-33 (attached hereto as Exhibit 3).

Jonathan Wayne is executive director of the Maine Commission on Governmental Ethics and Election Practices. He viewed his role as one to cooperate with the defense of the statute as offered by the Attorney General. The Attorney General's Office decided what content they wanted in the declaration and wrote a first draft. *Id*. at 6. Wayne takes no position on whether the law is constitutional or a good idea. *Id*. at 7. He merely administers the Act. *Id*. He had no intention of implying that SuperPAC spending impacts decisions of candidates to participate in Maine's Clean Election financing program. *Id*. at 11. He has no reason to believe an independent

10

expenditure committee is any more likely to be a source of corruption than a political party committee. *Id*. at 20-23. He offers data, but no opinion.

Braseth does the same. As executive director of Open Secrets, she views its role as to provide FEC contribution and expenditure data in an accessible form. Braseth Depo Tr. at 6:8-15. Additionally, Open Secrets advocate for transparency and flag certain organizations as donors or recipients of moneys that Open Secrets cannot tie back to a specific individual or corporate donor. *Id*. at16:20-24. Braseth provided data at the request of defense counsel and does not offer any opinions regarding the merits of this case. *Id*. at 10:5-14.

In this way, Wayne and Braseth supply this case with orphaned data. They provide reports on numbers of donors and amounts of donations and expenditures. But no witness for the Defendants does anything with the data. It just sits for the Court to decide what significance, if any, it has. The most obvious conclusion to be reached by the data is this: People from across the political spectrum enjoy exercising their free speech rights. It shows in action the free speech maxim: The remedy for speech you don't like is more speech. *McCutcheon v. FEC*, 572 U.S. 185, 205 (2014) ("[T]he Government may not penalize an individual for 'robustly exercis[ing]' his First Amendment rights.").

Defendants' final "evidentiary" submission consists of two criminal complaints that they claim evidence quid pro quo corruption associated with Super PACS. Neither does. The first, a botched trial against U.S. Senator Menendez resulted in jury hung 2-10, with 10 jurors voting to acquit of all charges—even the counts alleging that elaborate vacations and private jet travel, were direct bribes. Porter, David, *New Jersey senator's bribery trial ends in a hung jury*, Associated Press (Nov. 16, 2017) available at: https://bit.ly/42I5vss. That case does not support Defendants' contention that IE contributions are sources of quid pro quo corruption.

The second case, which resulted in a conviction against Larry Householder, the former speaker of the Ohio House of Representatives, did not involve a super-PAC at all. Rather, Householder created and controlled a 501(c)(4) organization through which he laundered money to pay off mining debts and to pay for improvements to a vacation home. *See Former Ohio House Speaker sentenced to 20 years in prison for leading racketeering conspiracy involving $60 million in* bribes, U.S. Attorney's Office, Southern District of Ohio (June 29, 2023) available at: https://bit.ly/3GmP5hH. These bribes were the very opposite of IEs. A public utility gave money to an entity Householder controlled, which Householder used for his personal benefit. That was traditional, direct bribery. It has nothing to do with independent expenditures.

What both these cases, and all the others referenced in footnote 2 of Intervenors' Opposition to Motion for Injunction, have in common is that they are not independent expenditures. In each case is either an outright bribe, or a coordinated expenditure—i.e., a "contribution" as defined by law—in which an officeholder explicitly solicited or agreed to a *quid pro quo* exchange involving official duties. And these isolated examples are not bases to overrule *Citizens United*. As *Citizens United* held, "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements. The *Buckley* Court, nevertheless, sustained limits on direct contributions to ensure against the reality or appearance of corruption. That case did not extend this rationale to independent expenditures, and the Court does not do so here." 558 U.S. at 357 (internal citations omitted). None of the evidence submitted by Defendants takes this case outside of the control of *Citizens United*.

B.    *Intervenors Add No Evidence of Value to this Case*

    1.   <u>The Historians Are Irrelevant</u>[2]

To underscore the redundancy of this case to the Alaska case, in which the Supreme Court rebuffed the invitation to explore the political corruption theory Intervenors advance here,[3] *Patrick v. Alaska Pub. Offices Comm'n*, __ U.S. __, 142 S. Ct. 779 (2022), EqualCitizens reuses the same expert, Jack Rakove, to resubmit a nearly identical declaration discussing the various forms of political corruption the Founders were aware of, and addressed in various ways, during the founding. *See* Rakove's Alaska declaration, available at https://equalcitizens.us/wp-content/uploads/2018/10/Rakove-Expert-Report.pdf (retrieved Apr. 20, 2025).

Rakove's recounting of the British Stuarts, "rotten borrows" in England, the genius of Machiavelli, and other historical tidbits is fun and entertaining. However, Rakove admits, his recounting of political corruption has nothing to do with the First Amendment. See Dep. Tr. of Jack Rakove 29:4-7 (attached hereto as Exhibit 4)("Q. And were those potential concerns of the Founders about that potential political corruption expressed anywhere in the First Amendment?

---

[2] Both of Intervenors' historian experts, Jack Rakove and Jonathan Gienapp, supply what is known as "legislative facts." *Daggett v. Comm'n on Gov'l. Ethics & Election Pract.*, 205 F.3d 445, 455-56 (1st Cir. 2000) Legislative facts are facts "which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Fed. R. Evid. 201(a) advisory committee's note. Because legislative facts are non-adjudicative, these facts may be considered anew at each level of court, and are often submitted via briefs and argument. *Daggett v. Commission on Gov't Ethics and Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) ("So-called 'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts."). Testimonial submission of legislative facts are generally inappropriate. *Mass. Med. Soc'y v. Dukakis*, 637 F. Supp. 684, 696 (D. Mass. 1986) ("the entire line of questioning and the responses elicited underline the absurdity of determining the constitutionality of state laws on the basis of evidence of this kind, and the more clearly so if the evidence is required to be proffered in a trial court subject to rules of evidence designed for resolving disputes of adjudicative fact."). The role of the court is not to adjudicate arcane academic disputes between law professors and historians over what true originalists should do. Accordingly, Plaintiffs will file motions *in limine* to exclude these declarations as "evidence" and to prohibit Rakove and Gienapp from testifying.

[3] Petitioners there, with Lessig as record counsel, sought certiorari to obtain an order for the lower court to "weigh the arguments from originalism in determining whether the First Amendment permits the regulation of contributions to independent political action committees." Cert. Pet. at 1, *Patrick v. Alaska Pub. Offices Comm'n,* No. 21-822, available at https://equalcitizens.us/wp-content/uploads/2021/12/01_Petition.pdf (retrieved Apr. 20, 2025).

A. Not directly."); *id*. at 72:14-22 ("Q. So how does the concept of political corruption that you articulate here in this declaration inform the formation and creation of the Free Speech Clause in the First Amendment? If at all? … A. I'd say the link would be fairly thin."). Nor does he have anything to say about the Court's holding that preventing quid pro quo corruption is the only justification for restricting election related speech. *Id*. at 43:19-44:4. Rakove offers no support for the argument that the First Amendment should be narrowed to allow for the government to regulate political speech for a reason other than the prevention of quid pro quo corruption.

As originalist legal scholar Professor Seth Barrett Tillman explains in his counter-declaration, "the Framers did not include the term 'corruption' in any provision of the Constitution of 1788—so, whatever they meant by that term, they left it out, apparently deliberately after having considered including it, and for that reason, among others, we should not inject their understanding of that term back into our (and their) Constitution." Declaration of Seth Tillman, at 29 (attached hereto as Exhibit 5).[4] *See also* Seth Barrett Tillman, *Why Professor Lessig's "Dependence Corruption" Is Not a Founding-Era Concept*, 13 ELECTION L.J. 336, 343 (2014) ("Lessig and Teachout are asking us to embrace corruption as the key concept espoused by the Framers of the Constitution (and of the subsequent Bill of Rights). But when the Framers had a chance (actually multiple chances) to give this concept prominence in the Constitution's actual text, the Framers chose not to do so.") *available at* http://ssrn.com/abstract=2342945. Thus, Rakove's views on the meaning of the term "corruption" in the 18th Century provides no guidance in this case.

---

[4] Although Plaintiffs believe that legislative facts should not be determined via dueling experts, Plaintiffs submit the Declaration of Professor Seth Tillman in the event the Court disagrees.

Intervenors also submit the declaration of self-proclaimed anti-originalist historian Jonathan Gienapp.[5] Gienapp is not an originalist. Depo. Tr. of Jonathan Gienapp, at 13. He does not advocate using originalism to interpret the Free Speech clause. *Id*. at 97:22-98:2. Yet, he opines that originalism done correctly would lead to the conclusion that the Free Speech clause affords no judicially protectable right. *Id*. at 35:21-36-12; 37:23-38:19; 47:9-20. He believes the founders intended the only protection afforded by the Free Speech Clause to be that if speech is curtailed, it will be curtailed by an elected government. *Id*. at 52:6-13. Cold comfort there, which is unsurprisingly contrary to every line of First Amendment jurisprudence.

Gienapp is a historian engaged in an academic battle against originalist legal scholars. Depo. Tr. of Jonathan Gienapp, 64:9-14. Gienapp finds originalism to be too text-based. *Id*. at 16:1-4. He says historians ask different questions about the Constitution than lawyers ask. *Id*. at 6:19-7:5. Gienapp believes that his reading of history should convince legal scholars (and presumably judges) not to be originalists: "if you do the history properly it actually tells us why we should be less originalist in that standard conception." *Id*. 17:25-18:2.

Gienapp acknowledges that free speech caselaw in general is not originalist. *Id*. at 22:16-23. He suspects campaign finance law is not. *Id*. at 22:8-15. He views *Citizens United* not to be originalist. *Id*. at 21:15-19. He acknowledges that adopting his version of originalism would require a wholesale reconsideration of free speech cases in every context, not simply in independent expenditure cases. *Id*. at 93:19-94:11. The process of reconsidering these decisions would be involved. *Id.* at 94:25-96:19. Gienapp's ultimate prescription is not to be originalist: "one should then think about whether they want to be an originalist." Id. at 94:9-11.

---

[5] Gienapp's book is entitled "Against Constitutional Originalism: A Historical Critique," making him an interesting declarant to advocate what originalism demands. To the extent that Gienapp advocates a theory of constitutional interpretation, the motion in limine against him explains that legal advocacy cannot be submitted as evidence.

Unsurprisingly, originalists reject Gienapp's views on how originalism should be done. In countering the declarations of Rakove and Gienapp, Tillman writes: "where there is no genuine ambiguity, the agreed text should control. Likewise, a fair-minded interpreter should not look to Framers' and ratifiers' purposes, background assumptions, and policy concerns to generate interpretive principles abstracted from constitutional text. Why? First, no one agreed to purpose, background assumptions, and policy concerns. What was agreed to was the Constitution's text." Declaration of Seth Tillman, at ¶34. "It is precisely because such questions are, in my view, unanswerable that our understanding of the law of the Constitution should be tethered to constitutional text." *Id*.

Tillman is one of a bevy of originalist scholars who disagree with Gienapp's conclusions. *See* John O. McGinnis & Mike Rappaport, "The Finished Constitution", Law & Liberty (Sept. 28, 2023) ("[I]f a book by a historian of Gienapp's caliber often seems wrongheaded to constitutional lawyers, it may suggest the disagreement between historians and lawyers about constitutional meaning may be as intractable as the ancient one between philosophers and poets."), available at https://lawliberty.org/book-review/the-finished-constitution/; Stephen Presser, "The Past Is Not a Foreign Country: How a Historical Critique of Originalism Misses That the Past Is Prologue," 26 Fed. Soc. R. 134, 140 (March 19, 2025) ("Gienapp appears to believe, however, that the fact that those in the late 18th century believed that the Constitution did not do away with older sources of fundamental law—the law of nations, the social compact, inalienable rights—and that these sources informed their reading of the document shows how different they were from us, as we now allegedly rely only on the text."); Randy Barnett, "Challenging the priesthood of professional historians," *The Washington Post (The Volokh Conspiracy)* (Mar 28, 2017) (Critiquing Gienapp's critique of originalism) available at

https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/03/28/challenging-the-priesthood-of-professional-historians/

Thus, we are left with Gienapp, an avowed critic of originalism, explaining that all the scholars who actually are originalists are getting their theory wrong, and that true originalism would require the Free Speech Clause be unenforceable. But he does not endorse interpreting the Free Speech Clause this way. Nor does he claim any avowed originalist takes this view of the Free Speech Clause. No party is advocating that First Amendment jurisprudence be wiped clean and the Free Speech Clause rendered unenforceable. Thus, Gienapp's opinion on how originalism ought to be done is of no moment.

Further, even if Intervenors' historians had something important to say about the First Amendment, this Court must adhere to Supreme Court precent that there is "only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *Ted Cruz for Senate*, 596 at 305.

2.    Intervenor's Pollster's Submission is Invalid and Immaterial.

Intervenors' final expert, Professor Christopher Robertson, is a bioethics pollster who conducted a public opinion poll of paid panelists. As detailed in the attached Declaration of Professor David Primo, Robertson's poll proved both too much and too little. (Exhibit 6)

Primo is a Political Scientist and Economist. He has spent years on research that "focuses on the impact of campaign finance laws and campaign spending on features of democracy such as perceptions of government and electoral competitiveness." Primo Report at 2. Primo co-authored *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters*, a peer-reviewed book on the interrelationship between public opinion and campaign

finance. The conclusion of Primo's research is that real-world data show that contribution limits do not improve perceptions of corruption. *Id*.

Robertson's survey proved too much because it purports to show that over a third of participants thought a five-dollar donation was corrupting. In other words, these respondents are so cynical as to believe any donation—even a cup of coffee—corrupts. Dep. Tr. of Christopher Robertson at 52:4-10 ("A. Well, here, 35 percent of the people seem to agree with a very small donation could create a risk of corruption.") (Exhibit 7). No one suggests such limits are constitutional, *see Buckley*, 424 U.S. at 21; *Randall*, 548 U.S. at 247-48. But as Robertson said, "[P]eople just react to the entire private funding of elections, I don't know what else to say about it." *Id*. at 52:4-10.

As Professor Primo explains, "It would be a mistake … to take a data point like this (or any of Robertson's results) and conclude that contribution limits, whether on direct contributions to candidates or to Super PACs, will help ameliorate the situation." Primo Report at 8. Cynicism dies hard. Supposed cures for cynicism have proven ineffectual. *Id.* at 6-7. "[R]estricting campaign contributions will not do much if Americans believe even small contributions are potentially corrupting." *Id*. at 8. In short, if many Mainers believe a $5 contribution is corrupting, a $5,000 contribution limit does not satiate them.

Simultaneously, the Robertson poll showed no increase in perceptions of corruption between a $5,000 contribution and a $50 million contribution—evidencing no benefit to the $5,000 cap at all. *Id*. at 9. "These experiments instead show that respondents think contributions at the contribution limit at issue in this case—$5,000—are as corrupting as a $50 million contribution." *Id.* at 15. This aligns with Professor Primo's finding that all real-world studies

18

have shown that campaign finance laws have no "meaningful effects on perceptions of corruption or attitudes toward government." *Id*. This will be equally true of the Act. *Id*. at 6.

Between the two, Primo is the more credible expert. Primo has been studying campaign finance for years, and written books about it. Robertson "is a specialist in health law working at the intersection of law, philosophy and science. His research explores how the law affects decision making in domains of scientific uncertainty and misaligned incentives, which he calls 'institutional epistemology.'" https://en.wikipedia.org/wiki/Christopher_T._Robertson. Professor Primo's years of scholarship, which accounts for and incorporates other on-point scholarship, is simply more arduous and credible than a single slap-dash survey with inconsistent and ultimately unhelpful results. Primo's work, which shows that campaign finance laws do not impact public perception of corruption, should be fully credited by this Court.

Ultimately, Robertson's poll isn't weighty enough. "A tendency to demonstrate distrust of PACs is not sufficient." *Nat'l Conservative PAC*, 470 U.S. at 499. "When the First Amendment is involved, our standard of review is 'rigorous,' and the effort to link either corruption or the appearance of corruption to independent expenditures by PACs, whether large or small, simply does not pass this standard of review." *Id*. at 501. "[W]e have never accepted mere conjecture as adequate to carry a First Amendment burden." *McCutchen,* 572 U.S., at 210 (quotation marks omitted). The evidentiary submissions by the Defendants and the Intervenors do nothing to place this case outside the holdings of *Citizens United* or *SpeechNow.org*.

## IV. Preserving Issue for Appeal

Should this Court or a higher court conclude that *Citizens United* does not control this case, we will argue to the Supreme Court that *Buckley's* authorization of contribution limits should be overturned. As Justice Thomas correctly observed, what remains of *Buckley* is a rule

19

without a rationale. "Contributions and expenditures are simply 'two sides of the same First Amendment coin,' and our efforts to distinguish the two have produced mere 'word games' rather than any cognizable principle of constitutional law." *McCutcheon*, 572 U.S. at 231-232 (Thomas, J., concurring) *citing Buckley*, 424 U.S. at 241, 244 (Burger, C. J., concurring in part and dissenting in part). Accordingly, a contribution limit to an IEC or a candidate should have to survive strict scrutiny, *Id.* at 232 (Thomas, J., concurring), which this law cannot do.

## CONCLUSION

Every federal circuit court judge to consider the question has concluded that the holding in *SpeechNow.org* was dictated by *Citizens United*, which controlled there and here. The efforts by Defendants and Intervenors to distinguish those cases or have this Court reject the *Citizens United* conclusion that only direct contributions can be a source of quid pro quo corruption must fail. This Court cannot overrule *Citizens United*.

Dated: April 22, 2025                        Respectfully submitted,

*/s/ Charles Miller*
Charles M. Miller*
(**pro hac vice*)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, DC 20036
202-301-9800
cmiller@ifs.org

and

Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
207-791-1350
jdunlap@pierceatwood.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused a copy of the foregoing pleadings to be filed with the Court's EF filing system, which will cause an electronic notice to be sent to counsel of record.

Dated: April 22, 2025

/s/ Charles M. Miller
*Charles M. Miller**
*(\*pro hac vice)*