## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

DINNER TABLE ACTION, *et al.*,

                Plaintiffs,

      v.

SCHNEIDER, *et al.*,

                Defendants,

Case No. 1:24-CV-00430-KFW

## INTERVENORS' SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

Plaintiffs' Reply Brief ignores key arguments that prove fatal to its attempt to strike down Maine's law. Plaintiffs do not attempt to respond to Intervenors' defense of the Act's disclosure requirements, they do not grapple with the Supreme Court's decisions holding that the *appearance* of quid pro quo corruption is just as valid a justification for contribution limits as corruption itself, nor do they make any mention of the permanent injunction factors. The absence of any argument as to those issues alone is reason to find that the Act is constitutional and deny an injunction.

Plaintiffs' Reply instead fixates on a supposed effort to overturn *Citizens United v. FEC*. But *Citizens United* is clear: "contribution limits" are an "accepted" method of campaign finance regulation. 558 U.S. 310, 359 (2010). Maine voters overwhelmingly approved such limits on SuperPACs. And their votes vindicated Maine's interest in regulating quid pro quo corruption and its appearance, as well as the interest in regulating dependence corruption grounded in the history and original meaning of the First Amendment. There is no "binding precedent" to the contrary. The D.C. Circuit's decision in *SpeechNow v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc) adopted a crabbed reading of corruption rejected by the First Circuit, did not have specific evidence of an appearance of corruption before it, and made no attempt to reconcile founding-era history. Plaintiffs' additional arguments do nothing to change this. In fact, Plaintiffs recognize (at 20) that their position requires "overturn[ing]" decades of Supreme Court precedent upholding contribution limits. The Court should reject that effort and deny an injunction.

## I.    The Act Is Lawful Under Supreme Court Precedent.

In their opening brief, Plaintiffs staked this case on the maximalist claim that contributions to SuperPACs "cannot corrupt." Mot. 10 (quoting *SpeechNow*, 599 F.3d at 694); *see also id*. at 11 (claiming "no logical scenario" in which corruption would arise) (quotation marks omitted). It is remarkable, then, that Plaintiffs offer no response to the possibility that a SuperPAC contribution—as distinct from an expenditure—could logically serve as the "quid" in a quid pro

quo exchange. Indeed, that was precisely the government's charge in the prosecution of Senator Menendez. *United States v. Menendez*, 132 F. Supp. 3d 635, 639-640 (D.N.J. 2015).  Even though the PAC's expenditures are independent, an individual contributor could promise a SuperPAC donation in exchange for political favors—something the PAC itself could not do. Intervenor Opp. 5. Maine's law, passed by an unprecedented popular vote, closes that gaping hole.

Plaintiffs insist (at 5) that none of this matters because the "expenditures" that contributions fund have little value to the candidate. But that proves too much. As we explained, a "quid pro quo" does not require that the "public official personally benefits." *United States v. Correia*, 55 F.4th 12, 35 (1st Cir. 2022). The First Circuit has rejected such a "crabbed" view of quid pro quo corruption, *id.*, as have several other courts of appeal, *e.g.*, *id.* at 34-35 (collecting cases); *United States v. Renzi*, 769 F.3d 731, 743-744 (9th Cir. 2014) (same). Rather, it is enough that a payment go "to a third party"—here, a SuperPAC—as long as there is an agreed-upon exchange or the appearance thereof. *See Correia*, 55 F.4th 34 (quoting *United States v. Brissette*, 919 F.3d 670, 677, 680 (1st Cir. 2019)). *SpeechNow* never considered this scenario, which is why it missed the risk of corruption Maine's voters have now addressed. Intervenor Opp. 5-6 & n.2.[1]

Rather than tackle that scenario head-on, Plaintiffs present three alternative arguments.

*First*, Plaintiffs claim (at 7) that *Buckley* and its progeny concern only contributions to *candidates*. Not so. The Supreme Court has "repeatedly uph[eld] contribution limits" on both candidates "and groups." *FEC v. Colorado Republican Fed. Campaign Comm*., 533 U.S. 431, 441 (2001). Plaintiffs also suggest that these limits were only permissible because individuals could

---

[1] The point of Senator Menendez's indictment is not that he was later acquitted; it is that a court found the charged conduct to be the quid in a quid pro quo exchange. Larry Householder's conviction for accepting bribes through a corporation that could receive "unlimited contributions" similarly demonstrates this possibility. *United States v. Householder*, --- F.4th ---, 2025 WL 1300540, at *1 (6th Cir. May 6, 2025) (quotation marks omitted).

give unlimited amounts to entities that make independent expenditures. But *Buckley* upheld contribution limits on independent-expenditure entities because, *despite* individual contribution limits, the entity could still "aggregate large sums of money to promote effective advocacy." *Buckley v. Valeo*, 424 U.S. 1, 22 (1976). In other words, the modest "burden [on] fundraising" did not impermissibly restrict corporations' freedom of expression. *Id*. at 96.

*Second*, Plaintiffs aver (at 4-5) that limits on disclosures and candidates' ability to solicit funds resolve any risk of corruption, and that anything more would be superfluous. *SpeechNow* and its progeny do not rely on this argument. *E.g.*, 599 F.3d at 695. That is because contribution limits, solicitation restrictions, and disclosure requirements have long coexisted and serve distinct purposes. Indeed, *McConnell v. FEC* upheld both a limit on soft-money contributions to national party committees *and* a restriction on candidates' ability to solicit those same funds. 540 U.S. 93, 145-46, 182-83 (2003). The contribution limits addressed the risk and appearance of corruption, *id*. at 145, and "restrictions on solicitations" were "valid anticircumvention measures," *id*. at 182.

The Court has found an impermissible "prophylaxis-upon-prophylaxis" only when Congress doubles down on the same activity—for example, imposing both aggregate and individual limits on the same contributions. *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014). Like the FEC in *McConnell*, Maine is regulating the risk of corruption SuperPACs pose on a clean slate. After all, a donor can announce he is contributing to an entity that a candidate cares about, and that "quid" can create the appearance and reality of corruption.

In any event, the solicitation limits Plaintiffs cite apply only to candidates for "*Federal* office." 52 U.S.C § 30125(e)(1) (emphasis added); Reply 4. While Maine law contains its own solicitation provision for *state* candidates, it is very limited. Namely, Maine only limits solicitation of contributions to PACs "primarily promot[ing] . . . a single candidate." 21-A M.R.S. § 1015(4).

3

As Plaintiffs acknowledge (at 6), those PACs account for less than half of all SuperPAC activity. *See* Dkt. No. 45-5 ("Braseth Report") at 2. That regulatory gap contributes to the risk and appearance of corruption in Maine elections—something Maine voters and legislators acutely perceive. Dkt. No. 17-1 ("Bennett Decl.") ¶¶ 7-8; Dkt. No. 17-2 ("McCormick Decl.") ¶ 13.

*Third*, Plaintiffs suggest (at 6-7) that the Act is unconstitutional because it limits SuperPAC contributors' speech. But the Supreme Court has rejected the argument that a PAC is "merely the mouthpiece" of its contributors. *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 196 (1981) (plurality op.) Rather, it is "a separate legal entity," engaged in "independent political advocacy." *Id*. Plaintiffs reference (at 5-6) to Elon Musk similarly fails. An individual's donation to a SuperPAC—which will often obscure the individual's identity—appears more corrupting than an independent personal expenditure—which must be disclosed, 11 C.F.R. § 109.10(b), and is subject to a host of checks to ensure independence, *e.g.*, *id*. § 110.11 (extensive disclaimer requirements on political ads). In any event, "the special characteristics of the corporate structure require particularly careful regulation," and the Court has accepted regulation even if it burdens those "without great financial resources." *FEC v. Nat'l Right to Work Comm*., 459 U.S. 197, 209-210 (1982).

## II.    The First Amendment Would Not Bar The Act As Originally Understood.

The opinions of Intervenors' historical experts only confirm that the original meaning of the First Amendment would not have barred a law like the Citizens' Initiative. Plaintiffs' expert Seth Tillman adds nothing to the mix. His conclusions are largely irrelevant, and even those that find some purchase support Professors Rakove and Gienapp's accounts of Founding-era history.

Tillman spends most of his report discussing the original meaning of the Constitution's Foreign Emoluments Clause. Dkt. No. 62-3 ("Tillman Decl.") ¶¶ 15-33. To that end, Tillman challenges Lawrence Lessig and Zephyr Teachout's decade-old theory on the original meaning of the clause, *id*. ¶ 17, ultimately concluding that the Foreign Emoluments Clause does not apply to

4

either the "President," *id*. ¶ 28, or "members of Congress," *id*. ¶ 21.

If Tillman's report sounds far afield, it's because it is. This case concerns the First Amendment, not the Foreign Emoluments Clause. Furthermore, Tillman's opinion on whether the Foreign Emoluments Clause applies to *federal* officeholders has no bearing on the Maine law which only applies to candidates for *state* government. *See* 21-A M.R.S.A. § 1011. At best, Tillman's declaration builds a strawman out of scholarship on an orthogonal constitutional clause which has been neither raised nor tendered for this Court's consideration.

Pivoting from the Emoluments Clause, Tillman advances his own originalist methodology, which in fact, supports Intervenors. Tillman explains that constitutional interpretation should only turn to extratextual evidence "where there is genuine ambiguity in a constitutional provision." Tillman Decl. ¶ 34. Yet Tillman fails to acknowledge that the Free Speech Clause is the paradigmatic example of a constitutional provision with an "obscure" meaning. Leonard W. Levy, *Legacy Of Suppression: Freedom Of Speech And Press In Early American History* 4 (1960). Remaining "tethered" to the First Amendment's text is a fool's errand. Tillman Decl. ¶ 34.

Plaintiffs double down on Tillman's error (at 13-14), attacking Professor Rakove because the Constitution does not use the term "corruption." But the relevance of "corruption" to First Amendment doctrine on campaign contributions has never been based on text or history; Rakove's declaration at least grounds "corruption" in a Founding-era conception. Dkt. No. 53-2 ("Rakove Decl.") ¶¶ 30-48. As Tillman explains, corruption was "one of many policy concerns which occupied Framers', ratifiers', and the wider public's political mind and imagination." Tillman Decl. ¶ 18. It would make no sense to disallow corrupt influences in the Foreign Emoluments Clause but leave a backdoor for those very forms of corruption in the Free Speech Clause.

Taking a different tack, Plaintiffs decline to engage Professor Gienapp's historical

5

argument on the merits at all, instead *ad hominem*-ing Gienapp's opinions on originalism as a mode of constitutional interpretation. But if anything, Professor Gienapp's ambivalence towards originalism should *add* weight to his opinions. Without an ulterior motive, Gienapp's account of how the Framers would have analyzed the Citizens' Initiative remains unblemished: The law, which was enacted through a process "representative of the people" and serves "the interest of the public good" does not offend the First Amendment. Dkt. No. 53-1 ("Gienapp Decl.") ¶¶ 9, 13.

Under Tillman's theory of originalism, Professors Rakove and Gienapp's opinions are vital to "determin[ing] the meaning and scope of [the First Amendment's] text" given the ambiguous nature of the Free Speech Clause. Tillman Decl. ¶ 34. As Professors Rakove and Gienapp explain, the Framers would have regarded the "continuous solicitation of campaign-related funds" as a "shameful mark of their own political corruption," Rakove Decl. ¶ 48, and would not have considered the Citizens' Initiative to be an affront to the freedom of speech, Gienapp Decl. ¶ 13.

## III.    The Act Is Tailored To Address An Appearance Of Quid Pro Quo Corruption.

Plaintiffs' critique of Intervenors' empirical expert Chris Robertson fares just as poorly. Robertson found far more than a general "tendency" to "distrust" PAC's. Reply 20. Instead, Robertson's randomized survey found that a $5,000 cap on contributions to independent expenditure committees has a "substantial salutary effect by reducing perceptions of quid pro quo corruption" and "increases broader confidence" in representative government. Dkt. No. 53-3 ("Robertson Decl.") at 4.[2] Plaintiff's own expert, David Primo, has previously described randomized experiments like Robertson's as "the gold standard for statistical evaluation studies." Ex. A-1, Robertson Surreply Decl. at 6. By contrast, observational research, like that which Primo

---

[2] Plaintiffs (at 19) attempt to diminish Robertson's expertise citing an out-of-context snippet of a Wikipedia page. Needless to say, they do not seriously dispute his extensive qualifications, which speak for themselves. Robertson Decl. Ex. B; Robertson Dep. at 9:19-21.

uses, is "fraught with problems that compromise . . . resulting causal inferences." *Id.* For one, Primo's report measures "trust in state government" rather than the appearance of quid pro quo corruption—the relevant question here that Robertson specifically tested. *Id.* at 1.

Plaintiffs complain (at 18) that "Robertson's [Experiment 1] survey proved too much" because "over a third of participants thought a five-dollar donation was corrupting." But Plaintiffs' focus on the $5 baseline contribution belies their fundamental misunderstanding of Robertson's primary finding: that *increasing* donations above the $5 baseline generally *increases* the appearance of quid pro quo corruption. Robertson Surreply Decl. at 1. Robertson's data thus refutes Primo's hypothesis that "restricting campaign contributions will not do much if Americans believe even small contributions are corrupting." Reply 19 (quoting Dkt. No. 62-4 ("Primo Decl.") at 8). Notwithstanding the minority of people who see even $5 as corrupting, there are many others who only see payments above $5,000 to be corrupting for whom the law is valuable—a belief that Maine voters unambiguously voiced in passing the Act.

In a similar move, Plaintiffs focus on levels *above* the $5,000 threshold, arguing that the study "showed no increase in perceptions of corruption between a $5,000 contribution and a $50 million contribution." *Id.* at 18. But again, Plaintiffs try to redirect attention from the positive correlation between contribution amount and the appearance of corruption to the small proportion of people who did not find that even large contributions lead to the appearance of corruption. Plaintiffs' sleight of hand is a distraction. The $5,000 contribution cap addresses the concerns of the majority of people who find contributions above that level to be corrupting. Robertson Dep. 60:16-19. Furthermore, the fact that similar proportions of people find $5M and $50M to be corrupting is immaterial since *both* of these levels are *impermissible* under Maine's $5,000 cap.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion.

Respectfully submitted,

/s/ David M. Kallin
David M. Kallin, Bar No. 4558
Adam R. Cote, Bar No. 9213
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101-2480
(207) 772-1941
dkallin@dwmlaw.com
acote@dwmlaw.com

Neal Kumar Katyal
Ezra P. Louvis
Milbank LLP
1850 K St., N.W.
Washington, D.C. 20006
Tel: (202) 835-7500
nkatyal@milbank.com

Nola Heller
Milbank LLP
55 Hudson Yards
New York, NY 10001-2163
Tel: (212) 530-5108
nheller@milbank.com

Mackenzie Austin
Milbank LLP
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone: (424) 386-4000
maustin@milbank.com


*Counsel for Richard Bennett, Cara McCormick, Peter McCormick, and EqualCitizens*

May 14, 2025

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 14, 2025, I electronically filed the foregoing using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties of record.

<u>*/s/ David M. Kallin*</u>
David M. Kallin