UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION et al., <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM J. SCHNEIDER et al., <br><br> Defendants. | Docket No. 1:24-cv-00430-KFW |

**STATE DEFENDANTS' SURREPLY IN OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION**

Plaintiffs' reply brief and declarations fail to refute Defendants' showing that the direct initiative challenged here (the "Act"), as overwhelmingly approved by Maine voters concerned about corruption in their State, passes the First Amendment test applicable to contribution limits and is otherwise constitutional. Among other things, Plaintiffs fail to grapple with the massive changes to campaign funding over the past 15 years that call into question the out-of-jurisdiction decisions like *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), on which they rely. While those decisions may have seemed modest at the time, later developments have shown that they created a conduit for donors to effectively circumvent contribution limits at enormous scale, creating the same risks of quid pro quo corruption—and its appearance—that the Supreme Court has recognized the government may legitimately regulate.

The Court should deny the motion for permanent injunction.

**Argument**

**I.    The Act is closely drawn to combatting quid pro quo corruption and its appearance.**

State Defendants demonstrated in their principal brief that the Act is closely drawn to

1

match its important interest in combatting quid pro quo corruption and its appearance. Opp. at 6–13. Plaintiffs do not appear to dispute that, under existing law, "closely drawn" scrutiny is the applicable test. *Cf.* Reply at 20.

Plaintiffs instead spill much ink suggesting that the Act is some sort of stalking horse for overturning protections for independent expenditures (IEs) recognized in *Buckey v. Valeo*, 424 U.S. 1, 21 (1976), and *Citizens United v. FEC*, 558 U.S. 310 (2010). Reply at 1–3. But State Defendants have shown that the Court can uphold the Act without contradicting or undermining any of the reasoning about IEs contained in those decisions. Opp. at 10–12. Even if IEs themselves cannot create a sufficient risk of quid pro quo corruption to justify restrictions, the same logic does not apply to a donor giving a large sum of money to a PAC aligned with particular candidates. In that scenario, the candidates, well aware that they will benefit from contributions to the PAC, can effectively circumvent candidate contribution limits by directing their donors to give to the PAC. The quid pro quo corruption risk is indistinguishable from the risk addressed by the candidate contribution limits upheld in *Buckley*.

Plaintiffs argue that the only proper way for government to combat coordination between candidates and Super PACs is the federal approach of treating contributions made to Super PACs at the request of a candidate as a contribution to the candidate. Reply at 4. But while the Supreme Court approved of this approach, it did not hold that it was the *only* constitutional way for the government to further its interest in preventing candidates from "avoid[ing] . . . contribution limits by soliciting funds from large donors and restricted sources to like-minded organizations engaging in federal election activities." *McConnell v. FEC*, 540 U.S. at 93, 182–83 (2003) *overruled on other grounds by Citizens United*, 558 U.S. 310. A major weakness of such laws is that a candidate's solicitation of a donor is easy to conceal, making enforcement

2

difficult or impossible.  As the Commission's Executive Director observed, quid pro quo arrangements would be "happening behind closed doors."  Wayne Dep. at 24:2–5 (ECF No. 62).  The Act addresses this enforcement challenge by making such arrangements impracticable, since no Super PAC would be able to accept the solicited contribution if it exceeded $5,000.

Moreover, the Act is not the sort of "prophylaxis-upon-prophylaxis" approach described in *Federal Election Commission v. Cruz*, 596 U.S. 289 (2022).  Reply at 5.  The Court's criticism in that case was directed at a federal campaign-finance law that imposed additional restrictions *on top of* a contribution limit.  *Id.* at 306.  The Act, in contrast, is itself a contribution limit.  Just as the bribery and disclosure statutes discussed in *Buckley* did not negate the state's interest in candidate contribution limits, 424 U.S. at 27–28, Maine's disclosure and anti-coordination laws do not negate Maine's anticorruption interest here.

Plaintiffs raise the example of Elon Musk contributing $238 million to a Super PAC that he may control to argue contributions to Super PACs cannot create an appearance of corruption any greater that the appearance caused by the PAC's IEs.  Reply at 6.  But, even assuming *arguendo* that the governmental interest in regulating contributions is less distinct in the unique circumstance in which a PAC's sole contributor also makes expenditure decisions, there is no evidence that this situation is common.  To the contrary, State Defendants' evidence suggests it is rare in Maine.  Wayne Decl., Ex. B (showing the number of $5,000+ contributors to high-spending PACs in 2022 and 2024).  And it is certainly not the case with the two Plaintiff PACs, both of which receive large donations from multiple sources.  *See* Titcomb Decl. ¶¶ 18–42; Wayne Decl. ¶¶ 23–24; Maine Ethics Commission, "For Our Future PAC," at https://mainecampaignfinance.com/#/exploreCommitteeDetail/478864.  Indeed, even America PAC

itself received large contributions from a number of persons, not just Musk.[1] The public could be reasonably concerned that any one of these contributors may have struck a quid pro quo deal with the candidates with which the PAC was aligned.

In a similar vein, Plaintiffs argue that the Act is not closely drawn because it is not limited to single-candidate Super PACs. Reply at 6. But while single-candidate Super PACs may be especially vulnerable to being used as conduits for quid pro quo arrangements, the risk is by no means limited to such entities. Indeed, the Super PACs at issue in the *Menendez* and *Householder* prosecutions were multi-candidate PACs. Menendez Indictment ¶ 57 (ECF No. 45-7); Household Indictment ¶ 15 (ECF No. 45-8). Even with multi-candidate PACs, donors can deliver benefits to a particular candidate simply by earmarking their contribution. *See*, *e.g.*, Menendez Indictment ¶¶ 57–61. Plus, a quid pro quo arrangement could easily involve securing a benefit for a group of candidates rather than just one. In short, the Act's focus on PACs beyond just single-candidate PACs does not create the sort of "substantial mismatch" that would cause it to fail closely drawn scrutiny. *See McCutcheon v. FEC*, 572 U.S. 185, 199 (2014).

Plaintiffs also assert in support of their tailoring argument that the Commission's Executive Director conceded in his deposition that the "risk of corruption through donations to political part[ies] and IECs is the same." Reply at 6. But what Director Wayne in fact said was that he had no basis for offering an opinion on the question, which is not the same thing. Wayne Dep. at 26:3–8, 27:15–16. State Defendants explained in their principal brief that there are legal reasons for treating parties differently, both because of their favored legal status and their commitment, by definition, to a much broader swath of candidates. Opp. at 14–17.

---

[1] *See* FEC, America PAC, Raising, https://www.fec.gov/data/committee/C00879510/?cycle=2024&tab=raising (May 14, 2025).

Finally, Plaintiffs try to distinguish *Buckley*'s characterization of all contributions, regardless of size, as having similar expressive value, arguing that *Buckley*'s observation does not hold true outside of candidate contributions. Reply at 7. But a donor providing money to a PAC dedicated to promoting a particular candidate or group of candidates produces the same quantum of expression as a donor contributing money directly to a candidate. In either case, the message is simply "I support this/these candidates." Moreover, Plaintiffs' lament for ordinary Mainers wishing to combine their resources might have more resonance if the Act's contribution limit were $50 or $100. But the Act's limit of *$5,000* per calendar year will have no effect whatever on the vast majority of these Mainers.

## II.  State Defendants' evidentiary submissions support upholding the Act.

State Defendants supplied the Court with federal and state campaign-finance data showing a dramatic change in how donors have funded political campaigns since 2010. *See* Wayne Decl. ¶¶ 8–26 & Exs. A–B; Breseth Decl., Ex. A. In Maine's most recent gubernatorial race, IEs outstripped candidate spending by a substantial margin, a dramatic change from the 2010 election. Wayne Decl. ¶ 10. The federal data is even more stark; contributions to groups that make IEs have grown from less than $1 billion in 2012 to nearly $7 billion in 2024, with over $2.5 billion coming in million-dollar-plus contributions. Breseth Decl., Ex. A at 4–5.

Plaintiffs argue that this data is somehow "orphaned" because Defendants' witnesses do not make qualitative judgments about the data. Reply at 11. Not so. The data may be considered directly by the Court to support at least two conclusions. First, the data makes clear that the federal courts of appeals that determined, shortly after *Citizens United*, that contributions to IE-only groups could not be corrupting were considering a very different campaign-finance landscape than the one that exists now. While it may have seemed reasonable in 2010 to

5

conclude that a contribution to a policy-based advocacy group did not pose a risk of quid pro quo corruption, *see SpeechNow*, 599 F.3d at 689, that analysis has aged poorly in the current world of multi-million-dollar contributions to single-candidate PACs that operate in ways indistinguishable from the candidate's own campaign.

Second, the massive increase in contributions to groups that make IEs in recent years shows that Maine people, when they voted overwhelming in favor of the Act in November 2024, had good reason to be concerned about corruption opportunities given the shift in financing of political campaigns to less regulated avenues. The data thus support that the Act addresses a significant and growing appearance of corruption in Maine.

Finally, the Menendez indictment and Household conviction are, contrary to Plaintiffs' argument, Reply at 11, probative of whether contributions to Super PACs pose corruption risks. While Menendez was not convicted on the facts, that the indictment was brought at all—and survived a legal challenge, *see Untied States v. Menendez*, 291 F. Supp. 3d 606, 623 (D.N.J. 2018)—refutes the tautology employed by *SpeechNow* that, because IEs cannot as a matter of law corrupt, neither can contributions to entities that make IEs. With regard to the Householder case, Plaintiffs are mistaken that a Super PAC was not involved in the scheme. While a 501(c)(4) entity was *also* part of the scheme, it was a Super PAC, the Growth and Opportunity PAC, that made the campaign expenditures contemplated by the scheme. *See Ohio v. Firstenergy Corp.*, Complaint ¶ 51, available at https://tinyurl.com/47x2ru7x (last visited May 14, 2025); FEC, "Growth and Opportunity PAC, Inc.," at https://www.fec.gov/data/committee/C00580340/?cycle=2018&tab=about-committee (last visited May 14, 2025).

By pointing to these prosecutions, State Defendants are not suggesting the Court should "overrule *Citizens United*." Reply at 12. Rather, they are illustrating a crucial distinction

6

between the makers of IEs protected by *Citizens United* and the donors who merely provide funding to others. As these cases show, the opportunities for quid pro quo corruption in the latter cases are significant. That increased risk, coupled with the lower "closely drawn" standard applicable to contributions, justifies regulation of contributors that goes further than what may be constitutionally applied to the IE-makers themselves.

**III.     The Act's disclosure requirement should not be enjoined.**

State Defendants showed that the Act's disclosure provision serves several distinct governmental interests and thus easily satisfies exacting scrutiny under *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021). Opp. at 17–20. Plaintiffs offer no response to this showing. Nor do they contest State Defendants' argument that, under Maine law, the Act's disclosure requirement is severable from the rest of the Act. *Id.* at 20. Thus, even if the Court were to enjoin the remainder of the Act (and it should not), it should preserve the disclosure requirement in Section 3 of the Act. *See* Bolton Decl., Ex. E.

## Conclusion

The Court should deny the motion for permanent injunction.

Dated: May 14, 2025

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

*Counsel for William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, Beth N. Ahearn, and Aaron M. Frey*