## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DINNER TABLE ACTION et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00430-KFW |
| | ) | |
| WILLIAM J. SCHNEIDER, | ) | |
| in his official capacity as Chairman | ) | |
| of the Maine Commission on | ) | |
| Governmental Ethics and Election | ) | |
| Practices, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER[1]

The Supreme Court has recognized only one constitutional basis for restricting political speech: preventing quid pro quo corruption or its appearance.  *See FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022).  Along those lines, the Court has struck down restrictions on independent political expenditures made without any candidate coordination after concluding that such expenditures—unlike direct campaign contributions—"do not give rise to corruption or the appearance of corruption." *Citizens United v. FEC*, 558 U.S. 310, 357 (2010).  The primary question in this case is whether Maine's recently enacted law limiting contributions to political action committees (PACs) that make independent expenditures (often referred to as super PACs) is a constitutional means of preventing quid pro quo corruption or whether it runs afoul of the Court's First Amendment jurisprudence.

---

[1] The parties have consented to me presiding over this case.  *See* ECF Nos. 11, 44.

## I.  Background

In November 2024, a record number of Maine voters passed by ballot initiative "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act").  *See* ECF Nos. 45-10 to 45-11.  The Act restricts individuals and entities from contributing more than $5,000 per year to any given PAC "for the purpose of making independent expenditures" supporting or opposing a clearly identified candidate for local or state office.  21-A M.R.S.A. §§ 1015(2-C)-(2-D), 1019-B(1)(A)-(B).[2] The Act correspondingly prohibits PACs from using funds contributed in excess of the limit to make independent expenditures.  *See id.* § 1019-B(6).  And finally, the Act requires PACs to disclose "the total contributions from each contributor" to an independent expenditure.  *Id.* § 1019-B(4)(B).

Dinner Table Action and For Our Future are Maine PACs that make independent expenditures.  *See* Declaration of Alex Titcomb (ECF No. 16-1) ¶¶ 8, 10-11, 13.  Both PACs receive a substantial amount of their funding from contributions that exceed the new limit, and For Our Future regularly contributes amounts exceeding the limit to other PACs such as Dinner Table Action.  *See id.* ¶¶ 18-19, 25, 37, 45.  The Act will severely curtail the ability of both PACs to raise and spend money to communicate their election views through independent expenditures or donations to other PACs making independent expenditures.  *See id.* ¶¶ 35-36, 45.

---

[2] Citations to the Maine Revised Statutes Annotated are to the version available on Westlaw, which, as of the date of this order, was current through emergency legislation Chapter 433 of the 2025 First Regular and First Special Sessions of the 132nd Legislature of Maine.

In December 2024, Dinner Table Action and For Our Future—along with their founder Alex Titcomb—filed a complaint against the members of the Maine Commission on Governmental Ethics and Election Practices[3] and Maine Attorney General Aaron M. Frey in their official capacities asserting that the Act violates the First and Fourteenth Amendments. *See* Complaint (ECF No. 1). They seek a declaration that the Act is unconstitutional on its face and/or as applied to them as well as a permanent injunction barring enforcement of the Act. *See id.* at 16.

At a conference early in the case, the parties proposed an abbreviated briefing schedule on the Plaintiffs' anticipated motion for a permanent injunction. *See* ECF No. 12. The State Defendants agreed to delay enforcement of the Act, which went into effect on December 25, 2024, until May 30, 2025, to allow time to resolve the case. *See id.* After the Plaintiffs had filed their motion (ECF No. 16), I permitted the nonpartisan fair elections organization EqualCitizens, ballot initiative proponents Cara and Peter McCormick, and Maine State Senator Richard A. Bennett to intervene and defend the Act. *See* ECF No. 51. The parties ultimately agreed that an evidentiary hearing was unnecessary to resolve the Plaintiffs' motion and that the matter was ready for final judgment on the merits. I held oral argument on May 22, 2025, *see* ECF No. 68, at which time the State Defendants agreed to further delay enforcement of the Act through July 15, 2025, *see* ECF No. 69 at 94.

---

[3] Namely, Chair William J. Schneider and members David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn. *See* Complaint at 1.

## II. Discussion

### A. Contribution Limit

Because free debate of public issues and candidates is critical to our democratic system of governance, the First Amendment provides robust protections for political speech, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011), and "the financing and spending necessary to enable political speech," *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).

When evaluating the constitutionality of laws restraining political speech, the Supreme Court distinguishes between limits on political expenditures and limits on political contributions. *See Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976). Limits on expenditures must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," while limits on contributions will be upheld so long as they are closely drawn to further a sufficiently important state interest. *Id.* The only state interest important enough to outweigh the First Amendment's political speech protections is the state's interest in preventing quid pro quo corruption or its appearance. *Ted Cruz for Senate*, 596 U.S. at 305.

Applying this framework, the Supreme Court struck down a limit on independent expenditures in *Citizens United*, holding that such expenditures "do not give rise to corruption or the appearance of corruption." 558 U.S. at 357. The Court explained, "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid*

*pro quo* for improper commitments from the candidate." *Id.* (cleaned up); *see also Buckley*, 424 U.S. at 47 (noting that "independent advocacy" has a "substantially diminished potential for abuse"); *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 751 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate.  The candidate-funding circuit is broken.  The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." (cleaned up)).

The question in this case is whether the Supreme Court's decision in *Citizens United* forecloses a state's ability to limit contributions to political groups making independent expenditures.  Although this is an issue of first impression in the First Circuit, other courts have—as the Plaintiffs point out, *see* Motion at 10-11—been seemingly unanimous in holding that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to" independent expenditure groups.  *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *see Wisc. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537-38 (5th Cir. 2013) ("[E]very federal court that has

considered the implications of *Citizens United* on independent [expenditure] groups . . . has been in agreement: There is no difference in principle—at least where the only asserted state interest is in preventing apparent or actual corruption—between banning an [independent expenditure] organization . . . from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or giving funds to other organizations to allow them to engage in advocacy on its behalf)."); *Republican Party of N.M.*, 741 F.3d at 1103 ("[T]he question before us is whether political committees that are not formally affiliated with a political party or candidate may receive unlimited contributions for independent expenditures.  On this question the answer is yes. . . . The Supreme Court has held that independent expenditures do not invoke the anti-corruption rationale . . . ."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013) ("The Supreme Court held in *Citizens United v. FEC* that the government has no anti-corruption interest in limiting independent expenditures.  It follows that a donor to an independent expenditure committee . . . is even further removed from political candidates and may not be limited in his ability to contribute to such committees." (cleaned up)); *Alaska Pub. Offices Comm'n v. Patrick*, 494 P.3d 53, 58 (Alaska 2021) ("Given the Supreme Court's holding that preventing quid pro corruption and its appearance is the only legitimate governmental interest for campaign finance regulations and its holding that independent expenditures do not give rise to quid pro quo corruption or its appearance, there is no logical rationale for limiting contributions to independent expenditure groups."); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293

(4th Cir. 2008) (holding, prior to *Citizens United*, that "it is implausible that contributions to independent expenditure political committees are corrupting" and declaring unconstitutional a limit on such contributions (cleaned up)).

Notwithstanding the fact that "[f]ew contested legal questions" have been "answered so consistently by so many courts and judges," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, the Defendants maintain that these cases "were wrongly decided." State Defendants' Opposition (ECF No. 45) at 13; Intervenor Defendants' Opposition (ECF No. 53) at 5.  They insist that *Citizens United* is inapposite because it involved a limit on expenditures that was subject to more intense scrutiny than the limit on contributions at issue here.

The Defendants' primary argument is that the Act is constitutional because it is closely drawn to serve "Maine's interest in stopping quid pro quo corruption by preventing candidates from trading official acts for contributions to Super PACs aligned with their campaigns."  State Defendants' Opposition at 8.  They point to two criminal cases involving political "candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements." *Id.* at 9; ECF Nos. 45-6 to 45-8.  And they emphasize that just because "SuperPACs *make* 'independent expenditures' does not ensure that they *receive* independent contributions free from quid-pro-quo corruption."  Intervenor Defendants' Opposition at 5.

Even accepting that contributions to independent expenditure PACs can serve as the quid in a quid pro quo arrangement, however, I am not persuaded that the Defendants' arguments on this point can be squared with *Citizens United*.  I do not

read the Supreme Court as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is "substantially diminished" to the point that the government's "anticorruption interest is not sufficient to displace" First Amendment protections. *Citizens United*, 558 U.S. at 357 (cleaned up). Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still. That being the case, there "is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Alaska Pub. Offices Comm'n*, 494 P.3d at 58.

The Defendants also suggest that the Act is closely drawn to further Maine's interest in preventing the appearance of corruption. They contend that "the Maine electorate's overwhelming" approval of the Act supports the notion that the public perceives large contributions to independent expenditure PACs as corrupting. Intervenor Defendants' Opposition at 7; *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 394 (2000) ("[A]lthough majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied on here: An overwhelming 74 percent of the voters of Missouri determined that [campaign] contributions limits are necessary to combat corruption and the appearance thereof." (cleaned up)). They also provide the results of a survey that, according to them, shows "a clear majority" of citizens "believe that quid-pro-quo

corruption is likely to occur" when such contributions exceed $5,000. Intervenor Defendants' Opposition at 6-7; ECF No. 53-3.

Justice Stevens made similar points in *Citizens United* when dissenting from the majority's opinion striking down limits on corporate independent expenditures. He criticized the majority for ignoring the "significant evidence" that such expenditures were, at the very least, susceptible to the appearance of corruption and warned that the Court's holding would result in "cynicism and disenchantment" among voters and "and an increased perception that large spenders call the tune." *Citizens United*, 558 U.S. at 457, 470 (Stevens, J., dissenting) (cleaned up). The majority, however, was unmoved, saying,

> By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker.

*Id.* at 360 (cleaned up).

If the government's interest in combatting the appearance of corruption was not enough to justify limits on independent expenditures, it stands to reason that the same interest is not enough to justify limits on contributions to independent expenditures. Thus, even accepting the Defendants' assertions about public perception, their arguments on this point once again fail under the Supreme Court's reasoning in *Citizens United*.

Finally, the Defendants argue that the Act is constitutional because it is closely

drawn to further Maine's interest in preventing dependence corruption—that is, the risk that elected officials will become dependent on constituencies disconnected from the electorate.  *See* Intervenor Defendants' Opposition at 8-17.  They assert that the First Amendment, as it was originally understood by the Framers, allows for the regulation of dependence corruption in addition to quid pro quo corruption.  *See id.* I need not address this argument further or resolve the disagreements of the parties' competing constitutional historians because, as discussed, the Supreme Court has been clear that the only interest it recognizes as sufficient to justify limits on political speech is the government's interest in preventing quid pro quo corruption.  *See Ted Cruz for Senate*, 596 U.S. at 305. Even the Defendants acknowledge that I am bound to follow Supreme Court precedent on this point and admit that their argument is primarily intended to preserve the issue for subsequent levels of review. *See* Intervenor Defendants' Opposition at 9-10 n.3.

At bottom, I agree with other courts that, regardless of whether strict or intermediate scrutiny applies, *Citizens United* forecloses limits on contributions to independent expenditure groups.  *See, e.g.*, *SpeechNow.org*, 599 F.3d at 696 (holding that no "matter which standard of review governs contributions limits," contribution limits on independent expenditure groups "cannot stand" under *Citizens United*). The portions of the Act limiting contributions to PACs for the purposes of making independent expenditures—21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6)—violate the First Amendment on their face because there is no set of circumstances

where they could be applied constitutionally. *See Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168 (1st Cir. 2024).

That leaves the question of injunctive relief. Granting a permanent injunction requires a court "to find that (1) plaintiffs prevail on the merits, (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

The Plaintiffs readily satisfy each of these factors.[4] They are prevailing on the merits; the loss of their First Amendment freedoms absent an injunction would be an irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976); the harm the Plaintiffs would face in losing their First Amendment freedoms outweighs the harm the Defendants will suffer from an injunction where the Defendants have failed to demonstrate a compelling state interest in limiting those freedoms; and, finally, the public's interest is served—rather than harmed—by enforcing the First Amendment, *see P.R. Assoc. of Mayors v. Vélez-Martínez*, 480 F. Supp. 3d 377, 379 (D.P.R. 2020).

---

[4] The Defendants suggest in passing that the Plaintiffs "cannot possibly be entitled to an injunction" because they did not specifically address all four of these factors in their motion. Intervenor Defendants' Opposition at 4. Where this case has focused almost entirely on the merits of the underlying constitutional issue and the Plaintiffs' entitlement to a permanent injunction is readily apparent, I decline to find that they waived their request.

Accordingly, I will permanently enjoin enforcement of 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), which are the portions of the Act limiting contributions to PACs for the purpose of making independent expenditures.

### B. Disclosure Requirements

The Plaintiffs also challenge the Act's separate requirement that a "person, party committee, or [PAC] that makes any independent expenditure in excess of $250 during any one candidate's election" disclose "the total contributions from each contributor" regardless of the amount of the contribution. 21-A M.R.S.A. § 1019-B(4)(B). Because Maine law did not previously require the disclosure of PAC contributions less than $50, *see* 21-A M.R.S.A. § 1060(6), Dinner Table Action avers that multiple of its smaller dollar amount contributors have indicated that they will not contribute as they have done in the past if their identities will be publicly revealed. *See* Declaration of Alex Titcomb ¶¶ 27-29.

Although disclaimer "and disclosure requirements may burden the ability to speak" and associate, they "impose no ceiling on campaign-related activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366 (cleaned up). Accordingly, such requirements are not subject to strict scrutiny but instead "to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (cleaned up). In this context, the government's interest is not limited just to preventing quid pro quo corruption—rather, the Supreme Court has said that the government has an important interest "in provid[ing] the electorate with information

and insur[ing] that the voters are fully informed about the person or group who is speaking." *Id.* at 368 (cleaned up). Nevertheless, disclosure requirements must be narrowly tailored to this informational interest, which requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

Maine's "interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021).[5] That leaves the question of whether the Act's disclosure requirement is narrowly tailored to that interest.

On this point, the First Circuit's decision in *Gaspee Project* is instructive. The Rhode Island law at issue in that case required, among other things, that covered organizations disclose donors of over $1,000. *See id.* at 83. The First Circuit found that the law was "narrowly tailored enough to avoid any First Amendment infirmity" because it was limited to organizations that spent $1,000 or more on independent expenditures within one calendar year and "provide[d] off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution." *Id.* at 88-90. Those off-ramps included "choos[ing] to contribute less than $1,000" or taking advantage of the law's provision allowing donors "to opt out of their monies being used for independent expenditures." *Id.* at 89. "Taken together," the First

---

[5] The Defendants also argue that the disclosure requirement is sufficiently related to Maine's interest in preventing corruption. *See* State Defendants' Opposition at 18. But as discussed above, Maine's anticorruption interest is not sufficient to displace First Amendment protections in the context of independent expenditures. As such, I will focus on Maine's informational interest.

Circuit concluded, "these limitations on the [law's] reach only require disclosure of relatively large donors who choose to engage in election-related speech." *Id.*

The disclosure requirement here is not nearly so constrained. Although the Act is somewhat limited by the fact that it only requires disclosure of contributions to an independent expenditure if the expenditure exceeds $250, it has no explicit opt out provision for contributors who do not wish to fund independent expenditures, and, most importantly, it requires the disclosure of contributors who give even very small amounts of money. *Cf. Wy. Gun Owners v. Gray*, 83 F.4th 1224, 1249 (10th Cir. 2023) ("[T]he First Circuit's suggestion [in *Gaspee Project*] that wary donors should just contribute less than $1,000 strikes us as an unacceptable ask here, where the disclosure requirements trigger at a *$100* donation.").

Where the Act's disclosure requirement sweeps so broadly and provides no meaningful opportunity for anonymous contributions, it cannot be described as narrowly tailored to Maine's informational interest.[6] In such circumstances, the disclosure requirement is facially unconstitutional because it risks chilling contributors' rights to speak and associate, and that risk "is enough because First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found.*, 594 U.S. at 618-19 (cleaned up); *see id.* at 617-18 (concluding that a disclosure

---

[6] I offer no general opinion as to what constitutes a reasonable dollar amount threshold for disclosure requirements, only that, in the specific circumstances of this case, the zero dollar threshold is not narrowly tailored to further Maine's informational interest.

requirement that "indiscriminately swe[pt] up information" of donors who might wish to remain anonymous was "facially unconstitutional"). [7]

Accordingly, under the same permanent injunction analysis outlined above, I will enjoin enforcement of the portion of 21-A M.R.S.A. § 1019-B(4)(B) that requires an itemized account of "the total contributions from each contributor." (This quoted language is the language that the Act added to section 1019-B(4)(B)—the State Defendants remain free to enforce the remaining portions of the statute.)

## III. Conclusion

In summary, the Plaintiffs' motion (ECF No. 16) is **GRANTED**. "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" is declared unconstitutional on its face. As such, the State Defendants are permanently enjoined from enforcing 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), and the portion of 21-A M.R.S.A. § 1019-B(4)(B) requiring an itemized account of "the total contributions from each contributor." Judgment shall enter for the Plaintiffs.

**SO ORDERED**.

Dated: July 15, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

---

[7] In light of my conclusion that the Act violates the First Amendment, I need not address the Plaintiffs' alternative argument that it also violates the Fourteenth Amendment's Equal Protection Clause. *See* Motion at 12-15.